# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| _____ ) | CIVIL ACTION |
| LAJUAN MELTON,                                ) | NO.  1:05-CV-10905-GAO |
|     *Petitioner*                              ) |  |
|                                                        ) |  |
| v.                                                      ) |  |
|                                                        ) |  |
| LOIS RUSSO, et al.,                           ) |  |
|     *Respondents*                          ) |  |
| _____) |  |


**Petitioner's Memorandum of Law and Appendix**
**in Support of Petition for Writ of Habeas Corpus**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ........................................................................................1

PROCEDURAL HISTORY ............................................................................1

EVIDENCE AT AND AFTER TRIAL ...............................................................4

    I.     The prosecution ....................................................................4

    II.    The defense ...........................................................................8

          A.    *The defense at trial* ................................................ 8

          B.    *The defendant's motion for new trial* ................................ 10

COUNSEL'S CLOSING ARGUMENT AND THE TRIAL JUDGE'S INSTRUCTIONS..12

    I.     Counsel's argument ................................................................12

    II.    The judge's instructions ..........................................................14

THE MASSACHUSETTS STATE COURTS' RESPONSE TO THE SIXTH
AMENDMENT CLAIM...................................................................................23

    I.     The Superior Court, in ruling on the motion for new trial ...23

    II.    Appeals Court ......................................................................25

    III.   Supreme Judicial Court............................................................26

ARGUMENT ...........................................................................................28

    I.     Mr. Melton is entitled to de novo review of his Sixth
          Amendment claim. ................................................................28

    II.    The faulty jury instructions, by undermining Mr. Melton's
          closing argument, violated the Sixth Amendment. ................29

          A.    *The faulty jury instructions, by contradicting counsel's*
              *theory of defense, transformed counsel's argument into a*
              *constitutionally ineffective one, under* Strickland v.
              Washington. ................................................................ 29

          B.    *Had the judge announced his intention to mis-instruct on*
               *self-defense and related theories, counsel's decision to argue*
              *those theories would have breached prevailing professional*
               *norms.* ................................................................ 32

          C.    *But for the judge's demolition of counsel's closing*
               *argument, there is a reasonable probability that the result*
               *would have been different.* ................................................ 33

    III.   The writ must issue, under either *Brecht* or *Strickland*...........39

CONCLUSION ...........................................................................................40

APPENDIX ..............................................................................................43

- ii -

## TABLE OF AUTHORITIES

### Cases

*Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) ................................................................................................ 28, 39, 40

*Clay v. United States*, 537 U.S. 522, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003) ..... 4

*Commonwealth v. Boucher*, 403 Mass. 659 (1989) ...................................... 12, 19

*Commonwealth v. Cabral*, 443 Mass. 171 (2005) ........................................ 12, 24

*Commonwealth v. Cutty*, 47 Mass. App. Ct. 671 (1999) .................................... 31

*Commonwealth v. Roberts*, 433 Mass. 45 (2000) ................................................ 26

*Commonwealth v. Rodriguez*, 370 Mass. 684 (1976) .......................................... 12

*Commonwealth v. Sarvela*, 16 Mass. App. Ct. 934 (1983) ................................. 33

*Commonwealth v. Sires*, 413 Mass. 292 (1992) .................................................. 22

*Commonwealth v. Street*, 388 Mass. 281 (1983) ................................................. 33

*Commonwealth v. Triplett*, 398 Mass. 561 (1986) ............................................. 32

*Commonwealth v. Walker*, 443 Mass. 213 (2005) .............................................. 27

*Commonwealth v. Westmoreland*, 388 Mass. 269 (1983) ................................... 32

*Derman v. United States*, 298 F.3d 34 (1st Cir.), cert. denied, 537 U.S. 1048, 123 S.Ct. 636 , 154 L.Ed.2d 522 ....................................................................... 4

*Fortini v. Murphy*, 257 F.3d 39 (1st Cir. 2001), cert. denied, 535 U.S. 1018, 122 S.Ct. 1609, 152 L.Ed.2d 623 (2002) ........................................................ 28

*Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) ................................................................................................ 25, 29, 30

*Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) ................................................................................................ 28

*People v. Clark*, 453 Mich. 572 (1996) ............................................................... 37

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ................................................................................................ passim

*United States v. Andrade*, 135 F.3d 104 (1st Cir. 1998) .................................... 38

*United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) ................................................................................................ 30, 40

*United States v. Dominguez Benitez*, 542 U.S. 74, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) ...................................................................................... 40

*United States v. Gaskins*, 849 F.2d 454 (9th Cir. 1988) .................................... 37

*United States v. Harvill*, 501 F.2d 295 (9th Cir. 1974) ............................... 36, 37

*United States v. Mendoza*, 473 F.2d 697 (5th Cir. 1973) ................................... 37

*United States v. Owens*, 167 F.3d 739 (1st Cir.), cert. denied, 528 U.S. 894, 120 S.Ct. 224, 145 L.Ed.2d 188 (1999) ......................................................... 38

*United States v. Porter*, 764 F.2d 1 (1st Cir. 1984) ........................................... 38

- iv -

*United States v. Thurston*, 358 F.3d 51 (1st Cir. 2004), cert. granted and judgment vacated on other grounds, __ U.S.__, 125 S.Ct. 984, 160 L.Ed.2d 988 (2005).............................................................. 38

*Waters v. Thomas*, 46 F.3d 1506, 1521 (11th Cir.), cert. denied, 516 U.S. 856, 116 S.Ct. 160, 133 L.Ed.2d 103 (1995) ......................................... 35

### Constitutional Provisions

United States Constitution, Fourteenth Amendment................................. 29

United States Constitution, Sixth Amendment .................................... passim

### Statutes

28 U.S.C. § 2101 ....................................................................... 4

28 U.S.C. § 2244 ....................................................................... 4

28 U.S.C. § 2254 ..................................................................... 28

### Other Authority

[Massachusetts] Model Jury Instructions on Homicide (1999) ............ 12, 21

- 1 -

## INTRODUCTION

At his murder trial, Petitioner Lajuan Melton contended that he had acted in self-defense (requiring acquittal), or at least that he had acted with excessive force in self-defense (requiring mitigation of murder to voluntary manslaughter).  The trial judge promised to instruct on those theories, and defense counsel argued accordingly.

When the judge's instructions came, they mangled the relationship among self-defense and the use of excessive force therein, murder, and manslaughter. At a motion for new trial and in the Massachusetts appellate courts, Mr. Melton argued that the incorrect instructions required reversal, but not simply because jurors might have misunderstood the law.  Rather, by contradicting the theory of defense set out in closing argument, the instructions violated Mr. Melton's Sixth Amendment right to present that argument. The state courts ignored this federal claim, which Mr. Melton raises again in the instant habeas petition.

## PROCEDURAL HISTORY

On May 22, 1998, the Plymouth County, Massachusetts, grand jury returned an indictment charging Mr. Melton with murder.[1]  Trial in the

---

[1] See the indictment, reproduced in the Appendix ("App."), below, at App.1; see also Superior Court docket sheets, below, at App.2-10.

- 2 -

Plymouth County Superior Court took place before a jury (Connolly, J., presiding) on September 27 through 30, 1999.  On the final date, the jury rendered its verdict:  guilty of second-degree murder.  The judge imposed the statutorily required life sentence, to run (contrary to the defendant's request) from and after a ten-year sentence previously imposed in an unrelated case.

On October 5, 1999, Mr. Melton timely noted his appeal.  The case was entered in the Massachusetts Appeals Court on March 1, 2001, and Mr. Melton filed his opening brief.[2]  Later, the Appeals Court stayed the appeal while Mr. Melton moved in the Superior Court for a new trial or reduction in the verdict on the basis of, *inter alia*, the Sixth Amendment violation and newly-discovered evidence.[3]  On June 14, 2002, without convening an evidentiary hearing, the Superior Court denied the motion.[4]  On June 17, 2002, Mr. Melton timely noted his appeal.[5]  On June 21, 2002, the Appeals Court consolidated the appeal from the denial of the motion

_____

[2] See App.11-13 (Appeals Court docket sheets).

[3] See App.63-68 (motion for new trial, filed Aug. 13, 2001); App.69-70 (amendment to motion for new trial, filed Oct. 17, 2001); App.71-74 (excerpt from transcript of oral argument on motion for new trial ("MNT.Tr.") at MNT.Tr.87-90, raising constitutional argument).

[4] App.8-9 (Superior Court docket sheets); App.75-89 (judge's memorandum of decision); App.90 (denial, in margin, of amendment to new trial motion); App.91-92 (judge's second memorandum of decision).

[5] App.8 (Superior Court docket sheet, P#76).

- 3 -

for new trial or reduction in verdict with Mr. Melton's direct appeal,[6] and Mr. Melton filed a supplemental brief.[7] On November 6, 2003, the Appeals Court affirmed the conviction in an unpublished decision.[8]

On December 1, 2003, Mr. Melton applied to the Supreme Judicial Court (SJC) for further appellate review.[9] Before deciding the application, the SJC took the unusual step of asking defense counsel to submit copies of the Appeals Court briefs and the trial transcript; counsel did so.[10] Nevertheless, on January 29, 2004, the SJC denied the application.[11] Later, on December 20, 2004, Mr. Melton requested reconsideration[12] on the ground that the SJC was at that time considering an unrelated case with a Sixth Amendment claim identical to his. On February 2, 2005, reconsideration was denied.[13]

The ninety-day period for seeking review in the United States Supreme Court began to run, at the earliest, on January 29, 2004, when the

---

[6] App.12 (Appeals Court docket sheet, order of June 21, 2002).
[7] App.13 (Appeals Court docket sheet, P#27).
[8] App.13 (Appeals Court docket sheet, P#41); App.104-112 (Appeals Court's unpublished memorandum and order).
[9] App.14 (SJC docket entries).
[10] App.14 (SJC docket sheet, P#2).
[11] App.14 (SJC docket sheet, P#3).
[12] App.14 (SJC docket sheet, P#5).
[13] App.14 (SJC docket sheet, P#6).

- 4 -

SJC initially denied Mr. Melton's application for further review.[14]  When,

on April 28, 2004, that period expired, the one-year AEDPA[15] period for

filing a petition for a writ of habeas corpus began to run.[16]  That period

expired on April 28, 2005, one day after Mr. Melton filed this petition.

Mr. Melton is now serving the life sentence imposed in this case at

the Souza Baranowski Correctional Center in Shirley, Massachusetts.[17]

### EVIDENCE AT AND AFTER TRIAL

I.     The prosecution

On the evening of March 31, 1998, in Brockton, Massachusetts,

Claudio Miranda drove a black Honda Civic south on Warren Street,

passing Bud's Variety.[18]  Alexander Colon was the front-seat passenger;

---

[14] See 28 U.S.C. § 2101(d) ("The time for appeal or application for a writ of certiorari to review the judgment of a State court in a criminal case shall be  as prescribed by rules of the Supreme Court"); S.Ct. R. 13(1) (setting ninety-day deadline).

[15] Antiterrorism and Effective Death Penalty Act of 1996.

[16] See *Clay v. United States*, 537 U.S. 522, 528, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003) (one-year limitations period set out in 28 U.S.C. § 2244(d)(1)(A) for filing of state prisoners' habeas petitions does not begin to run until "expiration of the time for seeking [direct] review" in the United States Supreme Court), citing, at 528 n.3, *Derman v. United States*, 298 F.3d 34, 40-1 (1st Cir.), cert. denied, 537 U.S. 1048, 123 S.Ct. 636 , 154 L.Ed.2d 522 (2002)).

[17] Mr. Melton's location is available at www.vinelink.com (last viewed July 21, 2005).

[18] See generally testimony of Claudio Miranda, transcript of trial, vol. II (Sept. 27, 1999), at 135-157; Exhibit 20 (transcript of defendant's

Edson Miranda may also have been in the car.[19]  Several minutes later, Claudio turned around and drove north up Warren, again passing Bud's. Shots were fired; one bullet hit and killed Mr. Colon.[20] The prosecution alleged that it was Mr. Melton and Donald Averett, standing in front of a Warren Street house near Bud's, who had fired into the car.  The jury convicted Mr. Melton of second-degree murder as a joint venturer. [21]

The only evidence of Mr. Melton's involvement came from his two statements to police:  an officer testified about the contents of the first, and jurors heard a tape-recording and were given a transcript of the second. (The defense sought unsuccessfully to have the statements excluded as obtained in violation of *Miranda*.[22])   In those statements, Mr. Melton acknowledged that he and Mr. Averett had been standing in front of a

---

tape-recorded statement (his second of two statements), introduced at trial transcript, vol. III (Sept. 28, 1999), p. 128.

In future citations, "T2" will refer to volume two of the trial transcript; "T3," to volume three (recording the proceedings of September 28, 1999); "T4," to volume four (Sept. 29, 1999); "T5," to volume five (Sept. 30, 1999); and "MNT.Tr." to the transcript of the nonevidentiary hearing on Mr. Melton's new-trial motion (Feb. 4, 2002).

[19]  See, e.g., T2:135-136 (Claudio Miranda's testimony:  he was driving, Colon was in front passenger seat).  See Exhibit 20 (Mr. Melton's statement) at 4 (Mr. Melton's companion Donald Averett told Mr. Melton that "Edson" was "hanging out the window").

[20]  T3:97, 104 (testimony of forensic pathologist for Office of Chief Medical Examiner).

[21]  T5:23.

[22]  App.3 (Superior Court docket entries, P#5a); see also discussion

- 6 -

Warren Street house.[23]   They saw the Honda pass by, with Claudio driving.[24]  When the car drove by a second time, Mr. Averett began firing his .380 caliber handgun, shattering the car's back window.[25]  Mr. Melton then fired his .9 mm handgun twice.[26]  The car had at that point already turned a corner off of Warren Avenue, and Mr. Melton did not think he hit anything.[27]  (He speculated that he had hit a building,[28] but police found no evidence of this.[29])  Mr. Melton and Mr. Averett left, hid their guns, and eventually gave them to other people.[30]  The weapons did not come into evidence at trial.

Ballistics evidence failed to connect Mr. Melton with the shooting. Police recovered and analyzed the lead core of the lethal bullet removed from Mr. Colon's body; four discharged cartridge casings found several days later outside the Warren Street house; a ".38-caliber class jacketed spent projectile" lodged above the Honda's driver's seat; and, lodged in

---

in Appeals Court's memorandum of decision, below, at App.108-109.

[23] See Exhibit 20 (transcript of Mr. Melton's second, tape-recorded statement), at 3; T3:25 (Sgt. Joseph Mason's testimony about Mr. Melton's initial statement (not tape-recorded)).

[24] Exhibit 20 at 3-4.

[25] Exhibit 20 at 5, 6, 23.

[26] Exhibit 20 at 5, 23; T3:27-28.

[27] Exhibit 20 at 23; T3:27-28.

[28] Exhibit 20 at 23; T3:143-144.

[29] T3:129-130, 145.

[30] Exhibit 20 at 9-13, 17.

- 7 -

the right side of the driver's seat, the spent jacket portion of a bullet.[31]  The

prosecution's ballistics expert testified that all four of the casings had been

ejected from the same unknown weapon, and that all of the ballistics

evidence (both casings and projectiles) had come from a ".380 auto caliber

semi-automatic pistol."[32]   They could *not* have come from a .9 mm

handgun like the one Mr. Melton was allegedly carrying.[33]

Jurors apparently agreed that Mr. Melton had not personally shot

Mr. Colon, as they convicted Mr. Melton as a joint venturer.

Mr. Averett was tried later and acquitted.[34]  Unlike Mr. Melton's

statements to police, Mr. Averett's were suppressed, and a prosecution

witness who had not testified at Mr. Melton's trial gave Mr. Averett's jury

contradictory accounts of what she had supposedly seen.[35]

---

[31] See Exh.15B (lead projectile recovered from victim), introduced at T3:111, discussed at T3:165-166; Exhs.16A-D (casings from front of house), introduced at T3:113, discussed at T3:165-180; Exh.21 (spent jacket portion of bullet recovered from driver's seat), introduced at T3:160; Exh.22 (".38 caliber class jacketed spent projectile" recovered from "headliner"), introduced at T3:164.

[32] T3:170.

[33] T3:180.

[34] Mr. Averett's case is docketed as PLCR 1998-01503; Patrick Brady, J., presided at trial.  Mr. Averett was acquitted on October 8, 1999.  On Mr. Averett's acquittal, see, e.g., M. Boyle, "Silence Stymies Probe of Slaying," The Enterprise, April 25, 2002 (avail. at http://enterprise.southofboston.com/articles/2002/04/25/news/export4075.txt (last visited July 22, 2005)).

[35] Conversation of March 18, 2004, between undersigned counsel

- 8 -

II.     <u>The defense</u>

     A.     *The defense at trial*

At trial, Mr. Melton (who put on no evidence) sought to create reasonable doubt (1) about whether the Commonwealth had proven lack of self-defense, or, failing that, had proven excessive force in self-defense; or, alternatively, (2) about whether he and Mr. Averett -- who had most likely fired the fatal shot -- had had a prior agreement to fire their guns, as required for a joint-venture conviction

In support of the self-defense claim was the following:

Mr. Averett and Mr. Melton were aware that earlier that day, Claudio and Edson had "shot up" a car at the Progresso Market.[36]  Mr. Melton also knew that Edson had a problem with him, because Mr. Melton was then dating, and had had a child with, Edson's ex-girlfriend, whom Edson might have "wanted ... back."[37]  In the past, Edson had "pulled a gun on him."[38]  Claudio also had a problem with Mr. Melton.[39]

---

and William F. Sullivan, Esq., trial counsel for Mr. Averett.  See also M. Boyle, *supra* note 34.

    [36] Exhibit 20 at 17-18.

    [37] Exhibit 20 at 5.

    [38] T3:31 (testimony of Sgt. Mason about Mr. Melton's first statement).

    [39] T3:27 (testimony of Sgt. Mason about Mr. Melton's first statement).

- 9 -

When Claudio turned around and headed back up Warren Street, jurors could infer that he had done so for a reason:  to seek out Mr. Melton and Mr. Averett.  As the car passed the second time, Mr. Averett thought he saw Edson Miranda inside,[40] and Mr. Melton saw Edson "sticking his head out the window," "looking at [Mr. Melton]"[41] (i.e., not riding peaceably by in the backseat).  Although Mr. Melton did not see Edson or Claudio's guns as the car drove by,[42] he knew that they carried .44 and .45 caliber firearms.[43]  He believed they were going to start shooting.[44]

In support of the self-defense theory, counsel also pointed out improbabilities in the testimony of the prosecution's only percipient witness, Claudio Miranda.  According to Claudio, he was driving through Brockton with no goal in mind, chauffeuring in the back seat two men whom he had never before met.[45]  He did not see Mr. Melton or Mr. Averett when he passed them, twice; he heard gunshots but saw nothing

---

[40] Exhibit 20 at 4.

[41]  T3:26-27 (testimony Sgt. Mason about Mr. Melton's first statement), 31-32.

[42] T3:27 (testimony of Sgt. Mason about first statement).

[43] Exhibit 20 at 22.

[44]  T3:64 (testimony of Tpr. L'Italien concerning his grand jury testimony).

[45]  T2:150, 151, 156, 157. Claudio claimed that Edson was not in the car.  T2:150.

and no one outside the car.[46]    (One of his anonymous companions apparently did:  at the hospital, the companion yelled, "Man, you can't die, you can't die, .... I'm going to get those niggers."[47])   He dropped off Mr. Colon at the hospital without even leaving his car because he thought Mr. Colon -- who had been shot in the back -- "was all right."[48]   He denied having ever had a problem with Mr. Melton and claimed to have been unaware that Mr. Melton was dating his former girlfriend.[49]   Although he testified in court wearing a T-shirt bearing the initials "N.S.," he was not a member of the local, criminally-inclined group, the "North Side Stars."[50] (A police witness had confirmed that such a group existed.[51]) When police first asked him about the shooting, he lied about what had happened.[52]

Jurors could have wondered, in sum, if Claudio Miranda and his passengers' involvement in the shooting had been other than innocent.

B.       *The defendant's motion for new trial*

Edson Miranda did not testify at the trial.  In his motion for new trial or reduction in verdict, Mr. Melton presented evidence that Edson

---

[46] T2:138-140.
[47] T2:166 (testimony of paramedic).
[48] T2:142.
[49] T2:147-148.
[50] T2:149; T4:51 (counsel's description of Claudio's shirt).
[51] T3:140-141.

had, after the trial, confessed to a cellmate that it was he who had shot Mr. Colon: specifically, he had accidentally fired his gun into Mr. Colon from the backseat of Claudio's car.[53]  Postconviction counsel argued that this evidence supported Mr. Melton's self-defense claim, in that it tended to show that at least one occupant of Claudio's car -- Edson, who was "sticking his head out the window" -- was armed.[54]

The trial judge declined to convene an evidentiary hearing and denied the new-trial motion:  he found that the Edson's cellmate's claim was not credible;[55] he ruled that the claim did not count as "newly discovered" evidence under Massachusetts law;[56] and he ruled it inadmissible under the "against penal interest" exception to the rule barring hearsay.[57]

---

[52] T2:144, 152.

[53]  App.69-70 (defendant's amendment to new trial motion), 85 (judge's discussion of proffered evidence).

[54] App.70 (defendant's amendment to new trial motion).

[55] App.85 (judge's memorandum of decision).

[56] App.86 (judge's memorandum of decision).

[57] App.87-88 (judge's memorandum of decision).

COUNSEL'S CLOSING ARGUMENT AND THE TRIAL JUDGE'S INSTRUCTIONS

I.    Counsel's argument

In his closing argument, counsel adopted two alternative defenses. The first[58] was that because there was no prior agreement between Mr. Averett and Mr. Melton, Mr. Melton could not have been a joint venturer in Mr. Averett's offense.

Second,[59] counsel argued that jurors could have a reasonable doubt whether the government had proven either the absence of self-defense or the use of excessive force in self-defense.  Under Massachusetts law, failure to disprove self-defense would require acquittal,[60] and failure to disprove self-defense while also proving the use of excessive force in self-defense would mitigate a murder verdict to voluntary manslaughter.[61]

_____

[58] App.18-21 (transcript of counsel's closing).

[59]    App.21-26 (transcript of counsel's closing argument on self-defense).

[60] *Commonwealth v. Rodriguez*, 370 Mass. 684, 687-688 (1976); rule reaffirmed in, e.g., *Commonwealth v. Cabral*, 443 Mass. 171, 178 n15, 179 (2005).  See also (Massachusetts) Model Jury Instructions on Homicide (1999) at 55 ("Self Defense").

[61] See Model Jury Instructions on Homicide (1999) at 33 ("Voluntary Manslaughter:  Excessive Force in Self Defense":  "If the Commonwealth proves beyond a reasonable doubt that the defendant used excessive force in defense of himself ... which caused the death of the deceased ... , then you should return a verdict of guilty of voluntary manslaughter" (citations omitted)); *Commonwealth v. Boucher*, 403 Mass. 659, 663-664 (1989) ("...if the

Occupying approximately five of the ten transcript pages of counsel's argument, self-defense was a significant theme.

In arguing self-defense, counsel made several points.  First, jurors could infer that, as required in order to justify the use of deadly force in self-defense, Mr. Melton had reason to be afraid for his life, and that he actually was afraid.  Counsel pointed to the evidence discussed above: e.g., Edson and Claudio Miranda's pre-existing hostility toward Mr. Melton; Mr. Melton's knowledge of Edson and Claudio's armed, violent activities earlier that day; and Edson's "sticking his head out the window," "looking at [Mr. Melton]."  Further, counsel questioned the plausibility of Claudio's testimony that his twice driving by Mr. Melton and Mr. Averett was merely an unfortunate coincidence.

Second, jurors could infer that retreat was not a live option.  Mr. Melton might reasonably have believed that when the car passed a second time, with (he believed) guns about to fire, turning his back and running would have had a lethal result.

---

defendant was privileged to use force to defend himself [a question on which the Commonwealth has the burden of proof (see discussion above, at note 61)] but the Commonwealth proved beyond a reasonable doubt that the defendant used excessive force, the defendant would be guilty only of manslaughter, not murder").

- 14 -

Third, counsel told jurors that they would have to decide whether Mr. Melton reacted with a proper degree of force.  They might believe that shooting back at Claudio's car was reasonable, or they might believe it was excessive.   Counsel was preparing jurors for the anticipated instruction:  use of a reasonable degree of force in self-defense would require acquittal, and use of excessive force would mitigate murder to manslaughter.[62]

II.    The judge's instructions

After conferring with counsel, the judge promised to instruct on self-defense and on voluntary manslaughter on a theory of the use of excessive force in self defense.[63]  What the judge actually gave, however, was a mélange of correct and incorrect instructions on the relationship between those theories.  Jurors following the incorrect instructions would not have understood that self-defense required acquittal, would not have understood that excessive force in self-defense mitigated murder to voluntary manslaughter, and would have believed that in order to convict

---

[62] This language, used throughout this memorandum, is shorthand for the more accurate formulation:  the Commonwealth's failure to prove the absence of reasonable force in self-defense would require acquittal; and the Commonwealth's failure to prove the absence of self-defense, but its successful proof of the use of excessive force in self-defense, requires mitigation of murder to voluntary manslaughter.

- 15 -

of the lesser-included offense of voluntary manslaughter, they had to find

that Mr. Melton had committed an intentional battery.

For completeness, the judge's instructions on self-defense, use of

excessive force in self-defense, and voluntary manslaughter are

reproduced below, at App.31-63.

The judge began correctly, instructing that in order to return a

verdict of first-degree, premeditated murder, the Commonwealth bore the

burden of proving, beyond a reasonable doubt, the absence of self defense:

> An unlawful killing is a killing done without excuse. <u>A killing may be excused, for example, in the case of self-defense</u>. The evidence in this case does raise an issue for you to decide as to whether this killing was excused as a result of the defendant's acts of self-defense. ....
>
> <u>The Commonwealth must prove to you beyond a reasonable doubt that the killing was not the result of the defendant's acts of self-defense. The defendant does not bear the burden of proving the excuse. Failure of the Commonwealth to prove beyond a reasonable doubt that the killing was not in self-defense requires you to return a verdict of not guilty</u>. I will instruct you later in more detail concerning the law of self-defense.[64]

The subsequent instructions on first-degree murder on the theory of

extreme atrocity and cruelty referred to the above, correct explanation.[65]

_____

[63] T4:27-29, 31-37, 42-43, 44.

[64] App.32-33 (emphasis added).

[65] T4:94.

- 16 -

Next, however, in an attempt to explain the "mitigating factor" of "excessive use of self-defense," the judge mistakenly referred to "self-defense," unqualified. Jurors now heard that, to the contrary of the initial instruction, above, self-defense only mitigated murder to manslaughter:

> In order to prove the defendant guilty of -- acted with malice, rather, the Commonwealth must prove beyond a reasonable doubt the absence of certain mitigating circumstances. Mitigating circumstances are circumstances which lessen the defendant's culpability for an act. Both the crimes of murder and voluntary manslaughter require the proof of an unlawful killing.

> Manslaughter, if the killing occurred under mitigating -- strike -- I'm going to have to repeat that sentence, folks. Mitigating circumstances are circumstances which lessen a defendant's culpability for an act. Both the crimes of murder and voluntary manslaughter require proof of an unlawful killing, but the crime of murder will be reduced to the crime of voluntary manslaughter if the killing occurred under mitigating circumstances that satisf[y] you that the defendant did not act with malice.

