UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LAJUAN MELTON,<br>  Petitioner,<br><br>v.<br><br>LOIS RUSSO,<br>  Respondent. | )<br>)<br>)<br>)<br>)   Civil Action No. 05-10905-GAO<br>)<br>)<br>)<br>) |

MEMORANDUM OF THE RESPONDENTS
IN SUPPORT OF MOTION TO DISMISS

The respondent, Lois Russo, respectfully submits this memorandum of law in support of her motion to dismiss the petition for a writ of habeas corpus filed by the petitioner, Lajuan Melton, pursuant to 28 U.S.C. § 2254. As discussed more fully below, Melton failed to exhaust state remedies on the two claims raised in his habeas petition. Consequently, the petition should be dismissed. <u>Rose v. Lundy</u>, 455 U.S. 509, 522 (1982).

PRIOR PROCEEDINGS

The petitioner was convicted of second degree murder on September 30, 1999 by a Plymouth County jury and sentenced to life imprisonment. He appealed and filed his appellate brief in June, 2001, claiming error in (1) a ruling that would have allowed four prior convictions to be used against him if he chose to testify; (2) the instruction on excessive force in self-defense; and (3) the denial of a motion to suppress. (Exh. 1). [1]

---

[1] The respondent is submitting relevant documents from the petitioner's state court appeal which will be cited by Exhibit No. and page as (Exh. 1 at 1). The facts in this section are drawn from the Brief and Appendix of the Commonwealth, Exh. 3 at 2-4).

2

On August 13, 2001, the petitioner filed a motion for new trial, claiming error in (1) the ruling that would have allowed four prior convictions to be used against him if he chose to testify and (2) supposed bias in the judge's voice inflection while delivering the charge.

In October, 2001, the petitioner filed a motion to reduce the verdict from murder to manslaughter. In mid-October, 2001, he filed an amendment to the new trial motion and the motion to reduce the verdict. He added the claim (3) that supposed newly discovered evidence showed that someone else, Edson Miranda, killed the victim. After a hearing the petitioner's motions were denied by the trial judge, Connolly, J., in a written decision on June 14, 2002. The petitioner's motion to reconsider was denied and the petitioner appealed. In September, 2002, the petitioner filed a supplemental appellate brief. (Exh. 2)

The Massachusetts Appeals Court issued a Memorandum and Order Pursuant to Rule 1:28 on November 6, 2003, affirming the judgment of conviction and the orders denying the petitioner's motions for a new trial and for a reduction of the verdict. <u>Commonwealth v. Melton</u>, 59 Mass. App. Ct. 1111, 798 N.E. 2d 585 (Table)(2003)(Unpublished disposition)(Exh. 4). The petitioner applied for leave to obtain further appellate review (ALOFAR) which was denied on January 29, 2004. <u>Commonwealth v. Melton</u>, 441 Mass. 1102, 803 N.E. 2d 332 (Table)(2004)(Exh. 5).

STATEMENT OF FACTS [2]

1.  <u>The Motion to Suppress</u>.

State Police officers investigating the drive-by shooting death of Alexander Colon

---

[2] The Statement of Facts is derived from the Brief and Appendix For the Commonwealth, Exh. 3 at 4-16. Transcript and other citations have been omitted.

3

learned that the petitioner "typically hung around in the neighborhood of the shooting and that he might have some information as to the shooter(s)."

At the time, the petitioner was held at the Plymouth County House of Correction on unrelated charges. There were several interviews. The tone was never hostile, threatening, or accusatory. (Judge's Finding: "The interview atmosphere was non-coercive and would not have indicated to a reasonable person that he was compelled to remain in the interview room and answer questions .... The petitioner agreed each time to meet with the Troopers and elected to give them various 'leads' which turned out to be false. At no time did the petitioner refuse to be interviewed or request to terminate the dialogue"). The petitioner met with the Troopers in a private room, about twelve by twenty feet in size.