> In order to prove a conviction of murder, the Commonwealth must prove beyond a reasonable doubt the absence of those mitigating circumstances. Based on the evidence of this case the mitigating circumstances that you must consider are: (1) heat of passion upon reasonable provocation; (2) sudden combat; (3) excessive use of force in self-defense.

> Let me explain these mitigating circumstances.

> [An explanation of "heat of passion" and "sudden combat" followed.]

> Use of excessive force in self-defense. <u>If the Commonwealth has not proved beyond a reasonable doubt the absence of self-defense, the Commonwealth has not proven malice.</u>[66]

The final statement, of course, has nothing to do with excessive force in self-defense. Rather, it refers to "self-defense," which, correctly explained, precludes not only a finding of malice but also a guilty verdict.

The judge made the same mistake in the following paragraph, in which he characterized "self-defense," without qualification, as a mitigating factor reducing murder to manslaughter.

> In summary there [sic], in order to prove murder, the <u>defendant</u> (sic[67]) is required to prove beyond a reasonable doubt that the defendant committed an unlawful killing with malice. <u>If, after your consideration of all the evidence, you find the defendant (sic) has proven beyond a reasonable doubt the elements of murder, except that you find the Commonwealth has not proven beyond a reasonable doubt the absence</u> of heat of passion, sudden combat, or <u>self defense, you must find the defendant guilty of murder, and you would be - - excuse me -- you must find the defendant not guilty of murder, and you would be justified in finding the defendant guilty of voluntary manslaughter.</u>[68]

Again, this misstated the law: failure to prove the absence of self-defense requires acquittal. (The judge's repeated, erroneous, uncorrected references in this paragraph to the "defendant's" burden of proof, and his

---

[66] App.41-44 (emphasis added).
[67] Notations of "sic," in parentheses, were added by the court reporter; bracketed notations were added by undersigned counsel.

quickly corrected statement that absence of self-defense required a conviction of murder, added to the confusion.)  Further, the instruction failed to give jurors the option of mitigating murder to manslaughter if the Commonwealth proved excessive force.

Later, following instructions on joint venture, the judge returned to self-defense.  This time, the instructions were correct in a sense, but highly misleading in a case involving the mitigation of murder to voluntary manslaughter.  They properly explained that in order to convict the defendant of murder, the Commonwealth was required to prove, beyond a reasonable doubt, the absence of any of the three requirements of self-defense.  One of those requirements is that the defendant use only the amount of force that was reasonably necessary in the circumstances.  If the Commonwealth proves that the defendant used unreasonable force, then the defendant is no longer entitled to an acquittal.  In a case like this, however, *he  may still be entitled to a reduction to voluntary manslaughter*.  The judge's instructions did not make this clear, directing jurors instead that if the defendant acted with excessive force, to convict him of murder:

> Now I'm going to charge you a little bit more on the issue of self-defense, ladies and gentlemen.

---

[68] App.44 (emphasis added)

.... The Commonwealth may show the defendant did not act in self-defense by proving beyond a reasonable doubt that any one or more of these three requirements of self-defense were absent in this case -- those three requirements are: ... ( 3 ) <u>for the defendant to have acted in self-defense he must have used no more force than was reasonably necessary in the circumstances to defend himself</u> .....

A person may not use more force than is reasonably necessary in self-defense. In the eyes of the law <u>a person who uses what is clearly excessive and unreasonable force has himself become an aggressor, and loses the right to self-defense</u>. [69]

This error is exactly that recognized in *Commonwealth v. Boucher*, where "The judge's charge [incorrectly] made it appear that, if the defendant was privileged to use some force in self-defense but used excessive force, the issue of self-defense would drop out of the case and any killing in such a situation would be murder and not manslaughter."[70]

Realizing that he needed to leave open the option of manslaughter-by-excessive-force, the judge attempted to clarify:

This is -- this is not -- <u>this is not to pertain, folks, to the charge I gave you that </u>if they -- <u>if the defendant used excessive force it is reduced to a second degree murder, that instruction still remains in effect.</u> [71]

The clarification was unhelpful:  first, it mistakenly stated that excessive force reduced first-degree murder to second-degree murder; second --

---

[69] App.50-54 (emphasis added).
[70] *Boucher*, 403 Mass. at 663-664 (footnote omitted).

- 20 -

even ignoring the first error -- it gave jurors no way to choose what to do with a finding of excessive force:  i.e., did excessive force deprive the defendant of *any* right to self-defense (requiring a murder verdict), or did excessive force reduce the defendant's culpability from murder to voluntary manslaughter?

The judge then returned to the principle, misleading in this context, that excessive force deprives a person of any right to self-defense:

> [In determining whether the defendant acted with self-defense,] [y]ou are allowed to take into account that a person must decide quickly and under pressure in situations, <u>but a defendant would lose his right to self-defense if he used a level of force that was unreasonable and clearly excessive in the circumstances.</u> .... [72]

The result of these instructions (the mistaken claims that "self-defense," rather than "excessive force in self-defense," reduced murder to manslaughter; and that if the defendant acted with "excessive force," he lost his right to self defense and, inferably, should be convicted of murder) was at best to confuse jurors, and at worst to prohibit them from returning a verdict of voluntary manslaughter.

To make things worse, when the judge later turned to the offense of voluntary manslaughter, he gave a misleading definition.

---

[71] App.54 (emphasis added).
[72] App.54-55 (emphasis added).

Voluntary manslaughter.   Voluntary manslaughter includes the intentional unlawful killing of the deceased by the defendant.  <u>In order to prove this crime, the Commonwealth must prove beyond a reasonable doubt the following elements: that the defendant intentionally inflicted an injury or injuries likely to cause death upon the deceased which caused his death, and that the defendant acted unlawfully</u>. An unlawful killing is a killing done without excuse. I have previously defined that for you. Not all killings are unlawful. Killings may be excusable, for example, in the case of self-defense. If the Commonwealth has proved each of these elements beyond a reasonable doubt you should return a verdict of voluntary manslaughter. <u>If the Commonwealth fails to prove each -- each one of these elements beyond a reasonable doubt, you may not convict the defendant of voluntary manslaughter.</u> [73]

As a stand-alone definition of "voluntary manslaughter," the "intentional injury" formulation was correct.  In the context of this case, however, it was misleading.  The judge gave jurors the option, if they returned verdicts of first-degree murder by extreme atrocity and cruelty or second-degree murder, to do so based on findings of so-called "third-prong" malice, in which the defendant does not intend to injure the victim but rather does something that, in the "circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow."[74]

---

[73] App.46-47 (emphasis added).

[74] Model Jury Instructions on Homicide (1999) (jurors may conclude that a defendant acted with malice, under the "third-prong" definition thereof, if they find he intended "to do an act, which, in the circumstances

- 22 -

The "intentional injury" formulation ruled out mitigation of murder to manslaughter for jurors who believed that the defendant had acted in those (third-prong-malice) circumstances.

The instructions just discussed were the only guidance jurors received on the relationship among self-defense, excessive force, murder, and voluntary manslaughter.  Instructions the next day, in response to a jury question, discussed only the difference between first- and second-degree murder and the definition of "deliberate premeditation"; jurors' written instruction sheet dealt only with those topics, omitting, apparently, any discussion of the relationship between murder and manslaughter.[75]

In sum, we are left with instructions that contradicted the defendant's closing argument.  Counsel urged jurors to find that Mr. Melton had acted in self-defense, and suggested they might also find his conduct had been "excessive."  This was clearly aimed at eliciting verdicts of acquittal or voluntary manslaughter.  The judge responded with

---

known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow"); *Commonwealth v. Sires*, 413 Mass. 292, 294 (1992) (discussing "the third definition of malice (sometimes called the third prong of malice), which involves knowledge of such circumstances that, according to common experience, there is a plain and strong likelihood that death will follow the contemplated act").

The judge's "third-prong malice" instructions appear at T4:95-6, 99.

instructions that sometimes correctly stated that self-defense required acquittal, but other times incorrectly contended that self-defense reduced murder to manslaughter; with instructions that excessive force in self-defense warranted a murder verdict; and with an instruction that voluntary manslaughter required jurors to find an intentional injury, ruling out voluntary manslaughter if jurors believed Mr. Melton had acted with what (absent self-defense) would have been third-prong malice.

### The Massachusetts State Courts' Response to the Sixth Amendment Claim

I.     <u>The Superior Court, in ruling on the motion for new trial</u>

At a nonevidentiary hearing on his motion for new trial (brought pursuant to Mass. R. Crim. P. 30(b)) and to reduce the verdict (pursuant to Mass. R. Crim. P. 25(b)), Mr. Melton's postconviction counsel drew the trial judge's attention to one of three misstatements in his jury instructions concerning the Massachusetts law of self-defense. Specifically, the judge had incorrectly told jurors that the Commonwealth's failure to disprove self-defense, combined with proof of excessive force in self-defense, would reduce a verdict from first- to second-degree murder (rather than

---

[75] See MNT Tr. 78-79 (discussing written instructions).

to voluntary manslaughter).[76]  Postconviction counsel argued that where trial counsel, in reliance on the judge's promise to instruct on self-defense, and had had focused his closing argument on that theory, the judge's incorrect instruction undermined closing argument in violation of Mr. Melton's state and federal constitutional rights.[77]

The judge agreed that the mistake was significant and that his other instructions did not adequately correct it.[78]  He concluded, however, that the evidence had in the first place been insufficient to require an instruction on self-defense.[79]  (Under Massachusetts law, the defendant bears the burden of producing some evidence of self-defense; only if he does so must the Commonwealth prove absence of self-defense.  See, e.g., *Commonwealth v. Cabral*.[80])  The judge had given instructions on that theory

---

[76] This instruction appears at App.54 (see excerpt and discussion at page 19, supra). For discussion of the judge's error, see MNT.Tr. at 24 (judge confirms that transcript correctly records misstatement), 76-77 (same).

[77]   MNT.Tr.85-89 (counsel argues that incorrect instruction prejudiced closing argument, in violation of Mr. Melton's state and federal constitutional rights).

[78] MNT.Tr.76-82.

[79] MNT.Tr.76-82 (considering the issue); App.91 (judge's ruling, in memorandum of decision denying motion for new trial or reduction in verdict).

[80] 443 Mass. 171, 179-180 (2005).

only "in an exercise of caution," and any errors he might have made were harmless.[81]

II.    Appeals Court

In the Massachusetts Appeals Court, defense counsel argued that the erroneous instruction identified at the postconviction hearing, plus two others, undermined counsel's closing argument in violation of Mr. Melton's right, under the Sixth Amendment, to present that argument. Counsel cited *Herring v. New York*,[82] the seminal case establishing that the Sixth Amendment right to effective assistance of counsel includes the right to have counsel make closing argument.

The Appeals Court's unpublished memorandum[83] affirming the conviction did not address the constitutional claim.  Rather, the Appeals Court's entire response to the defendant's argument was to agree with the trial judge:   that because the evidence did not support a self-defense instruction in the first place, any errors therein were harmless:

"Even if there was an error in the self-defense instruction given, it was harmless in light of the fact that no such

---

[81] App.91-92 (memorandum of decision denying motion for new trial or reduction in verdict).

[82] *Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975), cited in defendant's Appeals Court brief at page 22 (App.102, below).

[83] App.104-112.

- 26 -

instruction was warranted. [Footnote omitted.]  'Because there was no right to self-defense, a voluntary manslaughter instruction based on the use of excessive force in self-defense was not appropriate either.'  *Commonwealth v. Roberts*, 433 Mass. 45, 57 (2000) [internal quotation, editorial marks, and citation omitted by the Appeals Court]."[84]

III.    Supreme Judicial Court

In his application for further appellate review (FAR) to the SJC, Mr. Melton argued that the Appeals Court was mistaken in concluding that erroneous self-defense instruction could not have been harmful.  The jury's verdict, second-degree murder, was consistent with jurors' (1) having taken a reasonable view of the evidence, and (2) having followed the judge's incorrect instructions.  Specifically, jurors could reasonably have believed that:

(1)    Mr. Melton tried to fire into Mr. Colon's car,
(2)    without intending to commit a battery,
(3)    in the use of excessive force in self-defense.

Had they followed the judge's incorrect instructions, jurors with this view would have been compelled to return a verdict of second-degree murder (as in fact they did), rather than the correct verdict: manslaughter.

---

[84] App.107-108.

- 27 -

The SJC directed defense counsel to submit copies of the parties' Appeals Court briefs and the trial and motion transcripts.[85]  On January 29, 2004, however, the Court declined, without explanation, to review the case.[86]

Later in 2004, defense counsel learned that the SJC was reviewing a Sixth Amendment claim identical to Mr. Melton's in an unrelated case, *Commonwealth v. Donovan Walker* (No. SJC-08492).  Mr. Melton petitioned the SJC for reconsideration of the denial of FAR in his case, asking the SJC to take a new look at the Sixth Amendment claim.[87]  On January 6, 2005, the Court affirmed the conviction and denial of the new-trial motion in *Walker* (see 443 Mass. 213 (ignoring Sixth Amendment claim)), and, on February 2, 2005, declined (again without explanation) to reconsider its decision in Mr. Melton's case.[88]

---

[85] App.14 (SJC docket sheet, P#2).
[86] App.14 (SJC docket sheet, P#3).
[87] App.14 (SJC docket sheet, P#5).
[88] App.14 (SJC docket sheet, P#6).

**ARGUMENT**

I.   <u>Mr. Melton is entitled to de novo review of his Sixth Amendment claim</u>.

The state Appeals Court did not address, let alone "adjudicate[ ],"[89] Mr. Melton's claim that the erroneous instructions, by undermining his closing argument, violated the Sixth Amendment; nor did it address any analogous claim under state law. Therefore, Mr. Melton is entitled to this Court's de novo review of his Sixth Amendment claim.[90]

If this Court determines, after de novo review, that a constitutional error occurred, Mr. Melton is entitled to issuance of the writ if the error "'had substantial and injurious effect or influence in determining the jury's verdict.'"[91]

---

[89] 28 U.S.C. § 2254 (d).

[90] See, e.g., *Fortini v. Murphy*, 257 F.3d 39, 47 (1st Cir. 2001), cert. denied, 535 U.S. 1018, 122 S.Ct. 1609, 152 L.Ed.2d 623 (2002).

[91] *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

II.    The faulty jury instructions, by undermining Mr. Melton's closing argument, violated the Sixth Amendment.

    A.    *The faulty jury instructions, by contradicting counsel's theory of defense, transformed counsel's argument into a constitutionally ineffective one, under* Strickland v. Washington.[92]

The Sixth Amendment, as applied to the states by the Due Process Clause of the Fourteenth Amendment, guarantees a state-court defendant effective assistance of counsel.[93] A critical component of effective assistance is closing argument:

> "There can be no doubt that closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial. ... [It] serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. ... [F]or the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt."[94]

Hence, in *Herring*, where the trial court prohibited counsel entirely from presenting closing argument, the Supreme Court held that the Sixth Amendment had been violated, requiring issuance of the writ of habeas corpus.[95]

---

[92] 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[93] *Herring*, 422 U.S. at 856-857.
[94] *Herring*, 422 U.S. at 858, 862.
[95] Herring, 422 U.S. at 856.

- 30 -

It is harder to determine when a trial judge's interference with closing argument to an extent less serious than barring it altogether results in a Sixth Amendment violation. This Court may look to the law governing ineffective-assistance-of-counsel claims for an answer.

The right to closing argument stems from the right to effective assistance of counsel.[96] A claim that the trial court impermissibly interfered with closing arguments is equivalent to a claim that the trial court undermined counsel's effectiveness, in violation of the defendant's Sixth Amendment right.

Supreme Court cases evaluating ineffectiveness claims make clear that the Sixth Amendment is generally not violated unless the challenged action (of the judge or of counsel) undermines the reliability of the verdict. Where, as in *Herring*, the trial court completely deprives the defendant of ineffective assistance at a critical stage of the trial, a reviewing court will presume that reliability was undermined and reverse the conviction without inquiring into actual prejudice.[97]

Where, by contrast, the defendant is not completely deprived of counsel at a critical stage, he must demonstrate:

---

[96] *Herring*, 422 U.S. at 857, 862.

[97] See, e.g., *United States v. Cronic*, 466 U.S. 648, 659 n.25, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (discussing *Herring*).

- First, that "counsel's representation fell below an objective standard of reasonableness,"[98] or, stated differently, that counsel's behavior was not "reasonable[ ] under prevailing professional norms."[99]

- Second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[100]

Here, of course, the questions must be framed differently:  Mr. Melton is not claiming that counsel erred.  He asserts, rather, that the situation is analogous to one in which counsel chose to argue self-defense and excessive use of force, knowing in advance that the judge intended to instruct as he did -- i.e., if knowing that the judge would foreclose a voluntary manslaughter verdict for many jurors, decline to instruct on the consequences of excessive force, and instruct equivocally on whether self-defense required acquittal or something else.  There is "no principled distinction between the identical result being brought about by judicial act rather than by attorney oversight or misjudgment":[101]  therefore, this Court may analyze Mr. Melton's argument under the standards applicable to

---

[98] *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

[99] *Strickland*, 466 U.S. at 688.

[100] *Strickland*, 466 U.S. at 694.

[101] *Commonwealth v. Cutty,* 47 Mass. App. Ct. 671, 676-677 (1999) (judge's prohibition on counsel's arguing alibi defense in closing had same effect as if counsel had voluntarily opted to abandon that defense in closing; court therefore analyzed court's action using ineffective-assistance

- 32 -

ineffective-assistance claims.

> B. *Had the judge announced his intention to mis-instruct on self-defense and related theories, counsel's decision to argue those theories would have breached prevailing professional norms.*

Had counsel chosen to argue self-defense with the knowledge that the judge's instructions would contradict, or at least not support, that theory, he would have breached prevailing professional norms.  As a matter of common sense, competent counsel will not waste time on an argument unsupported by the law governing the case.  Massachusetts cases, while not binding on this Court, contain persuasive reasoning on this point.  See, for example, *Commonwealth v. Westmoreland*.[102]  There, counsel in closing abandoned his client's (reasonable) defense of insanity, arguing instead for a theory unsupported by any evidence.  The SJC assumed that counsel's choice was unreasonable, and moved directly to the "prejudice" prong of the analysis.[103]  (Because better work might indeed have changed the outcome, the SJC reversed.)  See also, e.g., *Commonwealth v. Triplett*[104] (counsel's closing argument, by asking jury to believe a witness whose testimony contradicted the defense theory, left

---

standards).

[102] 388 Mass. 269 (1983).

[103] *Westmoreland*, 388 Mass. at 274.

[104] 398 Mass. 561, 568-9 (1986) (citation and internal quotation marks

client "denuded of a defense"); *Commonwealth v. Sarvela*[105] (counsel's

closing argument, by contradicting client's and defense witness's

testimony, "completely undermined the defendant's credibility," thereby

providing ineffective assistance); *Commonwealth v. Street*[106] (counsel's

closing argument, by abandoning insanity defense and conceding critical

facts, amounted to ineffective assistance).

      C.     *But for the judge's demolition of counsel's closing argument, there is a reasonable probability that the result would have been different.*

The next part of the analysis concerns prejudice.  Normally, where

a defendant claims that a specific aspect or aspects of counsel's

performance were deficient, the deficiencies violate the Sixth Amendment

only if

> "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."[107]

Analogously, here, the test would be whether, if the Court had

acted differently, there is a reasonable probability that the jury would

---

omitted).

[105] 16 Mass. App. Ct. 934, 935 (1983).

[106] 388 Mass. 281, 287-288 (1983).

[107] *Strickland*, 466 U.S. at 694 (emphasis added).

have returned a different verdict.  The answer must be "yes."  First, had the court given correct instructions, counsel's credibility with the jury would have been significantly enhanced.  Instead, jurors must have wondered, when the judge essentially foreclosed a verdict of voluntary manslaughter based on excessive force, why counsel had made any reference to that theory.

Second, had the court informed counsel that it would not be giving the expected instructions, counsel could have focused on the other prong of his argument:  that Mr. Melton's intent was not sufficient to make him a joint venturer with Mr. Averett.  Indeed, there was evidence that it was Mr. Averett who intended to do damage, and did (actually killing Mr. Colon), while Mr. Melton had only pointed the gun at the already-damaged car and fired parting shots, which he did not believe had actually hit anything (and with which, jurors could have inferred, Mr. Melton had not *intended* to hit anything).  Though reckless and dangerous, Mr. Melton's actions might not have amounted, in the eyes of a correctly instructed jury, to murder.

Counsel could thereby also have *avoided* making the necessarily risky self-defense argument.  When he introduced self-defense, counsel acknowledged that jurors "may not like this," and "may not want to hear

it."[108]  Counsel inferably recognized that even if the law might justify shooting back at an assailant, jurors might be reluctant to excuse such behavior, as this would require them to accept that Mr. Melton was unlawfully carrying a weapon and was prepared to use it in the first place. Arguing self-defense was a risky strategy, and if counsel had known that the judge's instructions would not support it, he could have focused on a the less distasteful joint-venture theory.  Contrast, e.g., *Waters v. Thomas*[109] (Eleventh Circuit rejects claim of ineffective assistance in closing argument, where "'[p]etitioner has suggested no specific argument that would have seemed at the time more likely to dissuade the jury from the death penalty than counsel's [challenged] argument ...'").

In considering the prejudice to Mr. Melton from the juxtaposition of his closing argument and the instructions undermining it, this Court may look for guidance to cases considering defendants' assertions that judges violated Fed. R. Crim. P. 30 by deliberately deciding to instruct differently than they had promised before closing arguments. Where, as in Mr.

---

[108] App.21.

[109] 46 F.3d 1506, 1521 (11th Cir.), cert. denied, 516 U.S. 856, 116 S.Ct. 160, 133 L.Ed.2d 103 (1995), quoting, in parenthetical, *United States ex rel. Gacy v. Welborn*, No. 89 C 6392, 1992 WL 211018 (N.D.Ill. Aug. 26, 1992) (unpub. decision) (*Gacy* opinion's record references omitted), aff'd, 994 F.2d 305 (7th Cir.), cert. denied, 510 U.S. 899, 114 S.Ct. 269, 126 L.Ed.2d 220 (1993).

Melton's case, the unexpected instructions concerned an important part of the defense, courts have repeatedly found significant prejudice. See, for example, the Ninth Circuit's opinion in *United States v. Harvill*.[110] There, in reliance on the judge's promised instructions, counsel argued that his client could not be convicted because the government had failed to prove the requisite specific intent.[111] Following argument, the judge realized he had been mistaken about the law -- in fact, specific intent was *not* required.[112] He instructed the jury accordingly, contradicting counsel's argument.[113] Had the judge acted differently -- by telling counsel in advance that he would be instructing as he did -- counsel could have "retailored" his argument "to focus more vigorously" on other live issues.[114] Additionally (though the opinion does not explicitly mention this), advance warning would have prevented the destruction of counsel's credibility in the jury's eyes. See also, for example, the Michigan case of *People v. Clark*.[115] There, the judge promised to instruct (incorrectly, per the defendant's request) that an involuntary-manslaughter conviction required the state to prove that the defendant should have known the

---

[110] 501 F.2d 295 (9th Cir. 1974).

[111] *Harvill*, 501 F.2d at 297.

[112] *Harvill*, 501 F.2d at 296 n.3.

[113] *Harvill*, 501 F.2d at 296.

[114] *Harvill*, 501 F.2d at 297.

victim would die; counsel accordingly argued that her client had no such understanding.[116]  The court then decided to give the correct instruction -- that the state need only prove that a reasonable person would know the victim would suffer "serious injury."[117]  The appellate court ruled that where the judge's conduct (promising one thing, delivering another) resulted in "mischaracterization of a critical issue that directly affected the theories argued by defense counsel," the defendant was prejudiced, and it was "impossible to conclude that the last minute change in the instructions did not affect the verdict."[118] / [119]

---

[115] 453 Mich. 572 (1996).

[116] *Clark*, 453 Mich. at 579-580.

[117] 453 Mich. at 580.

[118] 453 Mich. at 587, 591.

[119] To similar effect, see also, e.g., *United States v. Gaskins*, 849 F.2d 454, 458 (9th Cir. 1988) (reversing, where judge unexpectedly instructed, after closing arguments, that defendant could also be found guilty on aiding-or-abetting theory:    appellate court unable to conclude that "'"effectiveness of counsel's argument and hence of appellant's defense" was not impaired by counsel's inaccurate information regarding the court's charge,'" quoting *Harvill*, 501 F.2d at 279, quoting *Wright v. United States*, 339 F.2d 578, 580 (9th Cir. 1964)); *United States v. Mendoza*, 473 F.2d 697, 701 (5th Cir. 1973) ("[a]though ... the evidence against the defendants is nearly overwhelming, we cannot say with reasonable certainty that the outcome would be the same if the defense had argued before the jury with accurate information about the Trial Judge's proposed action upon the requested jury instructions"); *Wright*, 339 F.2d at 579-580 (reversing: where appellant's defense was that she had intended to purchase car, not steal it, and court, contrary to pre-argument indications, merely gave general instruction on definition of "stolen," "counsel's closing argument was based upon a theory of defense which the court rejected, or at least

- 38 -

Evidence of prejudice can also be found in the jury's verdict. The judge's instructions included a pronouncement that use of excessive force in self-defense would mitigate a verdict of first-degree murder to second.[120] Jurors returned a verdict of second-degree murder, indicating that they could have followed the incorrect instruction. Indeed, it is difficult to think of another reason for the reduction to second-degree. The Commonwealth's factual basis for the allegation of "deliberate premeditation," an element of first-degree murder, was that Mr. Melton had reached for his gun and chambered a bullet before firing -- i.e., according to the Commonwealth, premeditation was inherent in the steps

---

ignored," prejudicing argument and therefore defense).

Contrast, e.g., *United States v. Thurston*, 358 F.3d 51, 67 (1st Cir. 2004), cert. granted and judgment vacated on other grounds, __ U.S.__, 125 S.Ct. 984, 160 L.Ed.2d 988 (2005) (rejecting Rule 30 challenge, where appellate counsel was "unable to identify any specific areas of prejudice occasioned by the trial court's lapse"); *United States v. Owens*, 167 F.3d 739, 753 (1st Cir.), cert. denied, 528 U.S. 894, 120 S.Ct. 224, 145 L.Ed.2d 188 (1999) (rejecting Rule 30 challenge, where appellant "neither specified a defense theory the court's promise led him to forego, nor explained how his closing arguments would have differed had the court instructed in precise accordance with his request"); *United States v. Andrade*, 135 F.3d 104, 110-111 (1st Cir. 1998) (rejecting Rule 30 challenge: counsel's closing argument had refuted new legal theory articulated by judge in unexpected, post-closing supplemental instruction); *United States v. Porter*, 764 F.2d 1, 11 (1st Cir. 1984) (rejecting Rule 30 challenge, where defendant "does not even argue how he would have significantly altered his summation had he known that the court was going to deny his supplemental request").

[120] See instruction discussed *supra* at 19.

- 39 -

involved in firing the bullet. Jurors apparently believed that Mr. Melton had at least attempted to fire his gun -- why, then, would they have rejected deliberate premeditation? One plausible conclusion is that they did not -- i.e., they agreed with the prosecution that Mr. Melton had "premeditated," in the sense of chambering a bullet before firing, but they also believed he had acted in the use of excessive force in self-defense. Following the judge's faulty instruction would yield a verdict of second-degree murder rather than the correct verdict: voluntary manslaughter. Stated differently, counsel's closing argument -- had it been untainted by the instructions that followed -- might have succeeded.