The first time that State Police went to the jail to interview the petitioner was on April 6, 1998. Troopers Paul L'Italien and Joseph Mason "identified themselves to the petitioner and told him the purpose of their visit." The petitioner was given <u>Miranda</u> warnings, which he waived in writing. The petitioner said he was in the area at the time of the shooting, identified the shooter as "Danny T," and said Danny T. went to a particular house after the shooting. The Troopers followed up this information and determined that it was inaccurate.

In the course of further investigation, the Troopers interviewed a woman named Sears and showed her a photographic array. "She identified the petitioner's photograph as looking like someone who was present at the scene with a gun before the shooting occurred."

4

On April 8, 1998, the Troopers interviewed the petitioner again at the jail. They told the petitioner that the information on "Danny T." was inaccurate and asked him to look through a book of photographs. The petitioner picked out and identified Antonio Texeira as the shooter.

The Troopers learned that Texeira was incarcerated at the time of the shooting. They returned to the jail and spoke with the petitioner once again. This time, the petitioner gave them the name of one "Carroll." Carroll's alibi checked out.

On April 10, 1998, Trooper Mason, accompanied by Lieutenant Michael Crisp, returned to the jail to speak with the petitioner. They explained that the information about Texeira and Carroll was false, that they knew the petitioner was lying, and they urged the petitioner to "come clean."  "Lieutenant Crisp told the petitioner that he would rather the petitioner said nothing than provide them with time wasting false leads." The petitioner admitted misleading them and said his friend, Donald Averett, was the shooter -- "he did not want to give up his friend."

Lieutenant Crisp questioned, given the false leads, why they should believe the petitioner now. The petitioner said Averett was arrested on April 9 (the night before) and "a Glock nine millimeter handgun was found nearby." The Troopers contacted the Brockton police and verified that the information was true. They returned to the interview room and spoke to the petitioner again. The petitioner insisted that Averett shot Colon. "Then, more or less unexpectedly, the petitioner stated that he 'fired a couple of shots as the car went around the corner.'" The Troopers had never indicated that they believed the petitioner was the shooter, or that he would be arrested for the incident.

(Judge's Finding: "The questioning, in my view, would not have suggested to a reasonable person in the petitioner's position that he had become a suspect in a criminal investigation").

"They were surprised by this sudden confession. It was "spontaneous." The Troopers stopped the petitioner and provided him with his <u>Miranda</u> rights, which he waived in writing before confessing in more detail.

On April 11, 1998, police returned to the jail. After the petitioner waived his <u>Miranda</u> rights once again in writing, they interviewed him on tape.

2.   <u>The Commonwealth's Case at Trial</u>.

On March 31, 1998, the petitioner and Donald Averett were outside at 918 Warren Avenue in Brockton. Exhibit 20 (transcript of the petitioner 's taped confession) at 6-8. It was a beautiful day with temperatures close to ninety degrees.

At about 6:30 P.M., Claudio Miranda drove his sister's two-door black Honda Civic south on Warren Avenue passing number 918. Alexander Colon was in the front passenger seat and two unidentified men sat in the back seat.

Miranda turned around on some side streets and then drove north on Warren Avenue, passing number 918 for a second time. The music in the car was turned up loud, but Miranda heard gunshots. He turned left onto Nilsson Street and turned down the radio. Alexander Colon said he was shot. Miranda brought him to Brockton Hospital.

Paramedic Heather Hartford was arriving at the hospital driving an ambulance. The black Honda swerved to get by her, pulled around, and stopped in her path. Two young Hispanic males pulled the victim from the car. He appeared lifeless and the men said

6

he had been shot. The victim's pulse was weak. One of the Hispanic men straddled the victim yelling over and over, "Don't die, man, you can't, if you die ... I'm going to get those n------s."

Miranda left the victim with the paramedics and departed. He thought the victim would be all right. In addition, there was a warrant out for one of the two men in the backseat. Miranda dropped the two men off on Track Street in Brockton.