III.     The writ must issue, under either _Brecht_ or _Strickland_.

Under _Strickland v. Washington_, a Sixth Amendment violation occurs, requiring issuance of the writ of habeas corpus, if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[121]  In the previous section, Mr. Melton demonstrated the existence of a reasonable probability of a different outcome; hence, the writ must issue.

---

[121] _Strickland_, 466 U.S. at 694.

- 40 -

Even, however, if *Brecht*[122] rather than *Strickland* governs, Mr. Melton is entitled to issuance of the writ.    Under *Brecht*, a habeas petitioner is entitled to relief if he demonstrates that constitutional trial-type error had a "had substantial and injurious effect or influence in determining the jury's verdict."[123]    As Justice Scalia has written, the *Strickland* standard is less "friendly" to defendants than the *Brecht* standard.[124]  If, therefore, a defendant meets the *Strickland* standard, he has necessarily also met the *Brecht* standard.  On this reasoning as well, the writ must issue.

## CONCLUSION

Setting aside the subtle differences in standards of review, the fundamental question for this Court is whether by virtue of the change in instructions, there was a "breakdown in the adversary process"[125] at a "critical stage"[126] -- closing argument.  Where the judge's promise to instruct led counsel to argue a theory that the judge's instructions at worst

---

[122] *Brecht*, 507 U.S. at 638.

[123] *Brecht*, 507 U.S. at 623, 637-638.

[124] *United States v. Dominguez Benitez*, 542 U.S. 74, __, 124 S.Ct. 2333, 2342, 159 L.Ed.2d 157 (2004) (Scalia, J., concurring) (*Brecht* standard "less defendant-friendly" than *Strickland*).

[125] *Strickland*, 466 U.S. at 700.

[126] *Cronic*, 466 U.S. at 659 (denial of counsel at "critical stage" is presumptively prejudicial).

contradicted and at best left unsupported, the answer must be "yes." The

writ must issue.

                         Respectfully submitted,

                         LAJUAN MELTON,

                         by his attorney,

                         _____/s/Anne E. Gowen_____
                         Anne E. Gowen, Mass. BBO #630486
                         64 Princeton-Hightstown Rd., # 127
                         Princeton Junction, NJ 08550
                         tel. 609.919.0381
                         fax 202.478.5203
                         aegowen@comcast.net

Dated:        July 22, 2005.

---

I hereby certify that on July 23, 2005, I mailed a true copy of the above document, and its appendix, to the Attorney General for the State of Massachusetts (Criminal Bureau -- Appeals Division), which, if this Court orders service of the habeas petition, will represent the interests of the respondents; and to each respondent.


    _____/s/Anne E. Gowen_____
Anne E. Gowen

- 42 -

**APPENDIX**

Indictment    .................................................................................App.1

Superior Court docket entries ............................................... App.2-10

Appeals Court docket entries.............................................. App.11-13

Supreme Judicial Court docket entries ....................................App.14

Defendant's closing argument (excerpt from trial transcript) ....... App.15-29

Jury instructions on elements of crimes, Sept. 29, 1999 (excerpt from trial transcript) (pertinent passages highlighted) ........................ App.30-55

Additional jury instructions on elements, Sept. 30, 1999 (excerpt from trial transcript) ................................................................ App.56-62

Defendant's motion for new trial....................................... App.63-68

Amendment to defendant's motion for new trial and reduction in verdict ...................................................................... App.69-70

Discussion of federal constitutional issue during hearing on motion for new trial (transcript excerpt)................................. App.71-74

Superior Court judge's memorandum and order denying defendant's motion for new trial................................................ App.75-89

Superior Court judge's denial, in margin of defendant's motion, of motion to reduce verdict...........................................................App.90

Superior Court judge's (second) memorandum and order denying defendant's motion for new trial and reduction in verdict App.91-92

Defendant's Appeals Court brief (excerpt) .................................. App.93-103

Appeals Court's decision and order affirming verdict.............. App.104-112

Defendant's application for further appellate review (excerpt) .............................................................. App.113-115

Order of Supreme Judicial Court denying application for further appellate review ........................................................App.116

Defendant's petition for reconsideration of denial of application for further appellate review (excerpt)...................................... App.117-123

- 44 -

# APPENDIX

Indictment   ...................................................................................App.1

Superior Court docket entries .............................................. App.2-10

Appeals Court docket entries........................................... App.11-13

Supreme Judicial Court docket entries ...................................App.14

Defendant's closing argument (excerpt from trial transcript)....... App.15-29

Jury instructions on elements of crimes, Sept. 29, 1999 (excerpt from trial
    transcript) (pertinent passages highlighted)........................ App.30-55

Additional jury instructions on elements, Sept. 30, 1999 (excerpt from trial
    transcript) ............................................................... App.56-62

Defendant's motion for new trial...................................... App.63-68

Amendment to defendant's motion for new trial and reduction in verdict
    ...................................................................... App.69-70

Discussion of federal constitutional issue during hearing on motion for
    new trial (transcript excerpt) .................................. App.71-74

Superior Court judge's memorandum and order denying defendant's
    motion for new trial ............................................... App.75-89

Superior Court judge's denial, in margin of defendant's motion, of motion
    to reduce verdict.............................................................App.90

Superior Court judge's (second) memorandum and order denying
    defendant's motion for new trial and reduction in verdict App.91-92

Defendant's Appeals Court brief (excerpt) ................................... App.93-103

Appeals Court's decision and order affirming verdict............... App.104-112

Defendant's   application   for   further   appellate   review   (excerpt)
    ............................................................... App.113-115

Order of Supreme Judicial Court denying application for further appellate
    review .......................................................................App.116

Defendant's petition for reconsideration of denial of application for
    further appellate review (excerpt)..................................... App.117-123

App. 1

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, SS.                          SUPERIOR COURT DEPARTMENT
                                       INDICTMENT NO. **100934**

                          COMMONWEALTH

                               VS.

                          LAJUAN MELTON

                          INDICTMENT
                           MURDER
              GENERAL LAWS CHAPTER 265, SECTION 1

        At the SUPERIOR COURT, begun and holden at PLYMOUTH, within and
for the COUNTY of PLYMOUTH, on   May 22, 1998      ,
        THE JURORS for the Commonwealth of Massachusetts on their oath
present that:

                          LAJUAN MELTON

of BROCKTON in the COUNTY of PLYMOUTH, on or about MARCH 31, 1998,
at BROCKTON in the COUNTY of PLYMOUTH, did assault and beat
ALEXANDER COLON with intent to murder him, and by such assault and
beating did kill and murder the said ALEXANDER COLON.

                         A TRUE BILL

_____                    _____
Foreman of the Grand Jury                  Assistant District Attorney

        _____
                              RETURN

PLYMOUTH, SS.   On this 22 ND day of    MAY        , 1998, this
indictment was returned and presented to said Superior Court by the
Grand Jury, and ordered to be filed and filed.

        ATTEST:

                                           _____
                                           Assistant Clerk

1

App. 2

Early trial-court docket entries (before switch to computerized docketing system)

SUPERIOR COURT, CRIMINAL

INDICTMENT NO. 100934

COMMONWEALTH

VS.

LAJUAN MELTON
Brockton

| OFFENSE | PLACE | PRESIDING JUSTICE | COURT REPORTER |
|---|---|---|---|
| Murder | Brockton | Connolly | R.Griffin |

| COUNSEL FOR COMMONWEALTH | COUNSEL FOR DEFENDANT |
|---|---|
| John Bradley | Ken Elias, Brockton<br>R. Greenberg, Swampscott CPCS |

**DOCKET ENTRIES**

| 1998 DATE | NO. | DOCKET ENTRIES |
|---|---|---|
| May 22 | 1 | Returned into court and ordered filed. |
| May 26 | " | copies of indictment sent to Chief Justice and Attorney General |
|  |  | Copies of indictment sent to Sheriff and defendant |
| June 5 |  | Case cont. to June 8, 1998 by agreement for arraignment |
|  |  | (Walsh, AC/M) |
| June 8 | 2 | Appearance of Elias for deft |
|  |  | Pleads not guilty |
|  | 3 | Held without bail |
|  |  | Special mittimus on indictment issued |
|  |  | Case cont. to June 29, 1998 for pre-trial conference |
|  |  | (Chin, J.) |
| June 8 |  | Special mittimus returned with service |
| June 5 | 1a | Habeas issued for deft in Middlesex HOC to appear in Brockton on June 8, 1998 |
| June 29 | 4 | Pre-trial conference report filed |
| July 7 | 5 | Deft's motion for funds |

App. 3

| DATE | NO. | DOCKET ENTRIES - (CONTINUED) |
|------|-----|------------------------------|
| July 14 | | Deft's motion for funds Allowed in the amount of $1500 (see #5) |
| | | (Tierney, J.) D. Cercone, court reporter |
| July 16 | | Case cont. to July 28, 1998 by agreement for motion to suppress |
| July 22 | 6 | Defendant's motion to suppress statements |
| July 28 | 5a | Habeas issued for defendant Middlesex House of Corrections to appear in Brockton July 28,1998 |
| | | (Tierney,J) B. StCharles, court reporter |
| August 19 | | Case continued to August 19,1998 by agreement for status |
| | | (King,J) D. Saulnier, court reporter |
| August 21 | 7 | Case continued to September 9,1998 for motion to suppress |
| Sept. 9 | | Habeas issued for deft Norfolk County HOC to appear in Brockton SEpt. 9, 1998 |
| | | (Hely, J.) D. Saulnier, court reporter |
| Sept. 10 | 8 | Case cont. to Sept. 23, 1998 by agreement for motion to suppress, |
| SEpt. 23 | | Habeas issued for deft Norfolk county HOC to appear in Brockton Sept. 23, 1998 |
| | | (Hely, J.) R. Griffin, court reporter |
| Sept. 24 | 9 | Case cont. to oct. 13, 1998 by agreement for motion to suppress |
| | | (Hely, J.) B. St. Charles, court reporter |
| October 5 | 10 | Habeas issued for deft Norfolk County HOC to appear in Brockton October 13, 1998 |
| October 13 | | Appearance of Bradley for the Commonwealth |
| October 20 | | Hearing on motion to suppress (Brady, J.) |
| October 21 | 11 | Deft's motion to suppress statements in opposition to deft's motion to suppress statements |
| | | Commonwealth's memorandum in opposition to deft's motion to suppress statements |
| | | Case cont. to Dec. 9, 1998 by agreement for trial |
| | | (Brady, J.) B. St. Charles, court reporter |
| December 8 | | Habeas issued for deft Norfolk County HOC to appear in Brockton January 12, 1999 |
| | | (Brady, J.) B. St. Charles, court reporter |
| December 10 | | Case continued to January 12, 1999 by agreement for motions |
| 1999 | | (DelVecchio,J) R. Griffin, court reporter |
| January 12 | | Case continued to February 25,1999 by agreement for status |
| | | (Joseph M Walsh,AC/M) R. Griffin, court reporter |
| March 1 | 14 | Habeas issued for deft in Norfolk County HOC to appear in Brockton March 15,1999 |
| March 24 | | Case continued to April 26,1999 by agreement for motion to suppress |
| | | (Hely,J) R. Griffin, court reporter |
| April 12 | 15 | Defendant's motion to obtain funds for transcript of motion to suppress hearing; filed and allowed |
| | 16 | Defendant's motion for funds; filed and Allowed |
| | | Case continued to April 22,1999 for status |
| | | (Ball,J) S. bates,court reporter. |
| October 29 | 12 | Deft's motion to suppress statements denied (see memorandum) |
| | | Memorandum of decision on deft's motion to suppress statements |
| | | (Brady, J.) B. St. Charles, court reporter |

CONTINUATION SHEET ___2___

SUPERIOR COURT, CRIMINAL

COMMONWEALTH                          VS.          LAJUAN MELTON

INDICTMENT NO. 100934

| DATE | NO. | DOCKET ENTRIES |
|------|-----|----------------|
| 999 | | |
| pril 21 | | Case cont. to April 26, 1999 by agreement for status |
| | | (Ball, J.) R. Griffin, court reporter |
| ay 14 | | Case cont. to May 17, 1999 by agreement for status |
| | | (Ball, J.) R. Griffin, court reporter |
| pril 26 | | Case cont. to May 17, 1999 by agreement for status |
| | | (Ball, J.) R. Griffin, court reporter |
| | 17 | Deft's motion for criminal history of alexander Colon |
| | | Deft's motion for criminal history of Alexander Colon Allowed (see #17) |
| | | Case cont. to June 7, 1999 for motions |
| | | (Walsh, AC/M) |
| | 18 | Habea issued for defendan tin Norfolk County HOC to appear in Brockton on June 7, 1999 |
| | | (Chi,J) S.BAtes, court reporter |
| ne 7 | | Case continued to Augsut 16, 1999 by agreement for trial |
| 7 | | Case cont. to June 7, 1999 for motions |
| | | S. Bates, court reporter |
| temebr 21 | 19 | Habea issued for defendant in Norfolk County HOC to appear in Brockton on September 23, 1999 @9:00AM |
| tember 22 | 20 | Habea issued for defendant in Norfolk County HOC to appear in Brockton on September 27, 1999 @9:00AM |
| tember 23 | 21 | Defendant's motion for individual voir dire of jurors; filed and after hearing, hearing, allowed as to |
| | | sentence #1, and denied as to sentence #2 |
| | 22 | Defendant's motion for a view; after hearing motion allowed |
| | 23 | Defendant's motion to sequester witnesses;after hearing allowed |
| | | Case continued to September 27, 1999 for trial |
| | | (Connolly,J) R.Griffin, court reporter |
| temebr 27 | 24 | Jury of 16 members impaneled |
| | 25 | Defendant's request for jury instructions filed |
| | 26 | Commonwealth's motion inlimine to exclude evidence of other shootings filed |
| | | (Connolly,J) R.Griffin, court reporter |
| tember 28 | 27 | Defendant's motion for a required finding of not guilty II: filed and after hearing denied |
| | 28 | Defendant's motion in limine; After hearing, and in the exercise of the court's discretion(Namely |
| | | whether the prejudicial value outweighs the probative value) In this exercise of it's discretion |
| | | the court denies this motion completely. This is a Murder case and the convictions are for assault |
| | | with a dangerous weapon. The crimes are not substantially similar. See Comm. Vs. Whitman.416 Mass.90/94. |
| | | The commonwealth has agreed not to use the convictions.(1) Firearm Violation.4/3/98, and.(2) Possession |
| | | of a Firearm without Permit 4/3/98 |
| temebr29 | 29 | (Connolly,)J R.Griffin, court reporter |
| | 30 | Defendant's motion for a required finding of not guilty I: after hearing denied |
| | | Defendant's motion for a required finding of not guilty III: after hearing denied |
| | | (Connolly,J) R.Griffin, court reporter |
| temebr 30 | 31 | Verdict of Guilty-Murder 2nd Degree |
| | | Sentenced Life, MCI Cedar Junction. From and After any sentence presently serving or about to serve |
| | | Defendant notified of right to appealease |
| | 32 | Clerk's written statement under Superior Court Rule 65 |

App. 54

| DATE | NO. | DOCKET ENTRIES - (CONTINUED) |
|---|---|---|
| 1998 | | |
| September 30 | | $60 Victim Witness Fee Imposed |
| | 33 | Defendant's motion for adirected verdict of not guilty despite the jury verdict; filed and denied |
| | 34 | Warrant for commitmetn with assessment |
| | | (Connolly,J) R.Griffin, court reporter |
| October 1 | 35 | Clerk's certificate that transcript has been ordered from. R.Griffin & B.StCharles |
| October 5 | 36 | Deft's notice of appeal filed |
| | 37 | Motion of counsel to withdraw |
| | 38 | Deft's motion to revise and revoke |
| Oct. 5 | 39 | Notice to Justice, D.A. and counsel of notice of appeal |
| Oct. 12 | 40 | Notice to Justice, D.A. and counsel of motion to withdraw and motion to revise and revoke |
| | | Motion of counsel to withdraw is and will be allowed after successor appellate counsel's appearance has been filed |
| | | Deft's motion to revise and revoke denied, without hearing. See the court's comments on the record at the time of sentencing |
| | | (Connolly,J.) |
| Nov. 23 | 41 | Notice-Assignment of counsel, CPCS |
| Dec. 1 | 42 | Appearance of Greenberg for deft. |
| 2000 | | |
| March 30 | 43 | Transcript (1 volume ) received from R. Griffin |
| June 12 | 44 | Deft's motion for investigative funds |
| June 13 | | Notice to Justice, D.A. and counsel of motion for investigative funds |
| June 13 | | Defendant's motion for investigative funds after review motion for funds for investigative purposes of a potential Rule 30 motion is denied, See Commonwealth vs Davis 410 Mass 680, 684-685 (Lynch, 1991) |
| | | (Connolly J.) |
| June 14 | 45 | Commonwealth's opposition to defendant's motion for investigative funds |
| 2001 | | |
| January 19 | 46 | Clerk's certificate that transcript of motion to suppress hearing ordered from R. Griffin |
| February 15 | 47 | Transcript (1 volume) received from R. Griffin |
| February 27 | 48 | Notice to D.A. and defense counsel that transcripts are available (6 volumes) |
| March 1 | 49 | Record on appeal transmitted to Appeals Court |
| | | Notice to District Attorney and defense counsel that record on appeal hs been transmitted to . (Appeals Court) |
| March 2 | 50 | Clerk's certificate that transcript(6 volumes) was mailed to defense counsel upon her request |
| March 8 | 51 | Clerk's certificate that.District Attorney has received copy of transcript (6 volumes) |
| Aug. 13 | 52 | Deft's motion for new trial |
| Aug. 14 | 53 | Notice to Justice, D.A. and counsel of motion for new trial |
| September 13 | 54 | Notice to Justice, District Attorney and counsel of letters from attorney to be attached to motion for new trial |

## App. 6

Later trial-court docket entries (after switch to computerized docketing system)

# Commonwealth of Massachusetts
# SUPERIOR COURT
# Case Summary
# Criminal Docket

## Commonwealth v Melton, LaJuan

Details for Docket: PLCR1998-00934

### Case Information

| | | | |
|---|---|---|---|
| Docket Number: | PLCR1998-00934 | Caption: | Commonwealth v Melton, LaJuan |
| Entry Date: | 05/22/1998 | Case Status: | Criminal 1 - CtRm 1 ( Brockton) |
| Status Date: | 02/11/2004 | Session: | Disposed (appeal denied) |
| Lead Case: | NA | Deadline Status: | |
| Trial Deadline: | | Jury Trial: | NO |

## Parties Involved

2 Parties Involved in Docket: PLCR1998-00934

| | | | |
|---|---|---|---|
| Party Involved: | | Role: | Defendant |
| Last Name: | Melton | First Name: | LaJuan |
| Address: | | Address: | |
| City: | | State: | |
| Zip Code: | | Zip Ext: | |
| Telephone: | | | |

| | | | |
|---|---|---|---|
| Party Involved: | | Role: | Plaintiff |
| Last Name: | Commonwealth | First Name: | |
| Address: | | Address: | |
| City: | | State: | |
| Zip Code: | | Zip Ext: | |
| Telephone: | | | |

## Attorneys Involved

2 Attorneys Involved for Docket: PLCR1998-00934

| **Attorney Involved:** | | **Firm Name:** | |
|---|---|---|---|
| **Last Name:** | Greenberg | **First Name:** | Ruth |
| **Address:** | 505 Paradise Road | **Address:** | Suite 166 |
| **City:** | Swampscott | **State:** | MA |
| **Zip Code:** | 01907 | **Zip Ext:** | |
| **Telephone:** | 781-593-5277 | **Tel Ext:** | |
| **Fascimile:** | | **Representing:** | Melton, LaJuan (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | |
|---|---|---|---|
| **Last Name:** | Gowen | **First Name:** | Anne E |
| **Address:** | 64 Princeton-Hightstown Rd | **Address:** | #127 |
| **City:** | Princeton Junction | **State:** | NJ |
| **Zip Code:** | 08550 | **Zip Ext:** | |
| **Telephone:** | 609-919-0381 | **Tel Ext:** | |
| **Fascimile:** | 202-478-5203 | **Representing:** | Melton, LaJuan (Defendant) |

## Calendar Events

No Calendar Events found for Docket: PLCR1998-00934.

There are currently no calendar events associated with this case.

## Full Docket Entries

87 Docket Entries for Docket: PLCR1998-00934

| Entry Date | Paper No: | Docket Entry: |
|---|---|---|
| 10/17/2001 | | Status at conversion(see docket for prior entries) |
| 10/17/2001 | 59 | Deft files amended to defendant's motion for new trial and reduction |
| 10/17/2001 | 59 | in verdict |
| 10/17/2001 | 60 | Notice to Justice, DA and defendant's amendment to defendant's motion |
| 10/17/2001 | 60 | for a new trial and reduction in trial |
| 11/09/2001 | 61 | Letter to Judge Connolly from D.A. office regarding stay in appeals |
| 11/09/2001 | 61 | court |
| 12/21/2001 | 62 | Motion by Commonwealth: to correct record |

App: 8

| 12/21/2001 | 63 | Comm's. opposition to deft's motion for new trial, motion to reduce |
| 12/21/2001 | 63 | verdict from murder to manslaughter and motion to amend deft's motion |
| 12/21/2001 | 63 | for new trial and mo. for reudction in verdict |
| 01/03/2002 | 64 | Defendant's response to the Commonwealth's pleadings |
| 01/04/2002 | 65 | Commonwealth's surreply and motion to strike |
| 01/08/2002 | 66 | Notice to Justice and D.A. on Defenant's response to Commonwealth's |
| 01/08/2002 | 66 | pleadigns and Commonwealth's surreply and motion to strike |
| 01/28/2002 | 67 | Habeas corpus for Deft at Plymouth County HOC to appear February |
| 01/28/2002 | 67 | 4,2002 at Suffolk county |
| 01/31/2002 | 68 | Affidavit in support of Comm's. mo. to correct record (Copies sent by |
| 01/31/2002 | 68 | D.A.) |
| 01/31/2002 | 69 | Motion by Deft: for deposition of written questions |
| 02/01/2002 | 70 | Motion of deft. for service of process witness Edson Miranda and |
| 02/01/2002 | 70 | Emmanuel Carapinho |
| 02/19/2002 | 71 | Motion by Deft: to expand the record, copy sent to Justice by Counsel |
| 06/14/2002 | | Deft's mo. for desposition on written questions after review mo. |
| 06/14/2002 | | denied (See courts memorandum on deft's mo. for new trial |
| 06/14/2002 | | (Connolly,J.) |
| 06/14/2002 | | Deft's mo. for new trial and reduction inverdict, after review mo. |
| 06/14/2002 | | for reduction in verdict from second degree murder to manslaugher is |
| 06/14/2002 | | denied. See separate memorandum issued this day, the request for new |
| 06/14/2002 | | trial has been dealt with in the courts 15 page decision denying the |
| 06/14/2002 | | mo.f or new trial issued this day (Connolly,J.) |
| 06/14/2002 | | Deft's mo. to expand the record after review mo,. denied. See courts |
| 06/14/2002 | | memorandum on deft's mo. for new trial further, there are no |
| 06/14/2002 | | affidavits supplied to support any of the factual statements made |
| 06/14/2002 | | herein |
| 06/14/2002 | | Deft's mo. for new trial after hearing and review of all submissions |
| 06/14/2002 | | mo. denied in its totality. See memorandum of decision and order on |
| 06/14/2002 | | deft's mo.f or new trial (Connolly,J.) |
| 06/14/2002 | 72 | Memorandum of Decision and Order on deft's mo. for new trial |
| 06/14/2002 | 72 | (Connolly,J.) |
| 06/14/2002 | 73 | Memorandum of Decision and Order on deft's mo. to expand record |
| 06/14/2002 | 73 | (Connolly,J.) |
| 06/14/2002 | 74 | Memorandum of Decision and Order on deft's mo. for new trial and |
| 06/14/2002 | 74 | reduction in verdict (Connolly,J.) |
| 06/17/2002 | 75 | Decisions on motion for new trial and 2 cassette tapes mailed to |
| 06/17/2002 | 75 | Appeals Court |
| 06/17/2002 | 76 | NOTICE of APPEAL FILED by LaJuan Melton from denial of mo. for new |

| 06/17/2002 | 76 | trial |
| 06/17/2002 | 77 | Copy of notice of appeal mailed to Justice, D.A. and counsel |
| 06/17/2002 | 78 | Court Reporter Romanow, Richard is hereby notified to prepare one |
| 06/17/2002 | 78 | copy of the transcript of the evidence of February 04, 2002. |
| 06/21/2002 | | Trans. (1 vol.) rec'd from R. Romanow |
| 06/21/2002 | | Two cassettes returned from Appeals COurt |
| 06/25/2002 | | Trans. (1 vol.) mailed to D.A. and defense counsel |
| 06/25/2002 | 80 | Notice of completion of assembly of record sent to clerk of Appeals |
| 06/25/2002 | 80 | Court and attorneys for the Commonwealth and defendant. |
| 06/25/2002 | 79 | Two (2) certified copies of docket entries, original and copy of |
| 06/25/2002 | 79 | transcript, two (2) copies of exhibit list and list of documents, |
| 06/25/2002 | 79 | each transmitted to clerk of appellate court. |
| 07/01/2002 | 81 | Deft's request for reconsideration and reconstruction of the record |
| 07/01/2002 | 82 | Notice to Justice, D.A. and counsel of request for reconsideration |
| 07/01/2002 | 82 | and reconstruction of the record |
| 07/02/2002 | 83 | Commonwealth files opposition to deft's mo. to reconsider |
| 07/03/2002 | 84 | Notice to Justice, D.A. and counsel Comm's opposition sto deft's mo. |
| 07/03/2002 | 84 | to reconsider |
| 08/05/2002 | | Motion (P#82) After review of this "request" which is being treated |
| 08/05/2002 | | as a motion and a review of the commonwealth's opposition to the |
| 08/05/2002 | | defendant's motion for reconsideration, Motion is denied in its |
| 08/05/2002 | | entirety for the reasons set out in the Commonwealth's opposition to |
| 08/05/2002 | | the defendant's motion to reconsider (9 pages) filed-2/7/02 |
| 08/05/2002 | | (Connolly,J) |
| 10/15/2002 | 85 | Motion by Commonwealth: for clarification |
| 10/17/2002 | 86 | Notice to Justice, DA and defense counsel of commonwealth's motion |
| 10/17/2002 | 86 | for clarification |
| 11/19/2002 | | Motion (P#85) allowed (Thomas Connolly, Justice). Copies mailed |
| 11/19/2002 | | November 20, 2002 |
| 11/19/2002 | 87 | Clarification of Order (Connolly,J) |
| 07/16/2003 | 88 | Appearance of Gowen for the defendant. |
| 09/23/2003 | | Exhibits (2 cassette tapes) from mo. for new trial sent to Appeals |
| 09/23/2003 | | COurt at their request |
| 02/11/2004 | 89 | ORDER(SJC) It is hereby ordered that the following application for |
| 02/11/2004 | 89 | further appellate review be denied ent: 1/29/04 |
| 02/11/2004 | 90 | Rescript received from Appeals Court; judgment AFFIRMED ent: 11/6/03 |
| 03/29/2004 | 91 | Defendant files motion to revise and revoke sentence |
| 03/29/2004 | 92 | Notice to Justice, D.A. and counsel of motion to revise and revoke |
| 04/23/2004 | | Motion (P#91) (at Boston)- After review of all submissions and the |

04/23/2004                    Court's own trial notes, motion denied (Connolly,J)

## Charges

1 Charges for Docket: PLCR1998-00934

| No. | Charge Description: | Indictment: | Status: |
| --- | --- | --- | --- |
| 1 | Murder | | Guilty verdict (lesser offense) |

© Copyright, Massachusetts Administrative Office of the Trial Court, 2000 - 2001.