The back window of the Honda was half shot out. Miranda took the car to Central Glass in Brockton to be repaired. He went to the hospital that night and learned that the victim died.

The victim was nineteen years old. He sustained a gunshot wound to his upper left mid-back. The bullet fractured his first left rib in the back and lacerated two major blood vessels to the left lung. He lost a significant quantity of blood. Despite extensive surgical intervention, the victim died of his injuries the next day, April 1, 1998. The entrance wound was "atypical" meaning that it was irregular -- the result of a tumbling bullet that hit and or went through another object, ricocheting before striking the victim. There was no exit wound.

Central Glass contacted the police after observing a bloodstain on the front passenger side seat of the car and a rag placed over the blood. After police obtained a search warrant, ballistics evidence was obtained from the vehicle. There were several bullet holes in the vehicle. Two projectiles were recovered from it, one from the driver's seat and tether from the headliner or visor. A badly mangled bullet was recovered from the victim's body. All of the projectiles were fired from a .380 caliber semi-automatic pistol.

7

Trooper Paul L'Italien and Brockton Detective Mark-Reardon located four shell casings from a .380 on the ground about two feet from the doorstep of 918 Warren Avenue. They were all from the same gun. A .380 casing can be used in a 9-millimeter gun.

Evidence of the circumstances of the petitioner's statements to police on April 3, 8 and 10, 1998, from the motion to suppress is substantially the same as that presented at trial.

On April 10, 1998, when Troopers spoke to the petitioner for a third time the petitioner admitted, "I shot too." The petitioner was given his Miranda warnings and waived them both verbally and in writing. He said he was at the scene with Averett. Averett had a .380, and he had a 9-millimeter. They saw the Honda drive by. Claudio Miranda and Edson Miranda were in it. The car returned five to ten minutes later. The petitioner said he saw Edson Miranda stick his head out the window. Averett started shooting. The back window blew out. At that point, as the car took the corner, the petitioner shot as well. He and Averett then fled and ditched the guns.

On April 11, 1998, the petitioner gave a more extensive statement to Trooper Paul L'Italien and Brockton Detective Mark Reardon. The statement was tape recorded and played for the jury. A transcript was entered into evidence.

After waiving his Miranda rights once again, the petitioner gave the following statement. Donald Averett was standing on the grass near the stairs to a porch at a light blue house on Warren Avenue. The petitioner was at the top of the stairs. Both had guns. Averett's was a .380. The petitioner had a Glock 9 millimeter tucked in his waist. He obtained the gun earlier in the day because he had heard a rumor that Claudio Miranda

8

also known as "Cardi" and Edson Miranda shot at a Honda Accord on Progresso Street.

The petitioner said a car driven by "Cardi" went by going south. There were five or six people in the car. Five or ten minutes later, the car came back going north on Warren Avenue. The petitioner loaded a bullet into the chamber as the car drove up. (chambering loads the weapon so it is "ready to be fired simply by pulling the trigger").

Averett said, "Is that the car." The petitioner replied that he did not know. Averett said, "It looks like Edson though hanging out the window." Averett said, "Fuck it." He and the petitioner "put up" and started shooting. Averett fired about three times and shot out the back window. The petitioner pulled out the "9" and shot twice. Averett was still shooting after he stopped.

The petitioner said he did not know if he hit anything -- "I probably hit the building I don't know." After he fired, he saw the car turn left on Nilsson Street. The petitioner and Averett ran away and stashed the guns. Afterwards, the petitioner returned to the scene and saw glass in the middle of the intersection. At the end of the interview, the petitioner once again confirmed that he voluntarily waived his rights.

Police examined nearby Bud's Variety and the Vega Club. There was no evidence that either building was hit by a bullet.

3.    <u>The Petitioner's Case</u>.

The petitioner did not testify; he relied on cross-examination of the Commonwealth's witnesses. On cross-examination, Miranda denied any confrontations or bad blood between himself and the petitioner. He also maintained that Edson Miranda was not in the car that night.