# APPEALS COURT
## Panel Cases
Case Docket

---

### COMMONWEALTH vs. LAJUAN MELTON
2001-P-0312

---

## CASE HEADER

| | | | |
|---|---|---|---|
| **Case Status** | Closed: Rescript issued | **Status Date** | 02/10/2004 |
| **Nature** | CRIMINAL | **Entry Date** | 03/01/2001 |
| **Sub-Nature** | Murder/Verdict guilty-2nd degree | **SJ Number** | |
| **Appellant** | Defendant | **Case Type** | Criminal |
| **Brief Status** | | **Brief Due** | |
| **Panel** | Rapoza, Grasso, Kantrowitz, JJ. | **Argued/Submitted** | 09/08/2003 |
| **Citation** | 59 Mass. App. Ct. 1111 | **Decision Date** | 11/06/2003 |
| **Lower Court** | Plymouth Superior (Brockton) | **TC Number** | |
| **Lower Ct Judge** | Thomas E. Connolly, J. | **TC Entry Date** | 05/22/1998 |

---

| INVOLVED PARTY | ATTORNEY APPEARANCE |
|---|---|
| **Commonwealth** | Robert C. Thompson, A.D.A. |
| Plaintiff/Appellee | Inactive |
| Red brief filed | John E. Bradley, A.D.A. |
| 13 Extensions, 522 Days | Withdrawn |
| | Gail M. McKenna, A.D.A. |
| | |
| **LaJuan Melton** | Ruth Greenberg, Esquire |
| Defendant/Appellant | Withdrawn |
| Blue br, app & suppl blue br filed | Anne E. Gowen, Esquire |
| 3 Extensions, 66 Days | |

---

## DOCKET ENTRIES

| Entry Date | Paper | Entry Text |
|---|---|---|
| 03/01/2001 | | Transcripts received: vols: 6; sets: 2; Cab: P; Shelf: 6. |
| 03/01/2001 | | Prior A.C. cases involving same parties: 1999-P-0216. |
| 03/01/2001 | #1 | Entered. |
| 03/07/2001 | #2 | MOTION to extend brief & appendix due date, filed by LaJuan Melton. |
| 03/07/2001 | | RE#2: Extension to 05/10/2001 granted for filing of brief of LaJuan Melton, Defendant/Appellant. No further enlargement. *Notice. |
| 04/06/2001 | #3 | Motion to vacate entry or alternatively, stay proceedings filed by LaJuan Melton. |
| 04/06/2001 | | RE#3: Case STAYED to 05/15/2001. Status report due by that date indicating status of appeal before the Supreme Judicial Court. *Notice. |
| 04/12/2001 | #4 | Status Report filed by LaJuan Melton. |
| 04/12/2001 | | RE#4: Case STAYED to 06/15/2001. Status report due by that date indicating status of defendant's separate appeal in S.J.C. Any request to dismiss the instant appeal must be made per M.R.A.P. 29(b), and with prejudice. *Notice. |
| 06/12/2001 | #5 | Motion to allow non-compliant brief filed by LaJuan Melton. |
| 06/13/2001 | | RE#5: Allowed. (Rapoza, J.) *Notice. |
| 06/13/2001 | #6 | SERVICE of brief & appendix for Defendant/Appellant LaJuan Melton. |
| 06/21/2001 | #7 | Notice of appearance of ADA John Bradley for Commonwealth. |

## DOCKET ENTRIES

| | | |
|---|---|---|
| 06/27/2001 | #8 | MOTION to extend brief due date of Commonwealth, w/attach. |
| 06/27/2001 | | RE#8: Allowed to 11/09/2001 granted for filing of brief of Commonwealth, Plaintiff/Appellee. No further enlargements. *Notice. |
| 10/26/2001 | #9 | Notice of change of counsel of ADA John Bradley with ADA Gail McKenna. |
| 10/29/2001 | #10 | MOTION to stay, filed by Commonwealth. |
| 10/29/2001 | | RE#10: Case STAYED to 11/28/2001. Status report due by that date from the Commonwealth indicating the status of the defendant's motion for new trial. *Notice. |
| 11/01/2001 | #11 | OPPOSITION to #10 filed by LaJuan Melton. |
| 11/13/2001 | #12 | Response to #11 filed by Commonwealth. |
| 11/15/2001 | | RE#11 After review of the defendant appellant's opposition to stay and the Commonwealth's response thereto, the stay of the appeal previously granted remains in effect as ordered until Nov. 28, 2001, at which time the appellee Commonwealth shall file a status report regarding the status of the motion for a new trial. (Cowin, J.) *Notice. |
| 11/28/2001 | #13 | Status Report filed by Commonwealth, with request for further stay. |
| 11/28/2001 | | RE#13: Appellate proceedings are further stayed to 12/13/01. Counsel is to file a status report regarding the proposed status conference and any results therefrom on or before the above date. (Cowin, J.) *Notice. |
| 12/03/2001 | #14 | Objection to stay, filed by LaJuan Melton. |
| 12/06/2001 | | RE#14 Noted. The trial court is proceeding with the motion for a new trial & appellate proceedings will remain stayed pending disposition of that motion. Commonwealth's next status report remains due 12/13/01. (Cowin, J.). Notice. |
| 12/12/2001 | #15 | MOTION to stay, filed by Commonwealth. |
| 12/12/2001 | | RE#15: Case STAYED to 01/14/2002. Status report due by then. *Notice sent. |
| 01/14/2002 | #16 | MOTION to stay, filed by Commonwealth. |
| 01/14/2002 | | RE#16: Case STAYED to 02/14/2002. Status report due by then. *Notice sent. |
| 02/15/2002 | #17 | Status Report & Motion to stay filed by Commonwealth. |
| 02/15/2002 | | RE#17: Case STAYED to 03/15/2002. Status report due by then. Notice sent. |
| 03/19/2002 | #18 | Status Report filed by Commonwealth with request for further stay. |
| 03/19/2002 | | RE#18: Case STAYED to 04/18/2002. Status report due by then. *Notice sent. |
| 04/10/2002 | #19 | Status Report & Request Further Stay filed by Commonwealth. |
| 04/10/2002 | | RE#19: Case STAYED to 05/21/2002. Status report due by then. *Notice sent. |
| 05/02/2002 | #20 | Copy of letter to Connolly, J. of Suffolk Superior Court received from Ruth Greenberg, Esquire.. |
| 05/30/2002 | #21 | Status report and motion for further stay, filed by Commonwealth. |
| 05/30/2002 | | RE#21: Case STAYED to 06/21/2002. Status report due by then. *Notice sent. |
| 06/18/2002 | #22 | Copy of Memorandum & Decision & order on defendant's motion for new trial w/two cassette tapes received from Plymouth Superior Court. |
| 06/21/2002 | #23 | Status report and motion for further stay, filed by Commonwealth. |
| 06/21/2002 | | RE#23: The appeal from the denial of the new trial motion is consolidated with the pending appeal. Proceedings stayed to 07/22/02. Status report to be filed regarding transcript on or before that date. *Notice. |
| 06/27/2002 | #24 | ORDER: "In accordance with the action of the court in 01-P-312 on June 21, 2002 (paper #23) and the parties' reliance thereon, 02-P-952 is vacated as having been entered in error. The appeal from the denial of the motion for a new trial is consolidated with the pending appeal under 01-P-312. *Notice/attest/image as paper #2 in 02-P-952. |
| 07/05/2002 | #25 | Motion supplemental brief filed by LaJuan Melton. |
| 07/05/2002 | | RE#25 The motion is allowed and the appellant is given leave to file a supplemental brief on or before September 15, 2002. The appellee's brief is to be filed on or before October 15, 2002. *Notice. |

## DOCKET ENTRIES

| | | |
|---|---|---|
| 08/30/2002 | #26 | Motion to extend supplemental brief, filed by LaJuan Melton. |
| 08/30/2002 | | RE#26: Allowed to 9/25/02. No further enlargements. *Notice. |
| 09/25/2002 | #27 | SERVICE of supplemental brief for Defendant/Appellant LaJuan Melton. |
| 10/01/2002 | #28 | Letter pursuant to MRAP 16(l) filed by LaJuan Melton. |
| 10/10/2002 | #29 | Motion for scheduling order, filed by Commonwealth. |
| 10/11/2002 | | RE#29: Allowed to 12/15/02. No further enlargement. *Notice. |
| 10/31/2002 | #30 | Letter pursuant to MRAP 16(l) filed by LaJuan Melton. |
| 11/19/2002 | #31 | Letter pursuant to MRAP 16(l) filed by LaJuan Melton. |
| 12/17/2002 | #32 | Motion to file brief in excess of page limitation filed by Commonwealth. |
| 12/17/2002 | | RE#32 The motion is allowed and the appellee brief is accepted for filing this date. *Notice. |
| 12/17/2002 | #33 | SERVICE of brief for Plaintiff/Appellee Commonwealth. |
| 05/09/2003 | #34 | Notice of 06/03/2003, 9:30 A.M. argument at Suffolk County Courthouse sent. |
| 06/02/2003 | #35 | MOTION to continue, filed by LaJuan Melton. |
| 06/02/2003 | | RE#35: Allowed. (Kantrowitz, J.) *Notice. |
| 07/02/2003 | #36 | MOTION to withdraw as counsel for LaJuan Melton, filed by Ruth Greenberg. |
| 07/02/2003 | | RE#36 The within may be allowed upon the filing of the appearance of successor. |
| 07/03/2003 | #37 | Letter of C.P.C.S. re assignment of Anne Gowen as counsel for LaJuan Melton. (C8001205-2) |
| 07/16/2003 | #38 | Notice of appearance of Anne E. Gowen for LaJuan Melton. |
| 07/30/2003 | #39 | Notice of 09/08/2003, 9:30 A.M. argument at Suffolk County Courthouse sent. |
| 09/02/2003 | #40 | MOTION to stay appellate proceedings, filed by LaJuan Melton. |
| 09/02/2003 | | RE#40: Denied. (Rapoza, Green & Kantrowitz, JJ.) *Notice. |
| 09/08/2003 | | Oral argument held. (R GR KN). |
| 10/14/2003 | | DAR DENIED (on 10/03/03). |
| 11/06/2003 | #41 | Decision: Rule 1:28 (R GR KN). Judgment affirmed. Order denying motion to expand record affirmed. Order denying motion for a reduction in verdict affirmed. Order denying motion for new trial affirmed. Order denying motion for reconsideration and reconstruction of the record affirmed. *Notice. (See image on file.) |
| 11/28/2003 | | Copy of FAR application of LaJuan Melton. |
| 02/02/2004 | | FAR DENIED (on 01/29/04). |
| 02/10/2004 | | RESCRIPT to Trial Court. |
| 05/20/2004 | | Two cassete tapes originally received from Plymouth Superior Court (paper #22) returned this date. |
| 10/04/2004 | #42 | Letter from Anne E. Gowen, Esquire re: changed of mailing address. |

As of 10/05/2004 01:01

App. 14

# SUPREME JUDICIAL COURT
## for the Commonwealth
### Case Docket

## COMMONWEALTH vs. LAJUAN MELTON
FAR-13816

### CASE HEADER

| | | | |
|---|---|---|---|
| Case Status | FAR denied; recon denied | Status Date | 02/02/2005 |
| Nature | Murder2 | Entry Date | 12/01/2003 |
| Appeals Ct Number | 2001-P-0312 | Opposition Date | |
| Appellant | Defendant | Applicant | Defendant |
| Citation | 441 Mass. 1102 | Case Type | Criminal |
| Full Ct Number | | TC Number | |
| Lower Court | Plymouth Superior (Brockton) | Lower Ct Judge | Thomas E. Connolly, J. |

| INVOLVED PARTY | ATTORNEY APPEARANCE |
|---|---|
| **Commonwealth** Plaintiff/Appellee | Gail M. McKenna, A.D.A. |
| **LaJuan Melton** Defendant/Appellant | Anne E. Gowen, Esquire |

### DOCKET ENTRIES

| Entry Date | Paper | Entry Text |
|---|---|---|
| 12/01/2003 | | Docket opened. |
| 12/01/2003 | #1 | FAR APPLICATION of LaJuan Melton, filed by Anne E. Gowen, Esquire. |
| 12/29/2003 | #2 | Action on application deferred. (1/5/04: Briefs/Appendix/Transcript requested from Atty. Gowen.)(Telecon 1/7/04: Atty. Gowen will send.) (1/12/04 - Material received: Defendant's Brief and Appendix, Suppl. Brief and Appendix; Commonwealth's Brief; 7 vols. of transcript (some with missing pages). NOTE: No need to return these items to counsel as they are copies. |
| 01/29/2004 | #3 | DENIAL of FAR application. |
| 12/20/2004 | #4 | MOTION to file a petition for reconsideration on denial of FAR application late, filed for LaJuan Melton by Anne E. Gowen, Esquire. (Referred to the justices) Notice sent. |
| 12/20/2004 | #5 | Petition to reconsider denial of FAR application filed by LaJuan Melton. (Referred to the justices) |
| 02/02/2005 | #6 | DENIAL of petition to reconsider denial of FAR application. |
| 02/10/2005 | #7 | Request to update docket filed by Anne E. Gowen, Esquire. *No action to be taken. |

As of 03/03/2005 01:02

App. 15



4-45

1
2
3

**Excerpt from transcript, vol. 4 (Sept. 29, 1999):**
**defendant's entire closing argument.**

**Discussion of self-defense begins**
**at App.22, below.**



13
14
15
16
17
18
19
20
21
22
23
24

MR. ELIAS: Thank you, Judge. Lajuan Melton was not responsible for the death of young Alex Colon. I don't think there's one amongst you that can doubt

App.    16

4-46

1    that.  No weapon that he fired -- assuming he fired one,

2    killed that young boy.  I think the evidence is

3    overwhelming that he was shot by a .380, that the

4    casings found at the scene are a .380, that the

5    projectiles and the bullets located by the ballistician

6    were a .380.  And in fact, the ballistician, an expert

7    witness, who had the gun, he testified that not in his

8    opinion, as a matter of fact, as a matter of fact none

9    of those casings or projectiles could have been fired by

10    that nine millimeter, including the bullet that was

11    taken -- found in Mr. Colon, because that gun he was

12    holding up presumptively is the weapon, the nine

13    millimeter, held by Lajuan.

14           Interestingly enough, and I say this as an

15    aside, because I know it may become somewhat outrageous

16    to you, it's entirely probable that Lajuan never fired a

17    shot.  He may have thought he did, he may have attempted

18    to, and he may still think he did, but he may never have

19    gotten a shot off.  We don't even know if that gun

20    fires.  And they had it, he was right there with it.  He

21    never said to you, I test fired it and it fires.  No

22    casings found in the area.  God knows, you've been

23    there, little bit of a square with dirt on it.  And he

24    said if it was fired it would only go three or four

App: 17

4-47

1   feet.  They came back later on and found these .380

2   casings right there.  No bullet or anything else found

3   that could have come from that.  So it's entirely

4   possible, is it not, that during all of this cacophony

5   of sounds, traffic, people shooting, bang, bang, he

6   thinks he's shooting, but he doesn't.  But I don't think

7   that's important.

8        The fact of the matter is he did attempt to do

9   something, we know that, he said that.  He said it, I

10  fired twice after I saw the window was shattered and the

11  car was going by me.  So whether he in fact did it or

12  not, he thinks he did.  It's important when we talk

13  about state of mind in these cases because you're going

14  to get to a point a little later in my argument in which

15  state of mind is going to become important, and as we go

16  along the judge is going to what the law is.  I may

17  comment on what -- tell you what I think it is, and

18  obviously -- maybe it's not so obvious to you -- if I

19  tell you something and the judge tells you something

20  else, then you must accept what the judge tells you.

21  I'll try not to mislead you, but I may misquote it, or I

22  may look at it a little differently.

23        Now, let's assume we all agree that he did not

24  fire a bullet, a gun that killed Alex.  What then are we

App.:    18

4-48

1    left with?  What do we do now?  Well, my 14-year-old

2    daughter, who's a freshman in high school one day came

3    home and said, Dad, I'm going to go out for football.

4    Now, she's five foot one and weighs 95 pounds.  And I

5    said, What position are you going to play?  She says,

6    You know when they all tackle the guys in a big pile and

7    somebody comes and jumps on top and they call it piling

8    on, I want to be a piler-on.  I said, Well, I think

9    that's what we're doing here.  The Government now wants

10   to pile on.  They want to say to you, You know what? if

11   you find that Lajuan, despite what he intended to do,

12   despite what he attempted to do, he didn't do it, the

13   other guy did it.  Well, okay, I agree, the other guy

14   did it.  Well, you know what, let's pile onto this

15   thing.  Let's take him, because he's there at the same

16   time, and say, Well, what the other guy did, he also

17   did.  That's what we call a joint venture.  What the law

18   says in that respect is that two people plan it -- plan

19   it -- plan it ahead of time do to something, whatever is

20   done is the result of both of their efforts.  The

21   planning can take place by saying, Well, I'll -- I'm

22   going to stand by and help you, or I'll help you later,

23   or I'll make it available for you to escape.  But

24   planning is the key word here.  I'd suggest to you that

**App.**   **19**

4-49

1    if you were to find that both these people -- both he

2    and the other person were there, firing independently of

3    one another, without saying together, Hey, let's do

4    this, let's get it done, but that because of what they

5    perceived to be happening -- and look, don't ask me why

6    they are carrying guns, I can't justify that, I'm not

7    even going to try. Do I think that stinks? You bet

8    your life I think it does. Do I think they ought to

9    have them? Absolutely not. But that isn't the issue.

10   We're not here to say, Hey, what a bad boy, you had a

11   gun. Indeed he did, and indeed he was a bad boy. But

12   the point is, do you believe on this evidence there was

13   a plan between he and the other guy to shoot at that

14   car? Or do you believe from the evidence that they both

15   reacted to what they thought was going to happen to

16   them, that is, independently of one another?

17       So the Government's going to say to you, Well,

18   don't let him go because he's a bad shot. Well, I'm not

19   saying that either. I'm saying to you I think the

20   evidence will permit you to find that (1) he didn't

21   shoot anybody, and (2) he was not in connection with the

22   other guy to do this in advance. To be sure, afterwards

23   you got evidence that they ran, hid their guns, that he

24   lied and all that sort of business. That isn't part, I

App:  20

4-50

1    suggest to you, of joint venture.  That's not a plan in
2    advance, that's something that happens after.  The thing
3    you have to satisfy yourself to is that he and the other
4    guy had the same intent at the same time.  I don't know
5    whether this is confusing you or not.  You know what a
6    conspiracy is.  A conspiracy can be two people without
7    ever talking to one another, without ever planning,
8    they're doing the same thing to get a certain result.
9    They can be said to have conspired, even though they
10   never got together.  Not so with a joint venture.
11   That's the difference.  A joint venture they must be
12   together.  They must be some -- pursuant to some plan to
13   do this.

14        I asked a couple of the police officers -- I'm
15   sure I did -- Do you have any reason to believe these
16   guys ever talked to one another or planned to do this?
17   The answer was no.  Did any of you -- what did he say,
18   15, 20, 30 witnesses?  Never got any of that information
19   from any of them.  So I suggest to you the Government
20   really is in a position of piling on here, saying, Look,
21   okay, we can't prove it, okay, he -- he didn't fire, he
22   didn't do the killing, but so what, the guy was there,
23   the other guy did it, blame him too.  I don't think
24   that's fair.  I don't think that's the American system

App. 21

4-51

1    of doing things.  Just because I happen to be with -- at

2    that place at the same time doing the same act does not

3    mean we're doing it together.

4            I got to talk to you about self-defense.  You

5    may not like this, and you may not want to hear it,

6    because you may have everything in you that says, Look,

7    this can't be tolerated in our city, we can't have these

8    kids running around with guns, and you know, we can't.

9    We can't.  But we're not here to justify that or to

10   eradicate that.  We're here to decide what he did that

11   day.

12           He says to you in his statement -- you'll hear

13   it, you've got it -- that, In the past I've been

14   threatened by a gun by Edson Miranda, that I've had

15   confrontations with Claudio.  Now, Claudio was a piece

16   of work, wasn't he?  First witness, can you believe

17   anything he said?  Anything at all?  Did you notice what

18   he was wearing?  I didn't want to belabor it, a shirt

19   that had "NS" on it with a star on the back, but he

20   never heard of the North Side Stars.  He doesn't know

21   what that is.  Can you believe him?  Do you believe him

22   when he says they're just driving around?  I think the

23   police officer said, Playing their system.  Just happen

24   to be driving where, of all the bad luck in the world,

App.  22

4-52

1  Lajuan Melton and somebody that they have had problems
2  with before, including confrontations, he happens to be
3  there?  What a stroke of back luck, isn't it?  What a
4  stroke of luck that these guys firing into a car, and
5  who the heck's in the car but Cardi and -- we don't know
6  the other two in the back seat.  He's suggesting it's
7  Edson Miranda.  But you talk about bad luck.  And you
8  know it's not bad luck.  You know Cardi and them were
9  out there looking for him.  He knew it too.  When he saw
10  that car coming, it went by, and when they turned around
11  and came the other way and somebody's hanging out by the
12  window and somebody yells, They're shooting.  Police
13  officer told you he interviewed the witness who said she
14  heard them say, They're shooting, before any shots were
15  fired from the porch that she was on.
16        Now, is it appropriate?  I don't know, that's
17  for you.  The judge is going to tell you what self-
18  defense is.
19        THE COURT:  The judge is going to tell you
20  what, please?
21        MR. ELIAS:  Self-defense.
22        THE COURT:  The judge is going to -- no, the
23  judge is going to tell -- he's going to charge them on
24  the law of self-defense.

App.    23

4-53

1          MR. ELIAS:  When I --

2          THE COURT:  He's not going to tell them it's

3   self-defense.

4          MR. ELIAS:  When I say tell, I mean he's going

5   to tell you what the law is on self-defense.  State of

6   mind of the defendant is very important.  Whether it's a

7   reasonable position or not is something for you to

8   believe, but if his state of mind was for me to believe

9   that I'm going to be shot at or I am being shot at, even

10  if I don't see the gun, there's somebody out there

11  shooting, and I see people coming that posed a threat to

12  me in the past, and I think they're posing a threat to

13  me now, and I reasonably believe that, and I think it's

14  by virtue of a gun and I fire the same way, you're going

15  to have to decide was that an unreasonable, was that an

16  excessive response to that?  Or was that a proper

17  response?  Should I have run and hid, should I go

18  somewhere to avoid that or -- before I fire back?

19  That's going to be a decision for you to -- to come to.

20          You know the charge is first degree murder.

21  That's about as severe as it ever gets.  There is

22  nothing more severe in this Commonwealth than first

23  degree murder.  The judge is going to charge you what it

24  takes for you to arrive at that conclusion.  The salient

App:    24

4-54

1    part of it is premeditation. Planning, thinking. I

2    know my brother's going to argue to you that that

3    premeditation can be in an instant. It can. But

4    nonetheless, it has to be a determined -- made -- an

5    intelligent decision to do something in response to that

6    plan. He may say to you, Well, to load that clip into

7    the gun is premeditation. Baloney. That's a reaction

8    to what he saw going on out there. And one time he gave

9    a statement to the police he said the gun was already

10   loaded in his waistband. Another time he said he had to

11   put the clip in. Either way, that's all part of what's

12   going on here, that's all part of this terrible,

13   terrible situation that these kids have created in this

14   city -- maybe in all other cities.

15          The other statement might be -- he might bring

16   it for you to consider there: We set up and we fired.

17   Well, that's an after the circumstance -- that's exactly

18   what happened. The two of them got ready and fired back

19   thinking that they were being fired upon. That doesn't

20   mean that somehow this was planned, that this was all

21   organized. Do you think he'd be standing out there in

22   the middle of the street if it was planned to shoot

23   somebody when they came by?

24          And I got to keep going back to this, do you

4-55

1   really think it's a coincidence that that car happens to
2   be Cardi and maybe Edson Miranda?  Do you really think
3   -- and Cardi says to you, I didn't know where I was
4   going or who I was going with, yet, at the EMT the way
5   they were going to kill the niggers?  Well, how did he
6   know the niggers did it?  If he didn't see anybody, and
7   he wasn't looking for anybody, and he don't know what
8   happened, how in God's name did he say, We're going to
9   kill the niggers?  How did he know?  Because that's why
10  they were there in the first place.  That's pretty good
11  indication of why they were there in the first place,
12  they were looking.  They knew where they were going to
13  find them, and they were looking for them.  Why?  How do
14  I know why?  You're never going to know why, because I
15  don't think anybody can make any intelligent sense of
16  why they're out there, but they're out there.  Maybe
17  over something as stupid as a girl, maybe over a
18  question of turf, I'm in the North Side Stars, you stay
19  in Campello where you belong.  You've got evidence that
20  that same car, maybe the same people, are involved in a
21  shooting earlier that day up at the Progresso Market.
22  Things that these guys are all aware of that that Cardi
23  and that car were a dangerous instrumentality flying
24  around this city looking for trouble, and they found it

4-56

1   at this particular location.

2          I'm not going to try to belabor this.  The

3   length of time that I spend talking to you isn't going

4   to make much difference.  I know we tried the case

5   fairly quickly because there's no point in asking a lot

6   of questions when there's not a lot of information to

7   get.  But one of the things I think I have to do is to

8   try to impress upon you your significance to the

9   defendant.  A jury, except in capital cases -- a jury is

10  always the choice of the defendant's, nobody else.

11  Lajuan could have said to me if this were an appropriate

12  case -- and there's some question in this Commonwealth

13  whether this is a capital case or not, even though we no

14  longer have capital crimes, it probably is -- but in

15  most criminal cases he could have said, I don't want a

16  jury, I want a judge alone to decide the case.  John

17  Bradley can't say that, no one else can say that, only

18  he -- he has that choice.  And that's because -- and

19  it's terrible to get into fifth grade civics, but you

20  remember we fought a whole war over some of these

21  rights, to have a jury of our peers pass between us and

22  the Government, to make sure the Government doesn't

23  overstep its bounds.  The District Attorney's Office is

24  part of the executive branch of our government, not the

4-57

1   judicial. They're here to execute the laws and to seek

2   the punishment of those that break it. The judicial

3   system consists of it -- or the judge and myself. I

4   don't mean to belittle the district attorney or their

5   lawyers, they're very competent lawyers, but their job

6   is different, they're part of the executive branch of

7   this government. So we have a separation of all of

8   those branches of it. You're here to make sure that

9   this poor kid gets a fair shake by what's going on here.

10  Don't jump. Don't make that quick jump they're going to

11  ask you to jump. We can't prove what he did, but we can

12  prove what the other guy did because he told us what the

13  other guy did. It's his statement that tells you what

14  the other guy did. And nobody's proved that that's not

15  so.

16      I mean, first they take his statement and

17  present it to you as being true, and now they're saying,

18  But don't believe it. Believe that part that hurts him,

19  don't believe the part that helps. There's no

20  indication that there was any plan here, any acting

21  together, nothing whatsoever. When the time came to

22  shoot, this was a sudden reaction to what was going on.

23  If you find he acted in self-defense you can then find

24  him not guilty, and that's not out of the realm of

4-58

1   probability in this case.  You may  not like what he

2   did, again, I got to repeat, it's too bad he had a gun,

3   nothing I can do about that.  But it shouldn't lead to

4   any conclusion that therefore he was not acting in self-

5   defense.  Maybe in the world he travelled in that was a

6   part of their necessary daily equipment, like kids today

7   all have their beepers stuck in their belts.  They

8   wouldn't leave the house without one, as if their lives

9   depended on it.