9

In his statement to police, the petitioner said he believed there would be a shooting because of a prior altercation with the people in the car. The earlier shooting was unrelated however. The petitioner had not been there.

The petitioner argued that there was no evidence that the bullet came from his gun, he blamed Averett alone for the killing, and argued there was no joint venture. He emphasized that he had told police he had no prior discussions with Averett and brought out in cross-examination that he said he had hit a building.

The medical examiner had no opinion on the range from which the bullet was fired; it could have come from the backseat.

4.    The "Newly Discovered" Evidence Claim.

In his new trial motion, the petitioner asserted the following evidence was newly discovered. One Emmanuel Carapinha, as part of a proffer for immunity from prosecution made to the U.S. Attorney's Office in Boston, claimed:

> "[He] was arrested in Brockton and sent to the Plymouth County House of Correction where he was placed in a cell with Edson Miranda. He said that during their stay together, a lawyer had come to see Miranda. He said that when Miranda returned to the cell, he told Carapinha that the lawyer was representing Luan Melton who was convicted for the murder of Colon. He reportedly told Carapinha that the lawyer said he knew that Miranda had shot Colon through the seat of the car and that the shooting was an accident. The lawyer wanted Miranda to come forward and testify to that. The lawyer reportedly told Miranda that he would not get in trouble because it was an accident."

> "Carapinha stated that during further conversation with Miranda, Miranda admitted to him that he shot Colon through the seat by accident. He reportedly told Carapinha that he lied to the lawyer, telling him it did not happen. He further told Carapinha that he was not going to admit to the shooting.

10

The lawyer mentioned above was appellate counsel on this case.

Edson Miranda was interviewed by State Police and adamantly denied any involvement. He repeatedly labeled the insinuation "bullshit" and accused the petitioner of "spreading 'shit' around the jail about him" -- "Dude's trying to put my name in the mix. It's all a lie." Miranda said a "lady attorney" came to the jail and "tried to lay this 'bullshit' on him, telling him that if he said he accidentally shot Colon he wouldn't do much time and would help out Melton."

Miranda also told the State Police that the petitioner sent him a note trying to get him to "take the rap for accidentally shooting Colon so that Melton could beat the murder rap on appeal." Miranda said he knew what had happened the night of the murder, and no one in the car had a gun.

## ARGUMENT

**THE PETITION SHOULD BE DISMISSED BECAUSE GROUNDS ONE AND TWO ARE UNEXHAUSTED.**

A. Standard of Review

It is well settled that "a federal court will not entertain an application for habeas relief unless the petitioner first has fully exhausted his state remedies in respect to each and every claim contained within the application." Adelson v. DiPaola, 131 F.3d 259, 261 (1st Cir. 1997) (citing Rose v. Lundy, 455 U.S. 509, 518-19 (1982)). See also Picard v. Connor, 404 U.S. 270, 276 (1971); 28 U.S.C. § 2254(b)(1)-(2). In addition to ensuring that state courts have the first opportunity to correct their own federal constitutional errors, the exhaustion requirement enables federal courts to accord appropriate respect to the

11

sovereignty of the states and thus promotes comity by "minimiz[ing] friction between our federal and state systems of justice...." Duckworth v. Serrano, 454 U.S. 1, 3 (1981). See also Rose, 455 U.S. at 518 (reiterating importance of exhaustion doctrine). The federal nature of the claims must have been presented within the four corners of the Application for Further Appellate Review in the Supreme Judicial Court (ALOFAR). Mele v. Fitchburg Dist. Court, 850 F.2d 817, 823 (1st Cir. 1988).

Consequently, before filing an application for habeas corpus relief in federal court, the petitioner must have first presented the substance of each of his federal habeas claims to the state's highest tribunal. O'Sullivan v. Boerckel, 526 U.S. 838, 847 (1999); Gagne v. Fair, 835 F.2d 6, 7 (1st Cir. 1987); Mele, 850 F.2d at 819. This means that the petitioner must have submitted both the predicate facts and the federal legal theories to the state's highest court. Gagne, 835 F.2d at 7; Mele, 850 F.2d at 819-20.