10          So, I think it's a hard job, I wouldn't want

11  it, it's never easy.  A 19-year-old kid looking at you

12  and saying, Look, it's you that I want to decide whether

13  or not I murdered somebody.  I don't -- I'm not even

14  convinced he fired a weapon, anything came out of that

15  pistol, and if it did it certainly didn't endanger

16  anybody.  Was it a stupid act to be shooting at a car in

17  the middle of the day on one of the busy streets of this

18  city?  You bet your life it is, but he's not being

19  charged with being stupid.  He's charged with murder,

20  and the murder is, Let's get the other guy.  He's got to

21  get the other guy, he's not here, I can't defend him.

22  I'm not going to defend the other guy.  I don't know

23  what was in his mind, I don't know what he saw, what he

24  thought, how he came to be there, why he had a gun.  I

App.: 29

4-59

1    can't do that, that's none of my concern.  I got him.

2    But they're going to ask me, Well, take care of that guy

3    too.  They're going to ask you, You find the other guy

4    guilty, and therefore find him guilty too.  That's not

5    fair.  That just isn't right.  Thank you.

6         THE COURT:  Counsel for the Commonwealth,

7    please.

8                 ****

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

App: 30

4-89

**Excerpt of trial transcript, vol. 4 (Sept. 29, 1999):**
**Jury instructions on murder, voluntary manslaughter,**
**self-defense, and the use of excessive force**
**in self-defense**

* * * *

1
2
3
4
5
6
7
8
9
10
11        Now, ladies and gentlemen, I'd like to talk
12   about the crime.  This defendant has been indicted of
13   murder in the first degree on Alexander Cohn -- Colon.
14   There are two different types of first degree murder
15   which I will attempt to explain to you right now.  And
16   this case is being submitted to you on both of those
17   theories.  And you may find the defendant guilty of both
18   of them, one of them, or none of them.
19        Murder is the unlawful killing of a human
20   being, either with malice -- with malice, I'm sorry.
21   Murder committed with deliberate premeditation and
22   malice is murder in the first degree.  Murder with
23   extreme atrocity or cruelty and with malice is murder in
24   the second degree.  Murder committed -- no, sorry -- a

4-90

1   murder which does not appear to be murder in the first

2   degree is murder in the second degree.  The degree of

3   murder shall be found by you, the jury.

4           You will note, as I indicated at the beginning

5   -- you will note that the Commonwealth may prove the

6   defendant guilty of first degree murder in one of two

7   ways.  The Commonwealth may prove the defendant guilty

8   of first degree murder by convincing you beyond a

9   reasonable doubt that the defendant either Number (1)

10  committed murder with deliberate premeditation, as I

11  will define that for you; or Number (2) committed murder

12  with extreme atrocity or cruelty.

13          Let's talk about the deliberate premeditation

14  first, folks.  In order to find the defendant guilty of

15  first degree murder with deliberate premeditation the

16  Commonwealth must prove three elements beyond a

17  reasonable doubt:  (1) the defendant -- element Number

18  (1) the defendant committed an unlawful killing; (2)

19  that the killing was committed with malice, as I will

20  define for you that word; and (3) that the killing was

21  committed with deliberate premeditation.

22          Now I will attempt to define each one of these

23  three elements for you.  Element Number (1) an unlawful

24  killing:  the Commonwealth must prove beyond a

4-91

1    reasonable doubt that defendant committed an unlawful

2    killing.  For a killing to be murder it must be

3    unlawful.  The word killing refers to causing of death.

4    Death must occur as a direct result of the defendant's

5    acts, an act which, in the natural and continuous

6    sequence, results in death and without which death would

7    not have occurred, is a cause of death.

8            An unlawful killing is a killing done without

9    excuse.  A killing may be excused, for example, in the

10   case of self-defense.  The evidence in this case does

11   raise an issue for you to decide as to whether this

12   killing was excused as a result of the defendant's acts

13   of self-defense.  The burden of proof is upon the

14   Commonwealth to prove beyond a reasonable doubt that the

15   defendant unlawfully killed the deceased as I have

16   defined that for you.  Unlawful killing, again, ladies

17   and gentlemen, is a killing done without excuse.

18           The Commonwealth must prove to you beyond a

19   reasonable doubt that the killing was not the result of

20   the defendant's acts of self-defense.  The defendant

21   does not bear the burden of proving the excuse.  Failure

22   of the Commonwealth to prove beyond a reasonable doubt

23   that the killing was not in self-defense requires you to

24   return a verdict of not guilty.  I will instruct you

4-92

1   later in more detail concerning the law of self-defense.

2        Second element -- the first one was unlawful

3   killing -- second one is malice.  What's malice?  The

4   second element the Commonwealth must prove beyond a

5   reasonable doubt is that the killing was committed with

6   malice.  Malice, as it applies to deliberately

7   premeditated murder, means an intent to cause death.

8   The Commonwealth must prove that the defendant actually

9   had it in his mind that he wanted to cause the death of

10  the deceased.

11        Element Number (3):  deliberate premeditation.

12  The third element the Commonwealth must prove beyond a

13  reasonable doubt is that the killing was committed with

14  deliberate premeditation.  For the Commonwealth to prove

15  deliberate premeditation the Commonwealth must prove

16  that the defendant thought before he acted, that is, the

17  defendant decided to kill after deliberation.  The

18  element of deliberation, however, does not require an

19  expanded time span.  Nor does it mean that deliberation

20  must be accomplished slowly, rather, it refers to the

21  purposeful character of the premeditation.  Deliberation

22  may be a matter of days, hours, or even seconds.  It is

23  not so much a matter of time as it is of logical

24  sequence.  First the deliberation and the premeditation,

4-93

1   then the decision to kill, and lastly, the killing in

2   furtherance of that decision.  All of this may occur

3   within a few seconds.  However, deliberate premeditation

4   excludes action which is taken so quickly that there is

5   no time to reflect on the action and then decide to do

6   it.  The Commonwealth must show the defendant's

7   resolution to kill was, as least for some short period

8   of time, the product of recollection (*sic*).

9        If, after considering all the evidence in the

10  case you conclude the Commonwealth has proven beyond a

11  reasonable doubt each of these three elements that I

12  have just defined, that is, that the defendant committed

13  an unlawful killing; (2) that the killing was committed

14  with malice; and (3) that the killing was committed with

15  deliberate premeditation, you should find the defendant

16  guilty of murder in the first degree, committed with

17  deliberate premeditation.

18       If, however, after your consideration of all

19  of the evidence, you find the Commonwealth has not

20  proven any one of these three elements beyond a

21  reasonable doubt, you must not convict the defendant of

22  murder in the first degree on the theory of deliberate

23  premeditation.

24       Now we're going to go on the second type of

App. 35

4-94

1   first degree murder.  That was the deliberate

2   premeditation.  Now we're going to go on the other type,

3   which is extreme atrocity and cruelty.  As I mentioned,

4   there's a second theory by which the Commonwealth may

5   prove the defendant guilty of first degree murder, the

6   theory that the defendant committed murder with extreme

7   atrocity or cruelty, as I will define it for you.

8        In order to prove the defendant guilty of

9   first degree murder committed with extreme atrocity or

10  cruelty the Commonwealth must prove three elements,

11  again, beyond a reasonable doubt.  Element Number (1)

12  that the defendant committed an unlawful killing; (2)

13  that the killing was committed with malice, same as

14  deliberate premeditation so far;  element (3) changes.

15  It changes from deliberate premeditation to extreme

16  atrocity and cruelty.  So in place of the deliberate

17  premeditation you have on this theory you have extreme

18  atrocity and cruelty, and that the killing was committed

19  with extreme atrocity and cruelty.

20       The first element the Commonwealth must prove

21  beyond a reasonable doubt, the defendant committed an

22  unlawful killing, as I have defined it for you.

23       (2) malice.  This is slightly a different

24  definition than we had it for deliberate premeditation.

4-95

1    The second element the Commonwealth must prove beyond a

2    reasonable doubt in order to prove murder with extreme

3    atrocity or cruelty is the element of malice.  Malice in

4    the context of murder by extreme atrocity or cruelty may

5    be proven in any one of three ways:  malice in this

6    context includes an intent to cause death or an intent

7    to cause grievous bodily harm.  With respect to these

8    two ways, the Commonwealth must prove that the defendant

9    actually had in his mind that he either wanted to cause

10   the death of the deceased, or wanted to cause the

11   deceased grievous bodily harm.

12        Malice for purposes of this theory of murder

13   also includes as follows -- Number (3):  any -- an

14   intent to do an act which in the circumstances known to

15   the defendant a reasonable person would have known

16   created a plain and strong likelihood that death would

17   follow.  Under this third meaning of malice you must

18   determine whether, based upon the witness (*sic*) actually

19   knew at the time he acted a reasonable person would have

20   recognized that his conduct created a plain and strong

21   likelihood that death would result.  In determining

22   whether the Commonwealth has proved this third meaning

23   of malice to you, you must consider the defendant's

24   actual knowledge at the circumstances at the time that

4-96

1    he acted.

2            The third element the Commonwealth must prove

3    beyond a reasonable doubt is that the killing was

4    committed with extreme atrocity or cruelty.  Extreme

5    atrocity or cruelty means that the defendant caused the

6    person's death by a method that surpassed the cruelty

7    inherent in any taking of human life.  Atrocity means an

8    act which is extremely wicked or brutal, appalling,

9    horrifying or utterly revolting.  Indifference to or

10   knowledge of and pleasure in a person's pain is cruelty.

11           In deciding whether the Commonwealth has

12   proved beyond a reasonable doubt that the defendant

13   caused the death of the deceased with extreme atrocity

14   and cruelty, you must consider the presence and the

15   degree of the following factors:  (1) whether the

16   defendant was indifferent to or took pleasure in the

17   suffering of the deceased; (2) the consciousness and

18   degree of suffering of the deceased; (3) the extent of

19   the injuries to the deceased; (4) the number of blows or

20   shots delivered; (5) the manner, degree and severity of

21   the force used; (6) the nature and size of any weapons

22   used; and (6) the disproportionate between the means

23   needed to cause death and those employed.

24           You cannot make a finding of extreme atrocity

4-97

1    or cruelty unless you find it is based on one or more of

2    the factors that I have just listed for you, those seven

3    factors.  You must find one or more.  You, the jury,

4    should determine, based on the facts previously stated,

5    whether the crime was committed with extreme atrocity or

6    cruelty.  If, after your consideration of all the

7    evidence in the case, you find the Commonwealth has

8    proven beyond a reasonable doubt each of the three

9    elements that I have just defined, that is, the

10   committing -- the defendant committed an unlawful

11   killing, that the killing was committed with malice, and

12   (3) that the killing was committed with extreme atrocity

13   or cruelty, you should find the defendant guilty of

14   murder in the first degree, committed with extreme

15   atrocity or cruelty.  If, however, after your

16   consideration of the evidence, you find the Commonwealth

17   has not proven any one of these three elements beyond a

18   reasonable doubt, you must find the defendant -- you

19   must not find the defendant guilty of murder in the

20   first degree under the theory of extreme atrocity or

21   cruelty.

22              Now, there's a lesser included offense, and

23   that's of second degree murder that's going to be

24   submitted to you as one of the lesser included.  If,

4-98

1   after your consideration of all the evidence, the

2   Commonwealth has not proven beyond a reasonable doubt

3   all the elements necessary to prove the defendant guilty

4   of murder in the first degree, you should then consider

5   whether the Commonwealth has proved murder in the second

6   degree.

7          In order to prove defendant guilty of murder

8   in the second degree, the Commonwealth must prove two

9   elements beyond a reasonable doubt:  that the defendant

10  committed an unlawful killing, and (2) that the killing

11  was committed with malice.  You'll notice that the

12  deliberate premeditation or the extreme atrocity or

13  cruelty is not in that definition, but the first two

14  elements are.

15         Element Number (1) an unlawful killing is as I

16  have defined that for you before.  The second element

17  the Commonwealth must prove beyond a reasonable doubt is

18  malice.  For purposes of murder in the second degree,

19  murder may be proved in any one of three ways.  Malice

20  in this context includes an intent to cause death or an

21  intent to cause grievous bodily harm.  The Commonwealth

22  must prove that the defendant actually had it in his

23  mind that he either wanted to cause the death of the

24  deceased, or wanted to cause the deceased grievous

App. 40

4-99

1    bodily harm.  Malice for purposes of murder in the

2    second degree also includes an intent to do an act

3    which, if in the circumstances known to the defendant a

4    reasonable person would have known created a plain and

5    strong likelihood that death would result.  Under this

6    third meaning of malice you must decide whether, based

7    on what the defendant actually knew at the time he

8    acted, a reasonable person would have recognized that

9    his conduct created a -- created a strong and plain

10   likelihood that death would have resulted.

11           In determining whether the Commonwealth has

12   proved this third meaning of malice, you must consider

13   the defendant's actual knowledge of the circumstances at

14   the time he acted.  In order to prove murder in the

15   second degree, the Commonwealth is required to prove

16   beyond a reasonable doubt that the defendant unlawfully

17   killed the deceased with malice.  If, after your

18   consideration of all the evidence, the Commonwealth has

19   proved beyond a reasonable doubt both the elements of

20   murder in the second degree, then you shall find the

21   defendant guilty of murder in the second degree.

22   However, after your consideration -- after consideration

23   of all the evidence you find that Commonwealth has not

24   proven beyond a reasonable doubt either of the one of

App.: 41

4-100

1    the two elements of murder in the second degree, you

2    must not convict the defendant of murder in the second

3    degree.

4        In order to prove the defendant guilty of --

5    acted with malice, rather, the Commonwealth must prove

6    beyond a reasonable doubt the absence of certain

7    mitigating circumstances.  Mitigating circumstances are

8    circumstances which lessen the defendant's culpability

9    for an act.  Both the crimes of murder and voluntary

10    manslaughter require the proof of an unlawful killing.

11    Manslaughter, if the killing occurred under mitigating

12    -- strike -- I'm going to have to repeat that sentence,

13    folks.  Mitigating circumstances are circumstances which

14    lessen a defendant's culpability for an act.  Both the

15    crimes of murder and voluntary manslaughter require

16    proof of an unlawful killing, but the crime of murder

17    will be reduced to the crime of voluntary manslaughter

18    if the killing occurred under mitigating circumstances

19    that satisfies you that the defendant did not act with

20    malice.

21        In order to prove a conviction of murder, the

22    Commonwealth must prove beyond a reasonable doubt the

23    absence of those mitigating circumstances.  Based on the

24    evidence of this case the mitigating circumstances that

App. 42

4-101

1    you must consider are:  (1) heat of passion upon

2    reasonable provocation; (2) sudden combat; (3) excessive

3    use of force in self-defense.

4              Let me explain these mitigating circumstances.

5    Heat of passion upon reasonable provocation.  Heat of

6    passion includes the states of mind of passion, anger,

7    fear, fright and nervous excitement.  Reasonable

8    provocation is a provocation of the type which would be

9    likely to produce in a reasonable person such a state of

10   passion, anger, fear, fright and nervous excitement as

11   would overcome his capacity for reflection or restraint,

12   and did actually produce such a state of mind in the

13   defendant.  The provocation must -- must be such that a

14   reasonable person would have become sufficiently

15   provoked and would not have cooled off by the time of

16   the killing, and the defendant was -- the defendant was

17   so provoked and did not cool off at the time of the

18   killing.

19              In addition, there must be a causal connection

20   between the provocation, the state of heat of the

21   passion and the killing.  The killing must follow the

22   provocation before there is a sufficient time for the

23   emotions to -- to cool, and must be the result of the

24   state of mind induced by the provocation rather than a

4-102

1   pre-existing intent to kill or injure.  Mere words, no

2   matter how insulting, abusive or threatening, standing

3   alone do not constitute reasonable provocation.

4        The mere existence of sufficient provocation,

5   if you so find was provocation in this case, is not

6   foreclosed because the defendant learns of a fact from a

7   statement rather than personal observation.  If the

8   information conveyed is that of a nature to cause a

9   reasonable person to lose their self-control, and did

10  actually cause the defendant to do so, then a statement

11  is sufficient.  Physical contact, even a single blow,

12  may amount to a reasonable provocation.  Whether the

13  conduct is sufficient will depend on whether a

14  reasonable person under similar circumstances would have

15  been provoked to act out of emotion rather than reasoned

16  reflection.  The heat of passion must also be sudden,

17  that is, the killing must have occurred before a

18  reasonable person would have regained control of his or

19  her emotions.  If the Commonwealth has not proved beyond

20  a reasonable doubt the absence of heat of passion upon

21  reasonable provocation, the Commonwealth has not proven

22  malice.

23        Sudden combat -- if you find sudden combat is

24  here -- sudden combat involves a mutual and sudden

App. 44

4-103

1    assault by both the deceased and the defendant.  If the

2    Commonwealth has not proven beyond a reasonable doubt

3    the absence of sudden combat, the Commonwealth has not

4    proven malice.

5              Use of excessive force in self-defense.  If

6    the Commonwealth has not proved beyond a reasonable

7    doubt the absence of self-defense, the Commonwealth has

8    not proven malice.

9              In summary there, in order to prove murder,

10   the defendant (*sic*) is required to prove beyond a

11   reasonable doubt that the defendant committed an

12   unlawful killing with malice.  If, after your

13   consideration of all the evidence, you find the

14   defendant (*sic*) has proven beyond a reasonable doubt the

15   elements of murder, except that you find the

16   Commonwealth has not proven beyond a reasonable doubt

17   the absence of heat of passion, sudden combat, or self-

18   defense, you must find the defendant guilty of murder,

19   and you would be -- excuse me -- you must find the

20   defendant not guilty of murder, and you would be

21   justified in finding the defendant guilty of voluntary

22   manslaughter.

23              Now, I'd like to talk a little bit about

24   voluntary manslaughter, folks.  Voluntary --

35

App:    45

4-104

1          [The court and clerk confer regarding the tape

2     recorder]

3          THE COURT:  Okay.  We need to get another tape

4     for our recorder.

5          [Pause]

6          THE COURT:  Our District Attorney's Office

7     come up here and show us how to eject this?

8          [Pause]

9          THE COURT:  Thank you very much.

10          MR. ELIAS:  Judge, could we go over to the

11     side bar?

12          THE COURT:  Of course you can.

13

14          BENCH CONFERENCE

15          MR. ELIAS:  I dislike asking, but I'm a

16     diabetic, and I have to have something within the next

17     half hour or so.

18          THE COURT:  Absolutely.  Absolutely.  I'm just

19     about finished with this charge.  Do you wish to take a

20     little break now?

21          MR. ELIAS:  How much longer do you think

22     you'll be?

23          THE COURT:  I don't think I'm going to be any

24     more than ten minutes.

App.    46

4-105

1        MR. ELIAS:  It's self-defense --

2        THE COURT:  Believe me -- but believe me --

3        MR. ELIAS:  All right.

4        THE COURT:  -- believe me --

5        MR. ELIAS:  Ten minutes is not -- even 20

6    minutes is not a problem, but I can't go much beyond

7    1:30.

8        THE COURT:  Okay.  Well, you just make sure

9    you tell me when you want to go; okay?

10                  END BENCH CONFERENCE

11

12        THE COURT:  Voluntary manslaughter.  Voluntary

13   manslaughter includes the intentional unlawful killing

14   of the deceased by the defendant.  In order to prove

     this crime, the Commonwealth must prove beyond a

     reasonable doubt the following elements:  that the

     defendant intentionally inflicted an injury or injuries

     likely to cause death upon the deceased which caused his

     death, and that the defendant acted unlawfully.  An

     unlawful killing is a killing done without excuse.  I

21   have previously defined that for you.  Not all killings

22   are unlawful.  Killings may be excusable, for example,

23   in the case of self-defense.  If the Commonwealth has

24   proved each of these elements beyond a reasonable doubt

**App. 47**

4-106

1    you should return a verdict of voluntary manslaughter.

2    If the Commonwealth fails to prove each -- each one of

3    these elements beyond a reasonable doubt, you may not

4    convict the defendant of voluntary manslaughter.

5              Now, ladies and gentlemen, I'd like to discuss

6    with you the concept of joint venture.  A person may be

7    found guilty of murder in the first degree, murder in

8    the second degree, or voluntary manslaughter even if he

9    did not personally do the act, but, instead, was present

10   at the scene of the crime and aided and abetted its

11   commission as part of a joint venture with another

12   person.

13             You must determine as a question of fact in

14   this case whether or not there was a joint venture in

15   which the defendant was engaged.  In a joint venture a

16   person is guilty if he intentionally participates with

17   another and the commission of a crime is something he

18   wishes to bring about and seeks by his actions to make

19   it succeed.

20             In order to prove the defendant guilty of a

21   crime committed by joint venture the Commonwealth must

22   prove three things beyond a reasonable doubt:  (1) the

23   defendant was present at the scene of the crime; (2)

24   that the defendant aided or assisted in the commission

App.  48

4-107

1    of the crime, or stood by willing and able to help with

2    the crime if it became necessary; (3) that the defendant

3    did so while sharing the intent required to commit the

4    crime.

5          Such assistance may be provided in any of

6    several ways.  It may take the form of participating

7    with another person in the physical acts which make up

8    the crime.  Or it may take the form of obtaining or

9    encouraging the other person to commit the crime.  Such

10   assistance may also involve agreeing to stand by the

11   scene of the crime to act as a lookout, or to render aid

12   or assistance in committing the crime, or in escaping,

13   if such help becomes necessary.  An explicit verbal

14   agreement between the parties is not essential to a

15   joint venture.  It is not necessary that the joint

16   venturers have a formal advance plan or agreement, as

17   long as they conscientiously act together before and

18   during the crime to bring it about.  You are permitted,

19   but not required, to infer the defendant had the

20   necessary intention if the defendant knew it was going

21   on, and participated actively in the crime.

22         If -- if it has been proved that the defendant

23   was present at the scene of the crime, that fact alone

24   is not enough to find the defendant guilty.  Presence

4-108

1    alone does not establish a joint venture, even if a

2    person knew about the intended crime in advance and took

3    no steps to prevent it.  Our law does not allow for

4    guilt by association.  There must be proof that the

5    defendant intentionally participated in committing the

6    particular crime, not that he was there or knew about

7    it.  And as I have indicated, folks, you are permitted,

8    but not required, to infer that the defendant had the

9    necessary intention, if the defendant knew what was

10   going on, and participated actively in the crime.

11          The Commonwealth is not required, under a

12   joint venture theory, is not required to prove precisely

13   what the defendant actually committed and what the co-

14   venturer actually committed.  The Commonwealth is not

15   required to prove precisely which defendant actually

16   committed the crime and -- and -- and whether or not

17   which one of the two of them aided and abetted in it.

18          Under a theory of joint venture, premeditated

19   murder, or murder in the -- also premeditated murder in

20   the first degree, or murder of extreme atrocity or

21   cruelty, or second degree murder, or voluntary

22   manslaughter, under those theories, which are the

23   theories that are being submitted to you, during which

24   another person carried or used a gun, the Commonwealth

App. 50

4-109

1   must establish beyond a reasonable doubt that the

2   defendant knew the other person had a gun with him.

3                  Now I'm going to charge you a little bit more

4   on the issue of self-defense, ladies and gentlemen.

5   It's up to you to determine whether this defense under

6   the facts is available to the defendant.  A person is

7   allowed to use reasonable force in self-defense when

8   this is necessary to protect himself from physical harm,

9   and therefore it is not a crime to strike at another

10  person if this is done in a reasonable self-defense.  If

11  there is any evidence of self-defense in this case, the

12  Commonwealth must prove beyond a reasonable doubt that

13  the defendant did not act in self-defense, in other

14  words, if you -- if you have a reasonable doubt whether

15  or not the defendant acted in self-defense your verdict

16  must be not guilty.

17                  You must determine first of all, ladies and

18  gentlemen, whether there is any evidence of self-defense

19  in this case, and then go on and make the other

20  determination that the defendant -- the Commonwealth has

21  proved beyond a reasonable doubt that the defendant did

22  not act in self-defense.  The Commonwealth may show the

23  defendant did not act in self-defense by proving beyond

24  a reasonable doubt that any one or more of these three

App. 51

4-110

1    requirements of self-defense were absent in this case --

2    those three requirements are:  for the defendant to have

3    acted in self-defense he must have reasonably believed

4    he was being attacked or was immediately to be attacked;

5    and second, for the defendant to have acted in self-

6    defense he must have done everything that was reasonable

7    in the circumstances to avoid physical combat before

8    resorting to force; and (3) for the defendant to have

9    acted in self-defense he must have used no more force

10   than was reasonably necessary in the circumstances to

11   defend himself.  To prove the defendant did not act in

12   lawful self-defense, the Commonwealth must prove beyond

13   a reasonable doubt one or more of those.  All they have

14   to do is prove one of those three beyond a reasonable

15   doubt.  You may find the defendant guilty if the

16   Commonwealth has proved all the elements of the crime,

17   as I previously described them to you, and has also

18   proved to you beyond a reasonable doubt that one or more

19   of these requirements was not present.

20          In other words, the Commonwealth must -- may

21   disprove, rather, self-defense if you find that's --

22   that's been an issue in the case by proving beyond a

23   reasonable doubt one or more of the following things:

24   that the defendant did not have a reasonable belief that

App. 52

4-111

1    he was being attacked or was immediately about to be

2    attacked, and that he was in immediate danger; or that

3    the circumstances -- in the circumstances the defendant

4    failed to exhaust all other alternatives before

5    resorting to force; and (3) that the defendant used more

6    force than was necessary in the circumstances to defend

7    himself.  If there is evidence that the defendant may

8    have acted in self-defense, which your -- is your

9    decision to make, you must find the -- if -- you must

10   find the defendant not guilty unless the Commonwealth

11   has proven beyond a reasonable doubt that one or more of

12   the three requirements of self-defense was missing in

13   this case.

14        It is not self-defense if a defendant should

15   reasonably have realized that he was not in any real

16   immediate danger.  To determine this you may take into

17   account the relative size and strength of the persons

18   involved, where the accident took place, whether any

19   threats were made, whether any weapons were involved,

20   and if so what type of weapons they were, among other

21   things.  In the same way, it is not self-defense if the

22   defendant retaliated after he was no longer in any

23   immediate danger and was just pursuing his attacker for

24   revenge, or to ward off any possibility of attack in the

4-112

1    indefinite future.  The right of self-defense arises

2    from necessity and ends when that necessity ends.

3           Deadly force is defined as a force that is

4    intended or is likely to cause -- or likely to kill.  A

5    defendant -- and as a matter of law, the guns that were

6    -- two guns that were described in this case are deadly

7    weapons as a matter of law.  The defendant was permitted

8    to use deadly force in self-defense only if he had the

9    reasonable belief that he was being attacked or was

10   immediately being attacked, and that he was in immediate

11   danger of being killed or seriously injured.  Before

12   resorting to force, a person must use every reasonable

13   means that's available to him to avoid combat.  This

14   means the defendant was permitted to use physical force

15   in self-defense only if he could not get out of the

16   situation in some other way that was available and

17   reasonable at the time.  The defendant must have used

18   any avenues of escape that were reasonably available

19   before resorting to force to protect himself if this

20   could be done without exposing himself to further

21   danger.