Moreover, *every* claim must have been exhausted. Rose, 455 U.S. at 522; O'Sullivan, 526 U.S. at 848. If a petition is "mixed" – that is, contains both exhausted and unexhausted claims – it must be dismissed.[2] Rose, 455 U.S. at 522; Adelson, 131 F.3d at 261-62; Martens v. Shannon, 836 F.2d 715, 717-18 (1st Cir. 1988). Finally, a habeas petitioner

---

[2] Prior to enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), failure to exhaust all claims in state court required dismissal of the entire petition.  Under AEDPA, a court confronted with unexhausted claims may, in its discretion, either dismiss the entire petition as unexhausted or deny (but not grant) the petition on the merits. See 28 U.S.C. § 2254(b)(1)-(2) ("[a]n application for a writ of habeas corpus may be *denied* on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State") (emphasis added). Thus, the Court may deny the entire petition, but may not dismiss the unexhausted claims and then grant the petition on the basis of Josselyn's remaining claims. Id.; O'Sullivan, 526 U.S. at 842-48 (affirming dismissal of petition containing unexhausted claims).

12

"bears a heavy burden to show that he fairly and recognizably presented to the state courts the factual and legal bases of [his] federal claim." <u>Adelson</u>, 131 F.3d at 262. Melton cannot meet that burden here.

A.   Melton Tendered Ground One to the SJC Purely as an Error of State Law.

In Ground One the petitioner claims that by instructing incorrectly on (a) the relationship between self-defense and murder (b) the relationship of excessive force in self-defense and murder and (c) the definition of voluntary manslaughter, the trial court undermined defense counsel's closing argument so significantly as to have violated defendant's Sixth Amendment right to present closing argument (<u>Herring v. New York</u>, 422 U.S. 853 (1996). (Petition, p. 6, ¶ 12A).

This claim as explicated in the Petition was never presented to the SJC. In his ALOFAR to the SJC the petitioner did contend that the trial judge had instructed incorrectly under Massachusetts law. However, there was no mention in the ALOFAR of any lurking federal constitutional issue. (Exh. 5 at 12-15). As a reading of the ALOFAR readily attests, there is no citation to any federal constitutional amendment or precedent, much less a reasoned argument of the newly minted issue propounded in Ground One . In the ALOFAR, the petitioner stressed that the allegedly erroneous instructions did not comply with several Massachusetts cases. It cited only one precedent, <u>Commonwealth v. Alphas</u>, 430 Mass. 8, 13 (1999), in which the SJC explained the standard of review  it would apply for unpreserved trial errors in cases other than capital cases on direct appeal, the so-called <u>Freeman</u> "substantial risk of a miscarriage of justice" standard. (Exh. 5 at 14). Since the petitioner did not object to the jury instruction, he was attempting to convince the

13

SJC that the trial judge's error had influenced the verdict and that justice had miscarried. (Exh. 5 at 14). This citation to the SJC's own view of its standard is the only precedent mentioned in the claim attacking the trial judge's instructions. The petitioner did not cite to any constitutional authorities, advance any constitutional theories, make any constitutional analogies or do anything else to "fairly and recognizably present[] to the state courts ... the legal bases of [a] federal claim." Adelson, 131 F.2d at 262. There was no mention of a federal right abridged nor any indication to the SJC that they were considering a federal constitutional issue, much less a Sixth Amendment right to present a closing argument claim. The petitioner was never denied the right to a closing argument and there was never any mention of the Sixth Amendment of the United States Constitution in any of the petitioner's briefs to the Appeals Court or the SJC. (Exhs. 1, 2, 5).[3] The petitioner's ALOFAR did not include any constitutional analysis or contain any of the "trappings" generally associated with a federal claim, such as

> specific constitutional language, constitutional citation, appropriate federal precedent, substantive constitutional analogy, argument with no masking state-law character and the like – [that] would in all likelihood alert a reasonable jurist to the existence of a federal question.