22          In evaluating, you must consider all the facts

23   in the case.  Where the incident took place may be

24   particularly important.  Some situations a person may

4-113

1   have a clear field and be able to escape by walking away

2   or by -- otherwise getting to safety, or by summonsing

3   help if that could be done in time, or by holding the

4   attacker at bay if the means were available, or by some

5   other method.  In other cases, such escape routes may

6   not be available.  The issue is whether the defendant's

7   use of force seemed to be the only way to protect

8   himself in the circumstances.  In considering this you

9   are permitted to take in account that a person who is

10  attacked may have to decide what to do quickly and under

11  emotional strain.

12          A person may not use more force than is

13  reasonably necessary in self-defense.  In the eyes of

14  the law a person who uses what is clearly excessive and

15  unreasonable force has himself become an aggressor, and

16  loses the right to self-defense.  This is -- this is not

17  -- this is not to pertain, folks, to the charge I gave

18  you that if they -- if the defendant used excessive

19  force it is reduced to a second degree murder, that

20  instruction still remains in effect.  How such force is

21  necessary may vary with the situation, of course, and

22  this is not an area where a lot of exactness is

23  possible.  You are allowed to take into account that a

24  person must decide quickly and under pressure in

4-114

1   situations, but a defendant would lose his right to

2   self-defense if he used a level of force that was

3   unreasonable and clearly excessive in the circumstances.

4           In considering whether force used in self-

5   defense was reasonable, you may, again, ladies and

6   gentlemen, may consider the relative size and strength

7   of the persons involved, the location, how the persons

8   were -- were positioned, what kind of weapons, if any,

9   were used.

10          In order for you, the jury, to return a

11  verdict, that is, to reach a decision in a criminal

12  case, there can be only 12 persons on the deliberating

13  jury.  In order to avoid the need for a new trial in

14  this case if one or more of our jurors became ill, or

15  have to be excused for some good reason, we customarily

16  impanel in first degree murder cases four extra jurors

17  at the beginning of the trial, and we did so here.

18  However, when you begin your deliberations there can be

19  only 12 jurors.  Therefore, at the conclusion of my

20  instructions, your number will be reduced to 12 on a

21  random basis by the clerk.  The two jurors who are not

22  selected to serve on the jury will become alternate

23  jurors.  If you are selected as an alternate juror,

24  please do not feel that your efforts in this case have

                      * * * *

App.    56

**Excerpt from trial transcript, vol. 5 (Sept. 30, 1999): judge's response to jury's question on difference between first- and second-degree murder, and on definition of "deliberate premeditation"**

\* \* \* \*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

THE COURT:  Good morning, ladies and gentlemen of our jury, and good morning to our alternates.  I thank you very much for being -- coming here and being so promptly.  I -- I want to ask you folks, has everybody been able to abide by the court's instructions and not to discuss the case with the -- in substance -- the substance of the case with the folks at home and among your friends?  I see everybody's head nodding yes.  And I want to say thank you very much.

Ladies and gentlemen, you have asked the following question of the court [reading]:  "Dear Judge Connolly, could we please have a definition of premeditated according to the law?  (2) Could we -- could you please provide answers so that the jury is comfortable with the difference between first and second degree murder?"

What I'd like to do now is I'd like to -- could we pass out -- we have some -- which has been marked here as Exhibit E for identification -- we have a certain where it sets out the various elements that must be proven both for first degree murder, deliberate

1    premeditation, also murder in the first degree of

2    extreme atrocity and cruelty, and also murder in the

3    second degree.  And I wondered if you could just take a

4    brief look at that, and then I'll like to discuss it

5    with you.

6                [Document distributed to the jury]

7         THE COURT:  Ladies and gentlemen, that's just

8    basically an outline on the elements of murder, both in

9    the first degree and second degree.  I just wonder if

10   you can follow me along on this particular little

11   matter.  Murder in the first degree, there are two

12   theories under -- and you're going to be able to keep a

13   copy of that, of course, that -- this diagram in your

14   jury room -- that -- that murder in the first degree,

15   two theories:  (1) deliberately premeditated murder, or

16   (2) murder in extreme atrocity or cruelty.

17              Now, let's go down a little bit further and we

18   talk about the elements for each one of those that have

19   to be proven beyond a reasonable doubt.  For murder in

20   the first degree deliberate premeditation, there must be

21   an unlawful killing, there must be a showing beyond a

22   reasonable doubt of malice of an intent to cause death,

23   and there must also be deliberate premeditation.

24              Murder in the first degree extreme atrocity or

App:   58

1    cruelty, it has the first -- exact same first element,

2    an unlawful killing, as deliberate premeditation has,

3    and then it broadens the definition of what malice is.

4    Where in first degree under deliberate premeditation it

5    must be an intent to cause death, malice in the first

6    degree, extreme atrocity or cruelty can be proven beyond

7    a reasonable doubt (1) an intent to cause death, or an

8    intent to cause grievously bodily harm, or (3) the

9    intentional act which in the circumstances known to the

10   defendant a reasonable person would have known created a

11   plain and strong likelihood of death.  And then they

12   have to prove also extreme atrocity and cruelty.

13          Now, let's look over on the other page.

14   Murder in the second degree, folks, first element, an

15   unlawful killing, just like in the others -- in the

16   other two first degree murder deliberate premeditation

17   and extreme atrocity and cruelty.  (2) malice.  Note

18   that the definition of malice of murder in the first --

19   second degree is the exact same definition as it is in

20   murder of the first degree extreme atrocity or cruelty,

21   and not as it is defined in murder in the first degree

22   deliberate premeditation.  It's the broader definition

23   as to the extreme atrocity and cruelty uses.

24          Now, what's the difference between murder in

**App:** 59

5-14

1  the first degree and murder in the second degree?  From

2  looking at these schedules, folks, murder in the first

3  degree has the requirement of one of the three elements

4  as deliberate premeditation, as I am -- have and will

5  define it for you again.  Murder in the second -- first

6  degree extreme atrocity and cruelty has -- doesn't have

7  the deliberate premeditation, but has the extreme

8  atrocity or cruelty as one of the elements.  So, in

9  other words, the element of malice as it's defined here

10  in deliberate premeditation, that becomes a broader

11  definition down in murder in the first degree extreme

12  atrocity or cruelty, and for the deliberate

13  premeditation the -- is substituted the extreme atrocity

14  or cruelty element.  Can you see that on your -- on your

15  paper, folks?  Okay.

16        Now, we get over to murder in the second

17  degree.  You've got Number (1) first element is unlawful

18  killing, just like murder in the first degree, for both

19  deliberate premeditation and extreme atrocity or

20  cruelty.  Then we have a showing of malice that must be

21  shown beyond a reasonable doubt.  That is the definition

22  of malice that applies in murder in the second degree --

23  is -- is the same definition of malice that applies to

24  murder in the first degree extreme atrocity or cruelty,

1    which is broader than the definition of malice for

2    murder in the first degree deliberate premeditation.

3          Okay.  What's the difference?  In both murder

4    in the first degree deliberate premeditation, and second

5    degree murder and murder of extreme atrocity or cruelty

6    an unlawful killing must be proved.  (2) for murder in

7    the first degree malice must be proven, as I have

8    defined it for you.  The definition of malice under

9    deliberate premeditation first degree is a definition of

10    an intent to cause death.  The definition of malice is

11    broader as set out in this document, as it is defined in

12    murder in the first degree extreme atrocity or cruelty.

13          We look over to murder in the second degree

14    and we see an unlawful killing, with malice, which is

15    defined there as (1), (2) or (3) -- (1), (2) or (3).

16    The difference between first and second degree murder,

17    you have to prove the unlawful killing for second

18    degree, you have to prove the malice, but you do not

19    have to prove to the deliberate premeditation, and you

20    don't have to prove the extreme atrocity under those two

21    theories of first degree murder.

22          Folks, I hope I answered that question for

23    you.  If I didn't, please, feel free to ask any further

24    questions of this court; okay, Mr. Foreperson?

1      THE FOREPERSON:  Okay.

2      THE COURT:  Now, let's talk about deliberate

3  premeditation as -- which is one of the elements of

4  murder in the first degree, deliberate premeditation.

5  The third element -- this is only one -- this is the

6  only time this has to be proved is when discussing --

7  beyond a reasonable doubt -- is when discussing the

8  murder in the first degree on deliberate premeditation,

9  because it's not a part of either murder in the first

10  degree extreme atrocity and cruelty or in second degree

11  murder.

12      Deliberate premeditation, the third element in

13  murder in the first degree under deliberate

14  premeditation, that the Commonwealth must prove beyond a

15  reasonable doubt is that the killing was committed with

16  deliberate premeditation.  For the Commonwealth to prove

17  deliberate premeditation the Commonwealth must prove

18  that the defendant thought before he acted, that is, the

19  defendant decided to kill after deliberation.  The

20  element of deliberation, however, does not require an

21  extended time span, nor does it mean that the

22  deliberation must be accomplished slowly, rather, it

23  refers to the purposeful character of the premeditation

24  -- refers to the purposeful character of the

**App.** **62**

5-17

1    premeditation.  It is not so much a matter of time as is

2    logical sequence.  The deliberation and premeditation

3    first, then the decision to kill, and lastly, the

4    killing in furtherance of that decision.  All of this

5    may occur within a few seconds.  However, deliberate

6    premeditation excludes action which is taken so quickly

7    that there is no time to reflect on the action and then

8    decide to do it.  The Commonwealth must show that the

9    defendant's resolution to kill was, at least for some

10    short period of time, days, hours, even seconds, the

11    product of recollection -- reflection -- excuse me --

12    product of reflection.

13        Folks, I hope that defines it for you.  And if

14    it doesn't, just write me another note back, and I'm

15    going to tell you, I'm going to do my best to give you

16    another definition or try and give it to you, but,

17    hopefully, ladies and gentlemen, that answers your

18    questions for now.  I thank you very much for writing

19    the questions.  I also, you know, think that we made a

20    good move by not giving you this last night, because I

21    think everybody was real super exhausted.  Plus, it gave

22    me a chance to get this here developed for you too,

23    which is now Exhibit E for identification.

24        And so you may now return to the jury room.

* * * *

App.: 63

*32*

*8-13-01*

*100934*

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.

SUPERIOR COURT
TRIAL NO.: 2001-P-312

FILED
COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPT. OF THE TRIAL COURT
PLYMOUTH COUNTY

AUG 1 3 2001

Fine R Fowers
CLERK

COMMONWEALTH OF MASSACHUSETTS

v.

LAJUAN MELTON

## DEFENDANT'S MOTION FOR NEW TRIAL

COMES NOW LaJuan Melton, by counsel, Ruth Greenberg, and respectfully moves this court for a new trial because the four (4) prior assault convictions admitted to impeach him were not yet final at the time of his trial and may be overturned on constitutional grounds by the Supreme Judicial Court. The defendant additionally asserts that a new trial should be granted because the trial court delivered his instructions with an inflection that disparaged the defense and refused to give a contemporaneous corrective instruction upon request as is apparently required under Commonwealth v. Moore, decided July 23, 2001 by the Appeals Court.

As grounds:

1. Defendant was indicted on May 22, 1998 on the above-captioned homicide and convicted of second degree murder by Connolly, J., and a jury on September 30, 2000.

2. At trial, the Commonwealth moved to impeach the defendant with four (4) prior assault convictions all stemming from an incident where the defendant allegedly fired

1

8

a single shot towards a vehicle with four occupants. Over objection, all four convictions were admitted and, because of this ruling, the defendant chose not to testify. The trial court's ruling on this issue was thus preserved for direct appeal and the matter is now pending before the Appeals Court.

3.    Unbeknownst to the trial court and trial counsel, these four prior convictions were not final at the time of the defendant's trial. The defendant's appeal of those convictions has since been denied by the Appeals Court. The Supreme Judicial Court, however, has accepted the defendant's application for further appellate review. Hearing on the matter is expected in October and a decision within 180 days thereafter.

4.    By this motion, the defendant asserts that impeachment by convictions vacated as unconstitutionally obtained cannot be used for impeachment and that a conviction after trial at which these convictions are deemed admissible must be vacated. United States v. Penta, 475 F.2d 92 (1973), citing Loper v. Beto, 405 U.S. 473 (1972).

5.    The defendant further submitting that even though courts have held that the use of convictions pending appeal is not offensive to federal due process, the admission of state district court convictions prior to the exhaustion of

2

9

App. 65

direct appeal, although permitted by statute, violates state due process guarantees. These guarantees are stronger than federal due process protections. See generally Commonwealth v. Mavredakis, 430 Mass. 848 (2000).

6. The defendant further contends that our state courts should reach a different result because our state court convictions are inherently less reliable. According to statistics developed by the Appeals Court subsequent to the defendant's trial, in 1996, the Appeals Court reversed approximately twenty-three percent (23%) of criminal cases. In other words, at least one of the four prior convictions admitted against this defendant, statistically speaking, was going to be nullified. Any presumption of regularity is thus rebutted, and the rebuttal of this presumption combined with Massachusetts' commitment to due process pursuant to the Declaration of Rights compels a different result than that recited by federal courts.

7. The defendant thus argues that in the event these convictions are vacated by the Supreme Judicial Court, a new hearing is required under Penta, supra. He also argues that even if his convictions are not vacated, they could have been, and that the admission of convictions pending appeal, which chilled his right to testify, violated state due process, and he is entitled to a new trial no matter what ruling the Supreme Judicial Court makes on the prior

3

convictions because the ruling was not yet made at the time he was tried.

8.    The defendant further asserts that the trial court erred in refusing to grant the defendant's request for a contemporaneous instruction to the jury that the inflection of the court's tone of voice when instructing could not be considered on the issue of guilt or innocence and was no reflection on the court's view of the defense.  See relevant portion of trial transcript, attached and incorporated by reference.

9.    In Commonwealth v. Dwayne Moore, decided by the Appeals Court on July 23, 2001, the same issue was raised by the defendant.  Mr. Moore, by means of motion for new trial, brought five similar incidents to the trial court's attention.  A record of these incidents taken from Mr. Moore's brief is attached and incorporated by reference.

10.    In Moore, the Appeals Court appears to hold that the proper rememdy for voice inflection which may disparage the defendant's rights and defenses is a contemporaneous instruction that voice inflection should not be considered, pointing out that the court's standard instruction does not include any reference to tone of voice.

11.    Here, the defendant made the request for contemporaneous instruction required by Moore, and was

4

ll

App.: 67

denied, and the defendant was thus denied the benefit of due process of law, as guaranteed by Article 12 and the Fifth and Fourteenth Amendments to the United States Constitution because the trial court put the weight of his authority in the balance against the accused as forbidden by <u>Quercia v. United States</u>, 289 U.S. 466, 470 (1933), <u>Commonwealth v. Wanderlick</u>, 12 Mass. App. Ct. 970, 972 (1981).

12. The trial court's voice inflection created selective overemphasis on some portions of the charge, a result forbiddent by <u>Commonwealth v. Baseler</u>, 419 Mass. 500, 505-506 (1995): "A court is neither allowed nor required either to stress or to argue a particular side." <u>Commonwealth v. Harris</u>, 376 Mass. 201, 205 (1978).

13. Unlike <u>Moore</u>, defense counsel made a timely objection and requested a contemporaneous instruction. The trial court had no reason to refuse to give such an instruction, and the refusal casts doubt on the trial court's opinion of his own actions, which was, not surprisingly, that he made no mistake. But "a lawyer appointed to represent the interests of the defendant should not be required to delegate responsibility of detemining whether error occurred at trial to participants at that trial whose conduct may have formed the basis for that error." <u>Hardy v. United States</u>, 375 U.S. 277, 290 (1964) (Goldberg, J. concurring). The tape of the instructions at this trial being lost or destroyed

12

App. 68

(See affidavit of appellate counsel, <u>post</u>) the door is open to conflicting versions of what occurred at trial and a miscarriage of justice results. Cf. <u>Commonwealth v. Shea</u>, 56 Mass. 358 361 (1969).

For the reasons stated herein and on the record presented, a new trial is respectfully requested. A hearing is requested. In the event that trial court is inclined to rule on this motion without an evidentiary hearing, the defendant respectfully requests the court to make specific findings of fact, and to elucidate specific contingent rulings dependent on the outcome of the application for further appellate review of the defendant's prior convictions at the Supreme Judicial Court.

Respectfully submitted,

Ruth Greenberg
Attorney at Law
505 Paradise Rd. #166
Swampscott, MA 01907
(781) 593-5277
BBO #563783

6

13

App. 69

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.                              SUPERIOR COURT
                                           TRIAL NO.: 2001-P-312

COMMONWEALTH OF MASSACHUSETTS

V.

LAJUAN MELTON

## AMENDMENT TO DEFENDANT'S MOTION FOR NEW TRIAL AND REDUCTION IN VERDICT

COMES NOW LaJuan Melton, by counsel, and respectfully requests this Court to allow him to supplement his motion for new trial and for reduction in verdict to manslaughter with the claim asserted herein, a claim relying on newly discovered evidence provided by the Commonwealth on October 5, 2001, in response to a request for exculpatory materials.

As grounds:

1.   The defendant was charged and convicted of the murder of Mr. Colon.  To this charge at trial, the defendant asserted a claim of self-defense/provocation/excessive force premised on report of a gun in the car in which the deceased was a passenger.

2.   The material provided on October 5, 2001 by the Commonwealth, attached in entirety, provides evidence at p. 4, ¶¶ 20-21, that the deceased was in fact killed by another passenger, Edson Miranda, shooting a gun inside the car. Edson Miranda made this admission against interest to

37

A TRUE COPY ATTEST

*Frances R. Powers*

CLERK

1

Emmanuel Carapinha, offered through Carapinha's counsel as part of a proffer agreement with the Office of the District Attorney.

3.    This evidence is newly discovered within the meaning of Rule 30 and was not available at trial.

4.    This evidence supports Mr. Melton's claim of self-defense, and of excessive force in self-defense/provocation manslaughter.  The jury should have heard that a man in the victim's car had a gun and was shooting it.  This evidence was critical to the defendant's claim and the absence of the evidence requires a new trial and/or reduction in verdict to manslaughter.

An opportunity for oral argument is respectfully requested.

Respectfully submitted,

Ruth Greenberg
Attorney at Law
505 Paradise Rd. #166
Swampscott, MA 01907
(781) 593-5277
B.B.O. #: 563783

App. 71

87

**Excerpt from transcript of hearing on defendant's motion for new trial, Feb. 4, 2002**

6   MS. GREENBERG:  Judge, at the risk of

7   losing whatever sympathy I may have garnered, I

8   understand there was an issue in that case as well

9   as to the Court's inflection in instruction.

10   THE COURT:  Well, I never heard of

11   it.

12   MS. GREENBERG:  I had opportunity to

13   speak to Attorney Anders on this issue.

14   THE COURT:  Was it raised on appeal?

15   MS. GREENBERG:  The defendant was

16   acquitted.

17   THE COURT:  Oh, that's right.  You're

18   right.  Sorry.

19   MS. GREENBERG:  But coming back to

20   where we were.  Once the Court agrees, for whatever

21   reason the Court has, to instruct on the theory of

22   self-defense, the defendant argues based thereupon.

23   So if you were to say "I'm going to give a

24   self-defense instruction" and then the defendant

App.    72

88

1    argues self-defense, then the defendant's right --

2              THE COURT:  I think I remember

3    Mr. Alias' closing.  I can't remember anything that

4    he acknowledged that the man did the shooting; did

5    he?

6              MS. GREENBERG:  Judge --

7              THE COURT:  I thought he had argued

8    that he wasn't the guy?

9              MS. GREENBERG:  Judge, it's a joint

10   venture conviction.  The argument was --

11             THE COURT:  That's right.  It was.

12             MS. GREENBERG:  Yes.  The defendant

13   argues self-defense and excessive force in

14   self-defense and provocation and that's based on

15   your agreement to give that instruction.  You

16   weren't just instructing the jury to give them an

17   irrelevant and confusing theory of law, you were

18   instructing them based on the defense's request and

19   upon that request the defendant predicated his

20   defense.  So even if he had not originally been

21   entitled, by virtue of your promise to give it, he

22   based his argument on it.  And if you were to say

23   retroactively "There was no basis," that still

24   doesn't mean then you retroactively are denying him

ROMANOW REPORTING 617-325-3575

App:  73

89

1    his state and constitutional rights.  That's the

2    problem.

3                    THE COURT:  I got it.

4                    MS. GREENBERG:  Judge, can I get one

5    more sentence in?

6                    THE COURT:  Yes, go right ahead.

7                    MS. GREENBERG:  You know, this whole

8    thing on whether or not there was a basis for

9    self-defense, excessive force in self-defense, it's

10   intimately related to the question of whether there

11   was a guy in the car shooting a gun.  So all these

12   things --

13                   THE COURT:  But where is the evidence

14   there was a guy in a car shooting a gun?

15                   MS. GREENBERG:  That's in <u>Miranda</u>,

16   Judge.  So that's why I'm hoping still, Judge, that

17   we can work something out and I urge the Court to

18   consider it.

19                   THE COURT:  Okay.

20                   MS. McKENNA:  Your Honor, just

21   briefly?

22                   THE COURT:  Sure.

23                   MS. McKENNA:  Closing argument does

24   not make an issue part of a case.  It's a benefit

App: 74

90

1    the defendant isn't entitled to.  Yes, he argued

2    it, but this defendant not only got a fair trial,

3    he got a more than fair trial, and he really should

4    not be heard to complain at this point.  And I do

5    have those citations for you.  Your Honor, I did

6    find them.  Thank you, your Honor.

7              THE COURT:  Thank you.  Good.  Okay.

8    That's it.  We very well may come back in after we

9    get Mr. Alias, just to see what he says went on.

10   I'll have copies of tapes made.

11             MS. GREENBERG:  You will?  I will?

12             THE COURT:  No, no, we will.  We will

13   make one for the Commonwealth, one for the

14   defendant.  I wish you happy listening.  There are

15   gaps in those tapes because there are certain

16   times -- because it's obviously recorded from this

17   other one.  But if you persist on, okay, that will

18   spring right back and pick it right up.  But you

19   have to be a little patient because of the gaps.

20             MS. GREENBERG:  Judge, with regard to

21   obtaining an affidavit from Mr. Carapino, I can ask

22   Janice Bassil as a favor to go to see Mr. Carapino.

23                         * * * *

24   :

App: 75

6-14-02

# COMMONWEALTH OF MASSACHUSETTS

**PLYMOUTH, ss.**

**SUPERIOR COURT
CRIMINAL ACTION
NO. 100934**

## COMMONWEALTH

v.

## LAJUAN MELTON

### MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION FOR A NEW TRIAL

This matter is before this court on the defendant's motion for a new trial. After hearing and review of parties' submissions and for the following reasons, the defendant's motion for a new trial is **DENIED**.

## BACKGROUND

I. Procedural Background

On May 22, 1998, a grand jury indicted the defendant, Lajuan Melton ("the defendant"), of second degree murder in the death of Alexander Colon ("Colon" or "the victim"). On September 30, 2000, a Plymouth County jury convicted the defendant of second degree murder (Connolly, J). The defendant filed his brief in the Appeals Court on June 13, 2001, claiming error in a ruling that would have allowed four convictions to be used against him if he testified; error in the instruction on excessive force in self defense; and Judge Brady's denial of the motion to suppress. On August 13, 2001, the defendant filed a motion for a new trial claiming (1) error in the ruling that would have allowed four prior convictions to be used against him if he chose to testify, and that because of this ruling, the defendant chose not to testify; and (2) that the judge used prejudicial inflections in his voice when instructing the jury and then denied the defendant's request for a contemporaneous instruction. On October 3, 2001, the defendant filed a motion to

94

App: 76

reduce the verdict from murder to manslaughter, making an additional claim that (3) there is

newly discovered evidence showing that Edson Miranda, and not the defendant, killed the victim.

## II. Factual Background

The court adopts the following relevant facts presented in the Commonwealth's

opposition to the defendant's motion for a new trial. On March 31, 1998, the defendant and

Donald Averett ("Averett") were outside of 918 Warren Avenue in Brockton. At about 6:30

p.m., Claudio Miranda ("Miranda") drove his sister's car south on Warren Avenue, passing

number 918. Alexander Colon was in the front passenger seat and two unidentified young

Hispanic men sat in the back seat. Miranda then turned around on some side streets and then

drove north down Warren Avenue, again passing number 918. The music in the car was turned

up loud, but Miranda heard gun shots and Colon said he was shot. The back window of the car

was half shot out. Miranda brought Colon to Brockton Hospital where the two unidentified

young Hispanic males pulled the victim, who appeared lifeless, from the car. The unidentified

men told a paramedic, Heather Hartford, who was arriving at the hospital driving an ambulance,

that Colon had been shot. Colon's pulse was weak and one of the unidentified Hispanic males

yelled to Colon, "Don't die, man, you can't, if you die . . . I'm going to get those niggers."

The victim, Colon, was 19 years old and sustained a gunshot wound to his upper left mid-

back, which fractured his first left rib in the back and lacerated two major blood vessels to his

left lung. Despite extensive surgical intervention, Colon died of his injury the next day, April 1,

1998. The entrance of the wound was "atypical" meaning that it resulted from a "tumbling

bullet" that hit and/or went through another object ricocheting before striking the victim.

Initially, the defendant admitted to being in the area, but denied that he shot at the car.

Instead, he blamed two others, one of which was incarcerated at the time of the shooting, and

100

App. 77

another whose alibi checked out. After blaming two other individuals for the shooting, the defendant told police, in a taped confession, that both he and Averett had shot at the car, but that he had only shot twice while Averett shot more than twice and was still shooting when the defendant stopped. The defendant said he did not know whether he hit anything and said he had probably just hit the building. There was no evidence that either building in the area was hit by a bullet.

## DISCUSSION

### I. Standard of Review under Mass. R. Crim. P. 30(b)

Massachusetts Rules of Criminal Procedure 30(b) provides that a judge may grant a new trial "at any time if it appears that justice may not have been done." A judge has sound discretion over the disposition, except where the trial was infected with prejudicial error. Commonwealth v. Moore, 408 Mass. 117, 125 (1990). However, the doctrine of waiver may "foreclose a defendant from raising an objection because, while he might have raised it earlier and thus had it resolved during the normal course of adjudication, he does not raise it until after the regular process had already run its course." Commonwealth v. Amirault, 424 Mass. 618, 637 (1997)

### II. Prior Convictions

During the trial, the Commonwealth indicated its intention to impeach the defendant with four prior convictions if the defendant testified. The issue was raised by the defendant filing a motion in limine asking the court to exclude all prior convictions due to their prejudice to the defendant. The four convictions stemmed from an incident involving another drive by shooting that occurred the next day in a totally separate incident, namely April 1, 1998. The defendant fired a single shot towards a vehicle with four persons inside, and was subsequently convicted of

3

App. 78

four counts of assault by means of a dangerous weapon. He used a glock 9mm gun on the back-to-back days. The defendant filed a motion in limine asking the court to exclude the use of all prior convictions due to their prejudice to the defendant. The court, after hearing and in its discretion, denied the motion as to the four convictions of assault with a dangerous weapon. Defense counsel then indicated that the defendant would not testify because of the prejudice against the defendant that said convictions would create. It is noted that neither counsel informed the court at the time of the hearing that these convictions were on appeal. Even if the court had known of the pending appeal, the court would have allowed the admission of the prior convictions for impeachment purposes. The four convictions of assault with a dangerous weapon were affirmed by the Appeals Court on January 2, 2001. Commonwealth v. LaJuan Melton, 50 Mass. App. Ct. 637 (2001). The Supreme Judicial Court granted further appellate review at 434 Mass. 1102 (2001). On March 13, 2002, the Supreme Judicial Court affirmed the four convictions of assault and battery with a dangerous weapon at 436 Mass. 291 (2002).