---

[3] In his Brief to the Appeals Court, Exh. 1 at 22, the petitioner did cite inferentially Herring v. New York, 422 U.S. 853 (1996) but this passing reference did not rise to the level of appellate argument and may have been deemed waived by the Appeals Court. See Mass. R. App. P. 16 (a)(4). Moreover, the petitioner did not explain the significance of the case or how it supported his argument now made on habeas corpus review that his Sixth Amendment rights had been abridge. In any event both the Supreme Court and the First Circuit have ruled that the petitioner must present his federal constitutional claim fully and fairly in the ALOFAR before the state's highest court which has no obligation to look beyond the four corners of the application to find and decide a federal constitutional issue. See Baldwin v. Reese, 541 U.S. 27 (2004) and Mele, 850 F.2d at 819-20.

14

Nadworny v. Fair, 872 F.2d 1093, 1101 (1st Cir. 1989).

In short, Melton pressed his erroneous jury instruction claim to the SJC solely as a matter of state law, with reliance only state-law cases and principles. This issue is unexhausted and the petition must be dismissed.

B.    Melton Abandoned Ground Two When He Went Before the SJC.

In Ground Two of his Petition, Melton alleges that, "[i]n support of his new trial motion, he presented evidence that after trial a backseat passenger in the victim's car had confessed that it was he, not the [petitioner]'s friend, who had lethally shot the victim." Petition, p. 7, ¶ 12B. The petitioner contends that "[t]his was evidence that at least one occupant of the victim's car had been armed; as such it bolstered [petitioner]'s claim to have acted in self-defense or with excessive force in self-defense. The trial judge's refusal to grant a new trial at which [petitioner] could present the new evidence violated federal due process rights and equal protection rights guaranteed by the Fourteenth Amendment of the US Constitution. Chambers v. Misssisippi, 410 U.S. 284 (1973). " (Petition, p. 7,¶ 12B).

As he acknowledged in his Petition, Melton never proffered Ground Two to the SJC in his ALOFAR. (Petition, p. 8, ¶ (b). [4] While he did raise this complaint in the Appeals

---

[4] The petitioner's sought further appellate review on three issues:
(1) does Article 12 of the Declaration of Rights prohibit admission of prior Massachusetts convictions whose constitutionality has not been affirmed by an appellate court;
(2) was Melton required under Massachusetts cases to testify in order to preserve an appellate objection to the trial court's ruling that he could be impeached with four prior convictions if he testified;
(3) the trial judge instructed incorrectly (a) that if Melton acted with excessive force in self-defense the jury should reduce its verdict from first to second degree murder and (b)

15

Court, he dropped the claim when he went before the SJC. (See Exh. 5 at 5). The petitioner concedes that he did not include the issue but asserts that Ground Two was fairly presented because the SJC requested copies of the briefs and transcripts of the parties that had been submitted to the Appeals Court. (Petition, p. 7, ¶ (b). The petitioner apparently assumes that the SJC somehow intuited that the newly discovered evidence claim was before them and then reviewed and rejected the claim on the merits. This assertion, besides being totally speculative, is absurd and violates the primary rule of appellate practice that issues not raised are deemed waived. Moreover its acceptance would eviscerate the "full and fair presentation" requirement of the exhaustion of state remedies mandate.