The defendant argues that the admissions of state district court convictions prior to the exhaustion of direct appeal, although permitted by statute, violates state due process guarantees. Neither the U.S. Supreme Court or the First Circuit supports the broad assertion that the admission of state district court convictions prior to the exhaustion of direct appeal, violates state due process guarantees. See Loper v. Beto, 405 U.S. 473 (1972); United States v. Penta, 475 F.2d 92 (1973). Rather, the U.S. Supreme Court and the First Circuit have all recognized that certain, specific types of prior convictions are constitutionally invalid and must be set aside unless they are harmless error. Penta, supra at 96 (holding that the use of prior convictions which ultimately resulted from evidence obtained in an illegal search and seizure, were not constitutionally void, and even if they were, their use constituted harmless error); Loper, supra at

4

102

483 (holding that "the use of [uncounseled] convictions constitutionally invalid under <u>Gideon</u> v.

<u>Wainright</u>, [372 U.S. 335] to impeach a defendant's credibility deprives him of due process of

law").

"It has been held that the use of convictions for impeachment does not infringe either the

state or federal constitutional rights of criminal defendants. <u>Commonwealth</u> v. <u>Drumgold</u>, 423

Mass. 230, 249 (1996)" Liacos, Handbook of Massachusetts Evidence, 7th Ed., § 6.10.2, pp.

314-315.  In order to be used to impeach a conviction must be a final judgment.  <u>Wilson</u> v.

<u>Honeywell</u>, 409 Mass. 803, 808-809 (1991) (not permitting a district court conviction to be used,

from which a trial <u>de novo</u> was claimed.  The claim of the jury trial vacated the district court

conviction and rendered the conviction a nullity).  However, there are four convictions that were

pending in the Appeals Court at the time of trial.  In <u>Forcier</u> v. <u>Hopkins</u>, 329 Mass. 668, 670-671

(1953), the Court discussed the terms 'conviction' and 'final judgment.'  "[T]he term

'conviction,' as used in this statute [ch. 233, § 21] means a judgment that conclusively

establishes guilt after a finding, verdict or plea of guilty . . .  In a criminal case the sentence is the

judgment.  The sentence is not vacated by its suspension."

In <u>Commonwealth</u> v. <u>Jackson</u>, 45 Mass. App. Ct. 666, 670-671 (1998), the Appeals Court

discussed M.G.L. c. 233, § 21 and the definition of the word 'conviction' as used therein, stating:

> "as discussed in analogous precedent, a conviction occurs when
> there has been a finding of guilty by a jury . . . We see no reason to
> give the word 'conviction' as used in ch. 233, § 21, second
> paragraph, a meaning different from that discussed in the
> analogous precedents."

Here, there were four convictions that the court in its discretion indicated that it would

allow their use for impeachment.  If requested by the defendant the court would have allowed a

request to "sanitize" their use by striking the date of the offense.  From a practical point of view,

5

1v3

it seems to the court that there was not any real likelihood of the defendant testifying in this case.

The defendant voluntarily gave a recorded taped statement to the police, admitting his

involvement in this shooting and the tape was played and offered into evidence.

III.  The Judge's Supposed Voice Inflections

Next, the defendant argues that the judge exhibited inflections in his voice when

instructing the jury, indicating to the jury that he favored the Commonwealth's case, and that as a

result of these supposed prejudicial voice inflections, he requested and was denied a

contemporaneous instruction.  The defendant points to Commonwealth v. Moore, 52 Mass. App.

Ct. 120 (2000), for the proposition that a contemporaneous instruction is *required* to remedy

voice inflections that may indicate bias.  The defendant, however, is mistaken that Moore

requires that a judge give a contemporaneous instruction.  See id. at 129.  Rather, the Court, in a

decision that proceeded the defendant's trial, simply *suggests* that judges should give such an

instruction.  Id.[1]  Moreover, while counsel did raise an objection to the judge's voice inflections

on September 29, 1999, the record does not indicate, nor does the court recall, that defense

counsel ever, at any time, requested such a contemporaneous instruction.  Despite the absence of

such a request, on September 29, 1999, the judge did give the following instruction in the final

charge to the jury: "If I have said or done anything to cause you to believe that I have any

opinion concerning the facts of this case, then you are mistaken, because I am totally neutral on

this issue.  It is your decision, not mine, to determine whether the Commonwealth has met its

burden of proving the defendant's guilt."

---

[1]As a practical matter, this court now gives the suggested instruction in every civil and
criminal case tried before this judge.

App.   81

After a further colloquy on the matter (voice inflections), on the court's own motion the

court on September 30, 1999 around 9:18 a.m., at the end of answering a question from the jury

stated as follows: "Please do not hesitate to ask any questions concerning any of the law.  Of

course, as to the facts, I cannot answer any questions as to the facts, because that is your function

and your function only.  I have absolutely no position whatsoever on what the facts are in this

case.  I am neutral on trial issues, and that is solely and exclusively your concern." (p. 5-18).

The jury returned the verdict that day at 2:10 p.m.

Defense counsel never requested to the court a contemporaneous instruction on

September 30, 1999.  In fact, the only conversation regarding a contemporaneous instruction

occurred on the last day of the trial, September 30, 1999, when the judge, himself, raised the

issue of his voice inflection.  Defense counsel then misrepresented to the court that he has asked

for such a curative instruction the day prior, when in fact, according to the record, he had not.[2]

At that point, the judge, responding to defense counsel's misrepresentation, asked, "And what do

you want me to do now?," to which defense counsel responded, "at this point nothing, Judge."[3]

A hearing was held on this motion at Suffolk Superior Court, on February 4, 2002, with

the defendant present and on the stenographic record.  In said motion for new trial, defendant's

appellate counsel, Ruth Greenberg, Esq. included the following in the defendant's motion for a

new trial:

------------------------------------------------------------

[2]On September 30, 1999, defense counsel stated to the court that on September 29, 1999,
"all I asked you to say to the jury was, If I seemed to be emphasizing one part over another,
that's merely a delivery and not an intention.  That's all I asked."

[3]Defense counsel continued, I asked yesterday.  I don't want to emphasized it any further
today to put it in their mind that there's something unusual about the matter.  So having asked
and having not received it yesterday, I don't want it today."

105

1. The court's use of a voice inflection which may or did disparage the defendant's rights and defenses (parg. 2 of the defendant's motion);

2. The court "put the weight of his authority in the balance against the accused" (parg. 3 of said motion);

3. The court's voice inflections created selective overemphasis on some portions of the charge (parg. 3 of said motion); and

4. The defendant's counsel requested a "contemporaneous instruction" that voice inflections should not be considered, on September 29, 1999.

The court asked Attorney Greenberg on what facts or knowledge that she based the four above assertions. Attorney Greenberg indicated that she only read the record and based it on defendant's trial counsel's (Kenneth Elias, Esq.) comments on the record. (see 4-123 to 4-125 and 5-6 to 5-11). Attorney Greenberg indicated at that time that she had no other basis to make claims #1 to #4 inclusive. The court asked Attorney Greenberg whether she ever discussed the matter with trial counsel, Attorney Elias, and she stated, "no." Soon after the hearing, within a matter of weeks, Attorney Greenberg sent a hand scribbled affidavit from Attorney Elias indicating that he requested a contemporaneous instruction on the voice inflections off the record or in chambers on September 29, 1999. The court gives no credibility to the affidavit by Attorney Elias. The court specifically remembers that the request was not made on September 29, 1999. (4-123 to 4-125). If it had been made, there simply would be no reason for the court to revisit the subject on September 30, 1999. (5-6 to 5-11).

Finally, much has been said in the defendant's motions that a tape recording of part of the charge has been lost or destroyed. The court, at the time of the charge, indicated that it would tape record the charge, and give the tape and a tape recorder to the jury. see: Commonwealth v. Baseler, 419 Mass. 500, 506 (1995). However, due to the court's error, it turned off the tape

recorder due to a side bar conference and failed to turn it back on when it went to finish the charge. Under Commonwealth v. Baseler, the Court could not send it to the jury for use in deliberations because it did not contain the complete charge. Thereinafter, it became lost. Defense counsel argues as follows: "The tape of the instructions at this trial being lost or destroyed . . . the door is open to conflicting versions of what occurred at trial and a miscarriage of justice results."

At said hearing, the court asked Attorney Greenberg if she had bothered to contact the court reporter, Ms. Regina M. Griffin, so that she might listen to the tape containing the charge. The court reporter here uses a two track system - one of which is a direct recording of the court addressing the jury. Attorney Greenberg indicated that she had not - even though her filings indicate that she did check with Ms. Griffin to determine the accuracy of a few words in the transcript.

Prior to the hearing, the court obtained the tapes of the complete charge. The court informed the parties that three copies of the tapes would be made through the Administrative Office of the Trial Court, and a copy of same would be supplied to both counsel, with another copy being filed with the Clerk of the Appeals Court. The Appeals Court and the Supreme Judicial Court may, of course, listen to the tapes. The court believes it reflects a fair and moderate tone in the delivery of the charge, notwithstanding the defendant's claim that the court (1) disparaged the defendant's rights and defenses, (2) put the weight of his authority in the balance against the accused and (3) created selective overemphasis on some portions of the charge. Accordingly, after reviewing the record and the enclosed recordings (two tapes), this court finds no evidence that a contemporaneous instruction was requested on September 29, 1999 or required and that the court's tone or inflection was not improper in the slightest.

IV. The "Newly Discovered Evidence" claim under Mass. R. Crim. P. 30(b)

   The defendant alleges that there is newly discovered evidence, pursuant to Mass. R. Crim. P. 30(b), that shows that Edson Miranda ("Miranda"), and not the defendant, killed the victim by shooting a gun inside the car, and that Miranda made this admission against his penal interest.

   The issue arises from an interview with a person known as Emmanuel Caraphina, conducted by the Assistant United States Attorney, Denis Cooper, on Tuesday, June 26, 2001 together with, among others, the Massachusetts State Police and the ATF. The statements were given under a proffer agreement signed by the Plymouth County District Attorney's Office. A five page report dated June 27, 2001, of this meeting was written up by State Police Trooper, John P. Duggan of the Detective Unit-Plymouth County District Attorney.

   Mr. Caraphina stated that he was at the Plymouth House of Correction and was placed in a cell with Edson Miranda. Caraphina stated that the lawyer representing the defendant visited Miranda. (It was acknowledged by Attorney Greenberg, at the hearing on this motion, that she was the attorney that visited Caraphina). Miranda allegedly told Caraphina that the lawyer (for the defendant) said that she knew that Miranda shot Colon through the seat of the car and that the shooting was an accident. "The lawyer wanted Miranda to come forward and testify to that. The lawyer reportedly told Miranda that he would not get into trouble because it was an accident."

   Further, Caraphina stated that Miranda, in conversation, admitted to him that he shot Colon through the seat by accident. Miranda allegedly told Caraphina that he was not going to admit to the shooting.

10

108

App: 85

These statements allegedly made by Caraphina are directly contradicted by the defendant's statements to Lt. Crisp, where the defendant confessed to the shooting and his involvement in it.

On the next day, July 29, 2001 at 6:30 p.m., State Police Lieutenant, Michael Crisp and Brockton Detective Reardon interviewed Miranda. When told of what Caraphina said the day before, the report of Lieutenant Crisp, states as follows:

"Miranda told us this was all bullshit that he wasn't in the car and that Colon was his boy. He said some lady attorney came into the jail a couple of months ago representing LaJuan Melton and tried to peg this "bullshit" on him . . .. She told him some "dude" who was getting deported told her that Edson accidently shot Colon. Miranda told us that he told her this was "bullshit" and told her he didn't even know "who the fuck you are."

Further Miranda said "that no one with any street smarts would ever get into the back seat of a two door car like Cardi's with a gun because then you'd be trapped if the cops stopped the car. Miranda volunteered to take a lie detector test to show that he has nothing to do with Colon being shot and that "Luan got people behind the scenes trying to get him off the murder wrap any way they can."

There have been no affidavits filed in support of or in opposition to this motion, and the above references came from the five page State Police report from the interview at the U.S. Attorney's office dated 6/27/01 and the three page Police Report dated 7/5/01, copies of which are attached. Mass. R. Crim. P. 30(c)(3) requires the filing of affidavits concerning the facts on which the moving or opposing parties rely. However, assuming Caraphina had signed an affidavit attesting to the above statements attributable to him, the court would find the affidavit not credible.

11

109

App: 86

A defendant moving for a new trial on the ground of newly discovered evidence must show both that the evidence is newly discovered and that it is material and credible, or carries a measure of strength in support of the defendant's position, and that it casts real doubt on the justice of the conviction. Commonwealth v. Grace, 397 Mass. 303, 307 (1986). Such evidence must be based in evidence unknown and unavailable at the time of trial despite diligence of the moving party. Commonwealth v. Williams, 399 Mass. 60, 64 (1987); Commonwealth v. Markham, 10 Mass. App. Ct. 651, 654 (1980). "Merely introducing another possible suspect, without substantial admissible evidence that this person, and not the defendant, may have committed the crime, does not warrant a new trial." Commonwealth v. Lopez, 433 Mass. 406, 417 (2001).

The defendant has not met his burden of showing that the Miranda information was unknown and unavailable at the time of his trial despite his diligence. To the contrary, there is evidence that the defendant had considered whether the bullet that killed the victim could have come from the backseat of the car, but had chosen, nonetheless, for strategic reasons, not to use the information [4] The fact that the defendant had made a taped confession that the jury would hear, along with that the defendant had previously accused three other people of the deadly shooting, indicate that the decision not to use the suspected Miranda information as part of his defense was strategic.

---

[4] In the cross examination of James Weiner, M.D., the medical examiner, defense counsel asked Dr. Weiner whether the bullet "Could have been fired from somebody in the backseat?," to which Dr. Weiner replied, "Yes sir." Defense counsel then asked, "And would have-could have made the same entrance into the upper back and followed the same path?," to which Dr. Weiner replied, "Yes sir."

12

110

App.  87

Moreover, such information was and is inadmissible hearsay as it does not fall under any exception to the hearsay rule. The defendant claims that the Miranda information is admissible as a statement made against his penal interest. Miranda's alleged admission, however, was not made against his penal interest. "A statement is admissible as against penal interest if it meets three tests. '[1] [T]he declarant's testimony must be unavailable; [2] the statement must so far tend to subject the declarant to criminal liability that a reasonable man in his position would not have made the statement unless he believed it to be true; and [3] the statement, if offered to exculpate the accused, must be corroborated by circumstances clearly indicating its trustworthiness.'" Commonwealth v. Reynolds, 429 Mass. 388, 401 (1999), quoting Commonwealth v. Drew, 397 Mass. 65, 73 (1986) (citations omitted); see also Commonwealth v. Gagnon, 408 Mass. 185, 193-194 (1990), denial of post-conviction relief affirmed, 430 Mass. 348 (holding that an out-of-court statement made by a person that he, and not the defendant actually committed the crime is admissible where the defendant's testimony met all three tests). Additionally, a judge may consider the timing of the declaration; the relationship between the declarant and the witness; the reliability and character of the declarant; whether the statement was made spontaneously; whether other people heard the statement; and whether there was any motive for the declarant to misrepresent the matter. Drew, 397 Mass. at 76.

The defendant has failed to meet his burden of establishing that Miranda made a statement against his penal interest. The statement has not satisfied any of the three elements of the test required to be admitted as a statement against penal interest. First, there is no evidence that Miranda was unavailable to testify at trial. The defendant has failed to show that Miranda could not have been procured to testify. Miranda has adamantly and repeatedly denied that he was even inside the subject car, let alone that he fired a shot from the backseat of the subject car.

13

111

His adamant denial of the crime to the police suggests that he would have been available to testify if he were accused. Secondly, there is evidence that if Miranda did in fact make such a statement of culpability, he did so under the impression that he would not be subject to criminal liability.[5] Therefore, the defendant has failed to show that the statement was truly made against his penal interest. Third, the defendant has failed to establish that Miranda's statement is clearly corroborated. Nobody, but the informant, Caraphina, heard Miranda's purported statement and nobody else has even placed Miranda in the subject car. Further, the statement reported by Caraphina lacked detail and credibility because of his possible motives to misrepresent the matter. Further, Caraphina, a federal informant, may have had the motive of "saving his own skin" from the federal charges he faced. Finally, in considering the relationship between Caraphina and Miranda, there is evidence, according to the statement Miranda made to police that Caraphina may have been friends with the defendant. The defendant, then, has failed to show that Miranda made a statement against his penal interest or that the purported statement is otherwise admissible.

---

[5]According to the informant, Caraphina, the defendant's attorney told Miranda "he would not get in trouble because it was an accident."

14

112

App: 89

## ORDER

For the forgoing reasons, it is hereby **ORDERED** that the defendant's Motion for a New

Trial is **DENIED** on all grounds asserted.

Thomas G. Connolly
_____
Thomas E. Connolly
Justice of the Superior Court

**Dated**: June  6 , 2002

15

113

App. 90

6-14-02

58

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.                           SUPERIOR COURT
                                        TRIAL NO.: 2001-P-312

COMMONWEALTH OF MASSACHUSETTS

V.

LAJUAN MELTON

### AMENDMENT TO DEFENDANT'S MOTION FOR NEW TRIAL
### AND REDUCTION IN VERDICT

COMES NOW LaJuan Melton, by counsel, and respectfully

requests this Court to allow him to supplement his motion for

new trial and for reduction in verdict to manslaughter with

the claim asserted herein, a claim relying on newly

discovered evidence provided by the Commonwealth on October

5, 2001, in response to a request for exculpatory materials.

As grounds:

1.   The defendant was charged and convicted of the

murder of Mr. Colon.  To this charge at trial, the defendant

asserted a claim of self-defense/provocation/excessive force

premised on report of a gun in the car in which the deceased

was a passenger.

2.   The material provided on October 5, 2001 by the

Commonwealth, attached in entirety, provides evidence at p.

4, ¶¶ 20-21, that the deceased was in fact killed by another

passenger, Edson Miranda, shooting a gun inside the car.

Edson Miranda made this admission against interest to

37

1

A TRUE COPY ATTEST

Frances R. Powers
CLERK

App.  91

6-14-02

74

## COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.
COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPT. OF THE TRIAL COURT
PLYMOUTH COUNTY

JUN 14 2002

*Francis R. Powers*
CLERK

SUPERIOR COURT DEPT.
CRIMINAL ACTION
NO.: 2001-P-312

COMMONWEALTH OF MASSACHUSETTS

vs.

LAJUAN MELTON

A TRUE COPY ATTEST

*Francis R. Powers*
CLERK

### MEMORANDUM AND ORDER ON
### DEFENDANT'S MOTION FOR NEW TRIAL AND REDUCTION IN VERDICT

The Court allows the defendant to file his amendment to Defendant's Motion for a New Trial and Reduction in Verdict.

The Court erroneously submitted this case to the jury on a lesser included charge of involuntary manslaughter and on self-defense. It was discussed extensively with counsel in the charge conference on September 29, 1999, and the Court "in an exercise of caution" submitted those issues to the jury. This is a case of two men taking their guns out and blasting away at a passing car. There simply is no evidence they were threatened in any way by anyone.

It is noted by the Court that it inadvertently, but erroneously, misspoke when it stated in its final charge at 4-113 of the record that "If the defendant used excessive force, it is reduced to a second degree murder." The correct charge should have been "If the defendant used excessive force, it is reduced to manslaughter." The Court correctly charged the jury on the exact same issue appropriately two other times (e.g. pg. 4-100, l. 14-20; 4-102 to 4-106, l.4). There is absolutely no evidence, admissible or credible, by affidavit or otherwise, that indicates that Edson Miranda was in the subject car at the time of the shooting.

The Court therefore assumes that this Motion to Reduce the Verdict from second degree

App. 92

murder to manslaughter is being made pursuant to Mass. R. Crim. P. 25(b)(2).  See

Commonwealth v. Woodward, 427 Mass. 659, 666-672 (1998).  The Court will not deal with

that portion of the motion that requests a new trial as this issue has been dealt with in the Court's

decision on the Motion for a New Trial.

  After consideration, and a reading of the entire trial transcript, Motion for a Reduction in

Verdict from Second Degree Murder to Manslaughter is **DENIED**.  In light of the facts of this

case, there is no reason to do so.

<br>

      By the Court,

      *Thomas E. Connolly*

      Thomas E. Connolly
      Justice of the Superior Court

Dated: June *b* , 2002

**App. 93**

Excerpt from defendant's brief in the Massachusetts
Appeals Court

II. THE TRIAL COURT ERRED IN INSTRUCTING THAT THE USE OF EXCESSIVE FORCE IN SELF-DEFENSE WAS MURDER, AND THAT THE MITIGATION OF MURDER TO VOLUNTARY MANSLAUGHTER REQUIRED PROOF BEYOND A REASONABLE DOUBT OF AN INTENTIONAL BATTERY LIKELY TO CAUSE DEATH

The trial court's instructions on voluntary and involuntary manslaughter were garbled. On the reduction of murder to murder to voluntary manslaughter by the mitigation of malice, the trial court's instructions on excessive force in self-defense were unconstitutionally infirm for the reasons set forth below.

The trial court initially instructed, at Vol. 4, pp. 100-01:

"Both the crimes of murder and voluntary manslaughter require proof of an unlawful killing, but the crime of murder will be reduced to the crime of voluntary manslaughter if the killing occurred under mitigating circumstances that satisfies you that the defendant did not act with malice. In order to prove a conviction of murder, the Commonwealth must prove beyond a reasonable doubt the absence of those mitigating circumstances... the mitigating circumstances you must consider are (1) heat of passion; (2) sudden combat; and (3) excessive force in self defense."

On the critical question of self-defense, the trial court instructed only, "if the Commonwealth has not proved beyond a reasonable

13

App. 94

doubt the absence of self-defense, the Commonwealth has not proven malice," and went on to instruct in the next paragraph (following a peculiarly garbled and burden-shifting instruction on the burden of proof), directly contrary to the original instruction and wrongly, that if:

> "[Y]ou find the Commonwealth has not proven beyond a reasonable doubt the absence of self-defense, you must find the defendant guilty of murder and you would be, excuse me, you must find the defendant not guilty of murder and you would be justified in finding the defendant guilty of manslaughter." (Vol. 4, p. 103).

This is not the law. If the Commonwealth fails to prove the absence of self-defense, the jury is required to return a verdict of acquittal, not manslaughter. Mullaney v. Wilbur, 421 U.S. 684 (1975), Commonwealth v. Rodriguez, 370 Mass. 684 (1976).

This error standing alone, while egregious, could be considered harmless when a jury returns a verdict of second degree murder, since that verdict ordinarily signifies the jury did not in any case agree with the defendant's argument that

14

he was guilty of the use of excessive force in self-defense.

Here, however, the trial court's error does not stand alone. The trial court additionally instructed that a person who uses excessive force in self-defense loses the right to self-defense entirely, and that a person who uses excessive force in self-defense is guilty of second degree murder, as set forth below:

> "In the eyes of the law, <u>a person who uses what is clearly excessive and unreasonable force</u> has himself become an aggressor and <u>loses the right to self-defense.</u> This is, this is not, this is not to pertain folks, to the charge I gave you that if they, <u>if the defendant used excessive force it is still reduced to a second degree murder</u> that instruction remains in effect... <u>a defendant would lose his right to self-defense if he used a level of force that was unreasonable</u> and clearly excessive under the circumstances..." (Vol. 4, p 113.).

This is not the law. Excessive force in self-defense is manslaughter, not murder. <u>Commonwealth v. Torres</u>, 420 Mass. 491 (1995). These instructional errors on the issue of the mitigation of murder to voluntary manslaughter are further compounded by subsequent instructions confusing the distinctions between voluntary and

App. 96

involuntary manslaughter, and shifting the burden of proof on manslaughter to the defendant in violation of Article 12 and the Fifth and Fourteenth Amendments.

The trial court initially instructed that voluntary manslaughter involved the mitigation of malice. (Vol. 4, p . 100, 103). Following a break, the trial court then instructed that in order to prove voluntary manslaughter,

> "[T]he Commonwealth must prove beyond a reasonable doubt the following elements: that the defendant intentionally inflicted an injury or injuries likely to cause death upon the deceased which caused his death, an that the defendant acted unlawfully... if the Commonwealth fails to prove each, each one of these elements beyond a reasonable doubt, you may not convict the defendant of voluntary manslaughter." (Vol. 4, p. 105-6).

This instruction, as given, did not describe a separate and lesser-included crime of involuntary manslaughter, but instead acted as a modifier to the court's already erroneous instruction on mitigation. As a result of this odd instruction, before the jury could mitigate murder to voluntary manslaughter, they were required to find beyond a reasonable doubt that

App. 97

the defendant intentionally inflicted an injury likely to cause death. Such a requirement effectively and improperly made murder a lesser included of manslaughter, because shooting at a car full of people satisfies the Commonwealth's burden on third prong malice without proof beyond a reasonable doubt that the defendant intentionally inflicted an injury. Unless the defendant could show he intended to injure the victim, no manslaughter conviction could be returned. Regrettably, no objection was made. Reversal is required nonetheless.

A "defendant is entitled to have the issues of fact clearly presented to the jury and the law applicable thereto carefully explained." Commonwealth v. Pickles, 393 Mass. 775, 779 (1985). "The prejudice caused a defendant by error does not somehow evaporate or diminish simply because his counsel has failed to object." Commonwealth v. Wood, 380 Mass. 545, 551, n. 5 (1980). "Where the error is so fundamental as not to submit to the jury the essential ingredients...on which the conviction could rest, we think it necessary to take note of it on our

17

App: 98

own." <u>Screws v. United States</u>, 325, U.S. 91, 107
(1995). <u>See</u> also <u>Commonwealth v. Kelleher</u>, 395
Mass. 821, 828 (1985) (Liacos, J., concurring)
defects in charge which pertain to elements of
crime are <u>per se</u> extremely prejudicial and should
require a new trial.

The trial court made these critical
mistakes: That the absence of self-defense was
manslaughter, that excessive force in self-
defense was murder, and that the Commonwealth's
burden of proof on manslaughter was greater than
the burden of proof for murder in the second
degree so that no manslaughter verdict could be
returned absent proof beyond a reasonable doubt
that the victim was shot intentionally. These
instructions were never acknowledged as infirm,
and the final faulty instructions shifted the
burden of proof to the defendant on the issue of
mitigation by requiring him to show he had the
intent to inflict an injury likely to cause death
before a manslaughter verdict rather than a
murder verdict could be returned.

First, the trial court's instruction, never
acknowledged as infirm, that the use of force in

18

App.  99

self-defense justifies a verdict of manslaughter, is clearly wrong. After the decision of the United States Supreme Court in <u>Mullaney v. Wilbur</u>, 421 U.S. 684 (1975), the Supreme Judicial Court in <u>Commonwealth v. Rodriguez</u>, 370 Mass. 684 (1976), held that due process requires proof beyond a reasonable doubt that the defendant did not act in self-defense or acquittal, not mitigation, is required. The trial court's instruction thus violates the Fifth and Fourteenth Amendments and Article 12. The fact that elsewhere the trial court instructed that the use of self-defense requires acquittal does not correct the constitutionally infirm instruction because the wrong instruction is never acknowledged as wrong. <u>Commonwealth v. Richards</u>, 384 Mass. 396, 403 (1951). Particular care must be give to curative instructions on the issue of self-defense. <u>Commonwealth v. Ward</u>, 426 Mass. 290, n.5 (1997). Inconsistent self-defense instructions in a self-defense case require a new trial.