More importantly the Supreme Court and the First Circuit have rejected similar claims that sought to convince a habeas court that an issue had been fully and fairly presented to the state's highest court even though the claim was never included in the petition. In <u>Baldwin v. Reese</u>, 541 U. S. 27, 30 (2004), the Supreme Court held that a habeas petition does not fairly present a federal constitutional claim to a state court if that court must read beyond the petition or ALOFAR. Oregon law, like Massachusetts law, instructs litigants seeking discretionary review to identify clearly in the ALOFAR itself the legal questions presented, a short statement of relevant facts, and the reasons for further

---

that jurors could convict Melton of voluntary manslaughter only if they found beyond a reasonable doubt that he( or his co-venturer) intentionally committed a battery likely to cause death. The jury's rejection of first degree murder and conviction of second degree murder is consistent with, and is reasonably explained by jurors' having followed the incorrect instructions. The Appeals Curt did not address this congruity between error and verdict. Given such a congruity how can an appellate court ever be persuaded that the errors did not materially influence the guilty verdict. <u>Commonwealth v. Alphas</u>, 430 Mass. 89, 13 (1999). (Exh. 5 at 5).

16

appellate review including appropriate authorities. Id. at 30. Like the petitioner in Baldwin, Melton failed to comply with these requirements. See Mass. R. App. P. 17.1.

In Mele, the habeas petition contained arguments that the petitioner had presented to the Appeals Court, but which he had not included in his ALOFAR to the SJC. Mele, 850 F. 2d at 818-19. The First Circuit held that the petitioner had not properly exhausted his state-court remedies:

> It is not enough merely to raise an issue before an intermediate court; one who seeks to invoke the federal habeas power must fairly present – or do his best to present – the issue to the state's highest tribunal.

Id. at 820.

That holding applies here with full force. Melton pressed the complaint in the Appeals Court, but abandoned the issue when he went before the SJC. As a result, he failed to properly exhaust his state-court remedies. Id. See also Barresi v. Maloney, 296 F.3d 48, 52 at n.1 (1st Cir. 2002) (claim which is squarely raised in an intermediate state court but then abandoned on appeal to the state's highest court is not properly exhausted); O'Sullivan, 526 U.S. at 848 (habeas petition included claims that had been asserted in the appellate court but not the Illinois Supreme Court; claims therefore were not properly exhausted; dismissal of petition affirmed).

The petitioner never indicated to the SJC in his ALOFAR that he was dissatisfied with the Appeals Court's treatment of Ground Two. He never requested further review of the claim by the SJC. The receipt of briefs and transcripts does not magically insert Ground Two into the ALOFAR or bring this particular claim to the attention of the SJC or substitute for reasoned argument as to why further review is appropriate on a particular

17

issue.  Moreover, the petitioner raised six claims in his two briefs to the Appeals Court which were submitted to the SJC.  By this argument all six claims would be deemed fairly presented just because they were contained in material given to the SJC even though the petitioner only included two claims in his ALOFAR.  "Unless the ALOFAR purports to question a ruling below, the SJC has little reason to suspect the presence of an issue ripe for consideration."  Mele, 850 F. 2d at 821.   If the petitioner did not assign error to a ruling on an issue, the SJC was fully justified in assuming that he had no quarrel with the Appeals Court's disposition of it.  Id at 821-822.  The SJC was not required "to scour the whole of the record below for potential error beyond that called to the court's attention by the applicant."Id. at 822.  Ground Two was never included within the four corners of Melton's ALOFAR as the First Circuit has held and his petition therefore is unexhausted.  It should be dismissed. See Mele, 850 F.2d at 819-20; O'Sullivan, 526 U.S. at 848.

## CONCLUSION

For the above-stated reasons the petition should be dismissed.

Respectfully submitted,

THOMAS F. REILLY
ATTORNEY GENERAL
/s/ Annette C. Benedetto
Annette C. Benedetto
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200
BBO No. 037060

18

## CERTIFICATE OF SERVICE

      I hereby certify that a true copy of the above document was served upon the petitioner's counsel by first class mail, postage prepaid and by electronic filing January 10, 2006.

**Anne E. Gowan**
**64 Princeton-Highstown Rd**
**# 127**
**Princeton Junction, NJ 08550**

                                                     /s/ Annette C. Benedetto
                                                    Annette C. Benedetto
                                                    Assistant Attorney General
                                                    Criminal Bureau