Second, the trial court's uncorrected instruction that the use of excessive force in

19

App: 100

self-defense compels a verdict of second-degree murder is clearly erroneous. Excessive force in self-defense is manslaughter. <u>Commonwealth v. Torres</u>, 420 Mass. 491 (1995).

This mistake struck at the heart of the defense and even standing alone requires acquittal. The Commonwealth can argue that the defendant was not entitled to a self-defense instruction at all, but once the trial court agreed to instruct on self-defense and on excessive force, the defendant relied on the trial court's ruling and premised his closing argument on mitigation by excessive force. The jury, like the trial judge, might well have been persuaded by trial counsel that this was an excessive force case, and, following the trial court's erroneous instructions, returned a murder verdict. Justice miscarries when a murder verdict is returned on facts constituting manslaughter.

Third, the trial court's instruction that a voluntary manslaughter verdict required proof beyond a reasonable doubt of an additional element; that the defendant intended a battery

20

likely to cause death, melded and misstated the
law of voluntary and involuntary manslaughter,
shifting the burden of proof on intent to the
defendant before a mitigation verdict could be
returned.    It is involuntary, not voluntary
manslaughter, that requires proof of an
intentional battery Commonwealth v. Sneed, 413
Mass. 387, 394 (1992), Commonwealth v. Catalina,
407 Mass. 779, 784 (1992).   The trial court's
anomalous requirement that the mitigation of
murder to voluntary manslaughter was disallowed
in the absence of proof beyond a reasonable doubt
that the defendant intended a deadly battery thus
violated the defendant's due process protections
under the Fifth and Fourteenth Amendments and
Article 12 and reversal is required as well as
under Francis v. Franklin, 471 U.S. 307 (1985),
Mullaney v. Wilbur, supra, and all their numerous
state and federal progeny.

In sum, the trial court found the defendant
entitled to an instruction on excessive force in
self-defense as mitigating murder to voluntary
manslaughter.   Though an appellate court might
not agree with that judgment, it cannot be

21

App.: **102**

discounted absent an abuse of discretion. A reviewing court, after all, does not attend the view to evaluate the avenue of escape and cannot judge the credibility of the witnesses who falsely deny a violent past, and whose unrecorded dishonest demeanor is trial evidence with as much weight as a transcript. Furthermore, the defendant legitimately relied on a mitigation strategy in crafting his closing and the garbled mitigation instructions given effectively denied him the right to a closing argument.

The Commonwealth can argue that even though the defendant relied on the trial court's promise of a manslaughter instruction in crafting his closing argument, a right guaranteed by both the state and federal constitutions (See Commonwealth v. Triplett, 398 Mass. 561 (1986), citing Herring v. New York, 422 U.S. 853 (1996), the defendant's argument must fail because he made no objection to the faulty instructions. Commonwealth v. Woodward, 427 Mass. 659 (1998) and Commonwealth v. Berry, 47 Mass. App. Ct. 24 (1999) negate that proposition. A defendant cannot control whether the lesser included offense of manslaughter is

**App: 103**

given in a murder case. It follows that he cannot waive it accidentally. Nor can he waive it deliberately; an instruction on manslaughter must be given if any view of the evidence supports it, and a lesser included offense instruction cannot be waived without explicit permission of the defendant himself. Commonwealth v. Garabedian, 399 Mass. 304 (1987), Commonwealth v. Younggebauer, 23 Mass. App. Ct. 46 (1980). No such strategy can be inferred here, when the defendant forcefully and successfully argued a manslaughter instruction should be given.

* * * *

**App. 104**

**App. 33**

# Commonwealth of Massachusetts

Appeals Court for the Commonwealth

At Boston,

In the case no. 01-P-312

_____  COMMONWEALTH _____

*vs.*

_____  LAJUAN MELTON. _____

Pending in the <u>Superior</u> _____

Court for the County of <u>Plymouth</u> _____

    Ordered, that the following entry be made in the docket:

> Judgment affirmed. Order
> denying motion to expand
> record affirmed. Order
> denying motion for a
> reduction in verdict
> affirmed. Order denying
> motion for new trial
> affirmed. Order denying
> motion for
> reconsideration and
> reconstruction of the
> record affirmed.

By the Court,

_____ ,Clerk

*First Assistant*

Date <u>November 6, 2003</u>

NOTE:

The original of the within rescript
will issue in due course, pursuant
to M.R.A.P23

       APPEALS COURT

App. 105

App. 34
COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

01-P-312

COMMONWEALTH

vs.

LAJUAN MELTON.

MEMORANDUM AND ORDER PURSUANT TO RULE 1:28

The jury found the defendant guilty of murder in the second

degree.  He appeals,[1] arguing that the trial court erred in (1)

deciding that the defendant's prior convictions could be admitted

for impeachment purposes, thus chilling his right to testify; (2)

its jury instructions on use of excessive force in self-defense

in a homicide case; and (3) determining that statements the

defendant made were not custodial, thus obviating the need to

provide Miranda warnings.  Miranda v. Arizona, 384 U.S. 436

(1966).  The issues arising out of the denial of his motion for a

new trial[2] are that the trial court erred in (1) concluding that

------------------------

[1] After filing his initial brief in this appeal, the
defendant filed in the trial court a number of postconviction
motions, including a motion for new trial.  His appeal from the
denials of those motions was consolidated with his direct appeal;
we allowed the defendant leave to file an additional brief
pertaining to these matters.

[2] Although he also purported to appeal from the orders
denying "all [motions] ancillary . . . [to his new trial motion]
filed and denied since his conviction," which we take to be his
motions (1) to expand the record; (2) for a reduction in verdict;
and (3) for reconsideration and reconstruction of the record, the
defendant does not address these orders in his briefs.

App: 106

App. 35

newly discovered evidence was inadmissible; (2) ruling that his prior convictions, which at the time still were on appeal, could be used for impeachment purposes; and (3) not giving the jury an instruction concerning the tone of the judge's voice. We affirm.

_Prior convictions_. The defendant contends that his right to testify was chilled because the trial court improperly denied his motion in limine to prevent his prior assault by means of a dangerous weapon convictions from being used for impeachment purposes should he testify. He claims this denial was an "unprecedented abuse of discretion." (Defendant's brief: 12). We do not agree. "[A] defendant's asserted reluctance to testify, because of the likely adverse effect of his impeachment by evidence of his prior conviction, has not commended itself as raising a valid due process challenge." Commonwealth v. Chase, 372 Mass. 736, 751 (1977).

Even if the defendant did testify and the convictions were offered against him, there was no abuse of discretion. The judge carefully considered which convictions he would allow and disallow into evidence for impeachment purposes. After a hearing, he indicated that the defendant's juvenile adjudications and an adult conviction of malicious destruction of property could be admitted, rulings defense counsel acknowledged he could

---

Accordingly, we deem any argument or error related to these additional orders waived. Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

2

App. 36

"live with" and which are not here at issue. (Tr: 3:12, 198-199). The Commonwealth agreed not to seek admission of two firearm charges, and the judge concluded that, because the remaining four assault by means of a dangerous weapon convictions were not substantially similar to the current charge of murder, they could be admitted for impeachment purposes. (Tr. 3: 203). The judge also indicated that had there been a request to sanitize those charges, he would have done so. (S.R.A. 103). Further, the assistant district attorney indicated that he would forego mentioning that the dangerous weapon at issue in the latter four convictions was a gun. (Tr. 3: 201-202). There was no abuse of discretion.[3]

Jury instruction. Even if there were an error in the self-defense instruction given, it was harmless in light of the fact that no such instruction was warranted.[4] "Because there was no

---

[3] The defendant also alleges that since the prior convictions were on appeal, it was improper to use them. First, the ability to raise the issue when the evidence wasn't used, as the defendant did not testify, is questionable. Even were we to reach the substantive issue, the defendant would fare no better. See Commonwealth v. Digiambattista, 59 Mass. App. Ct. 190, 199 (2003). Lastly, we note that his convictions were ultimately upheld on appeal. Commonwealth v. Melton, 436 Mass. 291 (2002).

[4] The defendant and Donald Averett, having heard a rumor that Claudio and Edson Miranda recently shot at a car on Progresso Street, prepared themselves by each having a gun on their person. (Commonwealth's brief: 12, citing Exhibit 20 at 17). On the day they heard the rumor, while standing outside a residence on Warren Avenue, they observed a car driven by Claudio Miranda pass by them going south. A few minutes later the car passed by them again, this time going north. (Tr. 2: 137-148).

3

**App. 108**

App. 37

right to self-defense, a voluntary manslaughter instruction based on the use of excessive force in self-defense was not appropriate either." <u>Commonwealth</u> v. <u>Roberts</u>, 433 Mass. 45, 57 (2000) (internal quotation and editorial marks, citation omitted). See also <u>Commonwealth</u> v. <u>Curtis</u>, 417 Mass. 619, 632-633 (1994).

<u>Statements to police</u>. The police interviewed the defendant, who was incarcerated on an unrelated offense at the Plymouth County House of Correction, as a potential witness, albeit a reluctant one, to the shooting. While not required, out of an abundance of caution he was provided his Miranda warnings. See <u>Commonwealth</u> v. <u>Bookman</u>, 386 Mass. 657, 660-661 (1982). The police returned to him when his story did not pan out. The motion judge determined that the interviews were conducted in a nonaggressive, informal and nonthreatening manner. The defendant agreed each time to meet with the officers and in fact gave them a number of leads, which turned out to be false. At no time did the defendant refuse to be interviewed or request that the dialogue be terminated. (R.A. 26). The police were surprised

---

There was some discussion between Averett and the defendant about who they believed was in the car. Averett declared that the person hanging out of the window looked like Edson and began firing his gun at the car. (Commonwealth's brief: 13, citing Exhibit 20 at 4-6). The defendant fired two shots at the car as it went around the corner, <u>traveling away from the defendant</u>. (Tr. 3: 27-28; Commonwealth's brief: 30, citing Exhibit 20 at 3-4, 24). The victim, Alex Colon, a passenger in the car, was struck by a bullet. There was no evidence that the victim, or anyone else in the car, was armed at the time of the shooting.

4

App. 38

when, in giving another statement, the defendant inculpated himself, at which point the officers stopped the interview and provided the defendant with his Miranda warnings in both oral and written form. He subsequently gave a formal taped statement.

That the defendant was in custody on another matter does not compel the conclusion that he was in custody for Miranda purposes when questioned about the shooting. Commonwealth v. Larkin, 429 Mass. 426, 432-436 (1999); Commonwealth v. Girouard, 436 Mass. 657, 665 (2002). Moreover, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." Miranda v. Arizona, 384 U.S. at 478. See Commonwealth v. Caputo, 439 Mass. 153, 160 (2003).

Lastly, "[o]n review of a motion to suppress, we do not disturb the judge's findings of fact unless they are clearly erroneous . . . and accord deference to the judge's legal conclusions, but independently review the correctness of the judge's application of constitutional principles to the facts found." Commonwealth v. Sicari, 434 Mass. 732, 746-747 (2001), cert. denied, 534 U.S. 1142 (2002) (citations, internal quotation and editorial marks omitted). The trial court's determination that, in view of the totality of the circumstances, the defendant made a knowing, intelligent and voluntary waiver of his rights under Miranda was not error. (R.A. 28). See Commonwealth v. Medeiros, 395 Mass. 336, 345 (1985).

5

App. 110

App. 39

<u>Newly discovered evidence</u>.  "Merely introducing another possible suspect, without substantial admissible evidence that this person, and not the defendant, may have committed the crime[], does not warrant a new trial." <u>Commonwealth</u> v. <u>Lopez</u>, 433 Mass. 406, 416 (2001).  A defendant, moving for a new trial based on a claim of newly discovered evidence, must show that the evidence was unknown and unavailable at the time of trial, and that it is material and credible.  <u>Commonwealth</u> v. <u>Grace</u>, 397 Mass. 303, 305-306 (1986).

Here, the defendant's "new evidence" was neither newly discovered nor credible.  He alleges that after trial he learned for the first time that Emmanuel Carapinha, a cellmate of Edson Miranda, claimed, in an immunity proffer by the U.S. Attorney's office (S.R.A. 108, 117), that Edson told him that he (Edson) had accidently shot the victim from the rear seat of the motor vehicle both were in.

This information was not new.  In his taped confession, wherein the defendant admitted shooting at the car, he also stated his belief that Edson was in it.  Trial counsel established from the medical examiner that the bullet that killed the victim "[c]ould have been fired from somebody in the back seat."  (Tr. 3: 105).  For these reasons, as well as those provided by the judge in his memorandum of decision (S.R.A. 111-112), we agree that there is no new or substantial admissible

6

App. 111

App. 40

evidence that Edson Miranda shot the victim.

   _Voice inflections_.  The defendant faults the trial judge for refusing to give an instruction that the tone of his voice during the charge could not be considered on the issue of guilt or innocence.  We have listened to the tape of the judge's instructions and find no evidence of what the defendant complains.  Additionally, the judge did provide the jury with an appropriate jury instruction.[5]  The allegation of the defendant on this point is baseless and frivolous.

   For these reasons, as well as those essentially advanced by the Commonwealth in its brief at pages eighteen to fifty-three,[6] those cited by the motion judge in his memorandum of decision on the defendant's motion to suppress statements (R.A. 18-29), and those cited by the trial judge in his thorough and thoughtful memorandum of decision and order on the defendant's motion for

---

   [5] "If I have said or done anything to cause you to believe that I have any opinion concerning the facts of this case, then you are mistaken, because I am totally neutral on this issue.  It is your decision, not mine, to determine whether the Commonwealth has met its burden of proving the defendant's guilt."  (Tr. 4: 71-72).

   [6] We note, however, that the correct volume cite for _Commonwealth_ v. _Quinones_, cited on page 43, is 414, not 14, and the correct page cite for _Commonwealth_ v. _Hallet_, cited on page 20, is 552, not 553.

7

App. 112

## App. 41

new trial (S.R.A. 94-113), the defendant's conviction is
affirmed.

>*Judgment affirmed.*
>
>*Order denying motion to expand
>    record affirmed.*
>
>*Order denying motion for a
>    reduction in verdict affirmed.*
>
>*Order denying motion for new
>    trial affirmed.*
>
>*Order denying motion for
>    reconsideration and
>    reconstruction of the record
>    affirmed.*
>
>By the Court (Rapoza, Grasso &
>Kantrowitz, JJ.),
>
>First Assist&    Clerk

Entered: November 6, 2003

8

Excerpt from defendant's application
    for further appellate review               -12-

2003 WL 22517387) and will very likely cause confusion.

### III.

The trial judge instructed, incorrectly, (1) that if Mr. Melton acted with excessive force in self-defense, the jury should "reduce" its verdict from first- to second-degree murder; and (2) that jurors could convict Mr. Melton of voluntary manslaughter only if they found beyond a reasonable doubt that he committed an intentional battery likely to cause death. The verdict of second-degree murder is consistent with, and is best explained by, jurors' having followed the incorrect instructions. The Appeals Court did not address this congruity between error and verdict. Where such a congruity exists, an appellate court can only rarely be "persuaded that [the errors] did not materially influence ... verdict." Commonwealth v. Alphas, 430 Mass. 8, 13 (1999) (internal quotation marks and editorial marks omitted). This Court should clarify that congruity between error and verdict is crucial to any appellate assessment of prejudice.

The trial judge instructed incorrectly that

1. the absence of self-defense reduced a murder verdict to manslaughter (rather than to acquittal) (T4/103) (contrast, e.g., Commonwealth v. Webster, 5 Cush. 295, 303 (1850));

> Note to habeas court: para. 1 should have read: "the Commonwealth's FAILURE TO PROVE absence of self-defense ...."

2. failure to disprove the use of excessive force in self-defense reduced a verdict from first- to second-degree murder (rather than to manslaughter) (T4/113) (contrast, e.g., Commonwealth v. Kendrick, 351 Mass. 203, 211 (1966)); and

3. the jury could not convict Mr. Melton of voluntary manslaughter unless they found that he or Mr. Averett intentionally committed a battery likely to cause death (T4/105-106) (in fact, this is a definition of involuntary manslaughter: see, e.g., Commonwealth v. Catalina, 407 Mass. 779, 783-784 (1990) (summarizing law)).

The Appeals Court concluded that in hindsight, the

evidence did not warrant a self-defense instruction.

Therefore, any error in the self-defense instruction

App. 114

-13-

given could not have been prejudicial.

The Appeals Court's reasoning omits consideration of a crucial fact: in this case the verdict of second-degree murder was consistent with jurors' having believed that (1) Mr. Melton tried to fire into Mr. Colon's car, (2) without intending to commit a lethal battery, (3) in the use of excessive force in self-defense. Jurors with such a view, if they followed instruction # 2, above, would be compelled to return a verdict of second-degree murder rather than the correct verdict: manslaughter. Such jurors would, in addition, feel themselves (erroneously) prohibited from returning a verdict of voluntary manslaughter, because they had heard no evidence that Mr. Melton or Mr. Averett intentionally battered Mr. Colon. See instruction # 3, above.

In this case, moreover, the proposition that jurors followed the erroneous instructions is not only consistent with the verdict, but also serves as the verdict's best explanation. It is hard to see why else jurors would have rejected first-degree murder, on the theory presented by the Commonwealth. According to the Commonwealth, Mr. Melton's "deliberate premeditation" consisted of his chambering a bullet before firing. T3/195, T4/65-68. The jury apparently believed that Mr. Melton tried to fire his gun. Because chambering a bullet is a necessary prerequisite to firing, one can infer that

App.: 115

-14-

the jury also believed that Mr. Melton chambered a bullet, or tried to. It is unlikely, in other words, that the jury rejected first-degree murder and convicted Mr. Melton of second-degree because they disbelieved the factual basis for the Commonwealth's theory of deliberate premeditation.[8] More likely, jurors "reduced" their verdict to second-degree murder in accordance with the judge's instructions.

In this circumstance, where the verdict was consistent with jurors' having followed the erroneous instructions, and where the erroneous instructions provide the best explanation for the verdict, there is a substantial risk that justice miscarried. Stated differently, an appellate court in this circumstance cannot be "persuaded that [the erroneous instructions] did not materially influence the ... verdict." Commonwealth v. Alphas, 430 Mass. 8, 13 (1999) (internal quotation marks and editorial marks omitted) (explicating "substantial risk of a miscarriage of justice" standard).

In closing, a brief note about Mr. Melton's entitlement to an instructions on self-defense. Appellate opinions frequently cite the lack of such entitlement as the reason that an erroneous instruction on self-defense caused no prejudice. See, e.g., Commonwealth v. Toon, 55

_____

[8]The Commonwealth also proceeded on the theory that the murder was cruel and atrocious.

App.   116

# COMMONWEALTH OF MASSACHUSETTS

## SUPREME JUDICIAL COURT FOR THE COMMONWEALTH

O R D E R

It is hereby Ordered, that the following Application for Further Appellate Review be denied:

FAR-13816

**COMMONWEALTH**
vs.
**LAJUAN MELTON**

Plymouth Superior (Brockton) No. 100934
A.C. No. 2001-P-0312

By the Court,

*Susan Mellen*

Susan Mellen, Clerk

ENTERED:   January 29, 2004

<b>App. 117</b>

**Excerpt from defendant's petition to
reconsider the denial of his application
for further appellate review**                    - 4 -

**POINT WITH RESPECT TO WHICH
FURTHER APPELLATE REVIEW IS SOUGHT**

       The trial court agreed to instruct on
self-defense and voluntary manslaughter (based
on the use of excessive force in self-
defense), and trial counsel, relying on the
judge's promise, focused his closing argument
on those theories.  The three significant
instructional errors that followed undermined
counsel's argument so significantly as to have
violated Mr. Melton's state and federal rights
to closing argument by counsel.

**WHY FURTHER APPELLATE REVIEW IS APPROPRIATE**

The trial judge instructed incorrectly that

1. the Commonwealth's failure to prove absence of
   self-defense would reduce a murder verdict to
   voluntary manslaughter (rather than to acquittal)
   (T4/103 (reproduced below at App.14));

2. the Commonwealth's failure to disprove the use of
   excessive force in self-defense would reduce a
   verdict from first- to second-degree murder (rather
   than to voluntary manslaughter) (T4/113 (below, at
   App.18)) (contrast, e.g., <u>Commonwealth</u> v. <u>Kendrick</u>,
   351 Mass. 203, 211 (1966)); and

3. the jury could not convict Mr. Melton of the
   lesser-included offense of voluntary manslaughter
   unless they found that he or Mr. Averett had
   "intentionally inflicted an injury or injuries
   likely to cause death upon the deceased which
   caused his death" (T4/105-106 (below, at App.15-
   16)).  (In fact, this was closer to the definition
   of <u>involuntary</u> manslaughter:   see, e.g.,
   <u>Commonwealth</u> v. <u>Catalina</u>, 407 Mass. 779, 783-784
   (1990) (summarizing law)).

In affirming the conviction and denial of the new-

App. 118

- 5 -

trial motion, the Appeals Court agreed with the motion judge that in hindsight, the evidence did not warrant instructions on self-defense or on the use of excessive force.  App. 19 (motion judge), 36-37 (Appeals Court). Therefore, the Appeals Court opined, an error in those instructions could not have been prejudicial.  App.36-37.

The Appeals Court's analysis misses the point.  As Mr. Melton had argued in his Appeals Court brief (see excerpt, below, at App. 21-32, & esp. at 31), once the judge had agreed to instruct on the theories, counsel relied upon them in closing argument.  The judge's serious errors in defining the theories nullified central points of counsel's argument, implicitly instructing jurors that Mr. Melton's claimed defense was illegitimate.

In Herring v. New York, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (discussed in defendant's Appeals Court brief, below, at App.31) (followed in Commonwealth v. Triplett, 398 Mass. 561, 568-569 (1986) (discussed in Mr. Melton's Appeals Court brief, below, at App.31); Commonwealth v. Cutty, 47 Mass. App. Ct. 671, 674-675 (1999); Commonwealth v. Miranda, 22 Mass. App. Ct. 10, 12 1986)), the U.S. Supreme Court confirmed that a defendant's Sixth Amendment right (made applicable to the

App.  119

- 6 -

States by the Fourteenth Amendment) to the effective
assistance of counsel included the right to have counsel
make a closing argument:

> The very premise of our adversary system of
> criminal justice is that partisan advocacy on both
> sides of a case will best promote the ultimate
> objective that the guilty be convicted and the
> innocent go free. In a criminal trial, which is in
> the end basically a factfinding process, no aspect
> of such advocacy could be more important than the
> opportunity finally to marshal the evidence for
> each side before submission of the case to
> judgment.[4]

Thus, a New York statute giving a judge at a bench trial
the discretion to prohibit closing argument violated the
Sixth Amendment.[5]

This and other courts interpreting _Herring_ have
recognized that not only the total denial, but also the
undue restriction on or incompetent handling of closing
argument can also violate a defendant's Sixth Amendment
right.  See, e.g., _Triplett_, 398 Mass. at 568-569
(counsel's ineffective arguments in closing "eroded any
theory of voluntary manslaughter" and "left the client
denuded of a defense" (internal quotation marks omitted);
citing _Herring_ for the right to make closing argument);
_United States_ v. _Miguel_, 338 F.3d 995, 997, 999, 1002
(9th Cir. 2003) (judge's decision, after argument began,

---

[4] _Herring_, 422 U.S. at 862.

App.  120

- 7 -

to preclude counsel from arguing theory of defense and to instruct jury that defense theory was unsupported by evidence, was structural error); <u>United States</u> v. <u>Grabiec</u>, 96 F.3d 549, 551-552 (1st Cir. 1996) (although judge's restriction on argument not "plain error" under <u>Herring</u>, court did not challenge appellant's premise: that in an appropriate circumstance, restriction could violate <u>Herring</u>).

In Mr. Melton's case, counsel argued two points in closing:  first, that the Commonwealth had not proven beyond a reasonable doubt the existence of an agreement between Mr. Melton and Mr. Averett, as required for a joint venture; and second, that Mr. Melton and Mr. Averett had fired in self-defense (or that, in firing, they had used excessive force in self-defense).  On the self-defense claim, counsel's theory was that Claudio Miranda (the man driving the car in which Mr. Colon was a passenger) was not an innocent passerby:  rather, he and his friends had driven down Warren Street looking for Mr. Melton and Mr. Averett, whom they considered enemies:

> And I got to keep going back to this, do you really think it's a coincidence that [in] that car happens to be Cardi [Claudio Miranda, who testified against Mr. Melton] and maybe Edson Miranda?  Do you really think -- and Cardi says to you, I didn't

---

[5] <u>Herring</u>, 422 U.S. at 865.

App.    121

- 8 -

know where I was going or who I was going with,
yet, at the EMT [i.e., when they got to the
hospital,] the way [Cardi said that] they were
going to [']kill the niggers[']? Well, how did he
know the [']niggers['] did it? If he didn't see
anybody, he wasn't looking for anybody, and he
don't know what happened, how in God's name did he
say, [']We're going to kill the niggers[']? How
did he know? Because that's why they were there in
the first place. That's [a] pretty good indication
of why they were there in the first place, they
were looking. They knew where they were going to
find them, and they were looking for them.
    [¶]
    Why? How do I know why? You're never going
to know why, because I don't think anybody can make
any intelligent sense of why they're out there, but
they're out there. Maybe over something as stupid
as a girl, maybe over a question of turf, I'm in
the North Side Stars [a gang], you stay in Campello
where you belong. You've got evidence that that
same car, maybe the same people, are involved in a
shooting earlier that day up at the Progresso
Market. Things that these guys are all aware of
that that Cardi and that car were a dangerous
instrumentality flying around this city looking for
trouble, and they found it at this particular
location.[6]

Following arguments, the jury heard instructions

that flew in the face of counsel's suggested theory.

Contrary to counsel's claims, the judge instructed, the

Commonwealth's failure to disprove self-defense would not

require acquittal, but a verdict of manslaughter, and

failure to disprove excessive force would not reduce a

verdict to manslaughter, but to second-degree murder (the

verdict which jurors ultimately returned). Further, the

---

[6] T4/54-56 (App.6-8).

App.    122

- 9 -

judge made return of a manslaughter verdict far less likely with his incorrect instruction that such a verdict was permissible only if jurors found that Mr. Melton had intentionally battered Mr. Colon in a manner likely to cause death.  Such an instruction made it impossible for jurors considering a murder verdict based on third-prong malice (which requires no intent to batter) to reduce such a murder verdict to manslaughter.

This Court may agree with the motion judge and the Appeals Court that the evidence was not sufficient in the first place to require instructions on self-defense or the use of excessive force in self-defense. Nonetheless, what happened here was unacceptable:  the judge decided to give the instructions, counsel argued accordingly, and the judge proceeded to contradict counsel's argument. The erroneous instructions, like counsel's argument in Triplett, supra, implicitly "eroded [Mr. Melton's] theory" of defense, in violation of his Sixth and Fourteenth Amendment rights to have counsel make closing argument on his behalf.

This Court is currently considering an identical argument in Commonwealth v. Donovan Walker (see excerpt from Mr. Walker's brief, below, at App.46-50).  Mr. Melton respectfully asks the Court to consider its

App.   123

- 10 -

implications for his case as well.

## CONCLUSION

Mr. Melton asks the Court to reconsider the denial

of his application for further appellate review, and to

grant him such review.

Respectfully submitted,

LAJUAN MELTON,

By his attorney,

_____

ANNE E. GOWEN
BBO # 630486
64 Princeton-Hightstown Rd., # 127
Princeton Junction, NJ 08550
Tel. 609.919.0381
Fax 202.478.5203
aegowen@comcast.net

Dated:    December 17, 2004.